Nick Brustin (NY Bar 284405)
Anna Benvenutti Hoffmann (NY Bar 4412011)
Richard Sawyer (NY Bar 5237854)
Kate Fetrow (NY Bar 5601141)
***Pro Hac Vice Applications Forthcoming***
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081 Phone • 212-965-9084 Fax
nick@nsbcivilrights.com
anna@nsbcivilrights.com
rick@nsbcivilrights.com
katef@nsbcivilrights.com
Lara Bazelon (CA Bar 218501)
2139 Fulton Street, Suite 211
San Francisco, California 94117
415-422-6202 (Phone)
lbazelon@usfca.edu

***Attorneys for Plaintiff Lionel Rubalcava***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Lionel Rubalcava, an individual, | ) |
| Plaintiff, | ) Civil Action No. |
| v. | ) **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| City of San Jose, County of Santa Clara, Joseph Perez, Rafael Nieves, Ramon Avalos, Ron Baldal, Steven Spillman, Topui Fonua, Lieutenant Tibbet, Edgardo Garcia, Michael Brown, Rich Torres, Sergeant Hafley, Douglas Kaleas, and Brian Geer, | ) |
| Defendants. | ) |

COMPLAINT AND JURY DEMAND

1

### COMPLAINT AND JURY DEMAND

Plaintiff Lionel Rubalcava, by and through his attorneys, the law firms: Neufeld Scheck & Brustin, LLP, and Lara Bazelon, alleges as follows:

### INTRODUCTION

1. Lionel Rubalcava was wrongfully arrested, prosecuted, convicted, and imprisoned for over 17 years for a crime he did not commit: the 2002 attempted murder of Raymond Rodriguez in San Jose. In 2019, the Santa Clara County District Attorney conducted a reinvestigation, concluded Rubalcava was innocent, and joined a motion to exonerate him. Granting this motion, the California Superior Court ruled, "Rubalcava is factually innocent of the offense because he was not the person who committed it."

2. Raymond Rodriguez, a Norteño gang member, was shot by unknown members of the rival Sureño gang in a drive-by shooting in San Jose. Rodriguez survived the shooting but was paralyzed from the waist down.

3. Rubalcava, who has no connection to the Sureño gang, was in no way involved in the shooting. He has an airtight alibi—at the time of the shooting he was in his car driving to a movie date in Hollister, over 45 miles away. Cell tower data confirmed his location.

4. Rubalcava's wrongful prosecution was no accident. It was the result of misconduct by Defendants, officers of the San Jose Police Department (SJPD) and the Santa Clara District Attorney's Office (SCDA), the City of San Jose, and the County of Santa Clara.

5. When their investigation hit a wall, Defendants used coercion and suggestion to obtain false identifications from three witnesses. The key coerced witness was the victim, Rodriguez, who ultimately testified at trial that Rubalcava was the shooter—powerful purported

COMPLAINT AND JURY DEMAND

eyewitness identification testimony that was central to convicting Rubalcava in an otherwise threadbare case. But Rodriguez had not seen Rubalcava during the shooting because Rubalcava was not there. Defendants also fabricated police reports claiming that Rodriguez and other witnesses identified Rubalcava instantaneously and without any police suggestion. In reality, none of the witnesses independently made positive identifications of anyone, let alone the innocent Rubalcava.

6.   When the witnesses later expressed doubts concerning their purported identifications, Defendants secretly offered to pay them or their families to identify Rubalcava in court. Defendants provided the victim and his family with secret cash payments through a witness-protection program and helped relocate them to a nicer home in a safer neighborhood before trial. Following the established policy and practice of the Santa Clara County District Attorney's office, Defendants concealed those payments from the Rubalcava, his defense attorney, and the prosecuting attorney.

7.   Recognizing that Rubalcava had no connection to the Sureños, Defendants fabricated false evidence that the victim was shot as a part of an internecine Norteño feud. In fact, there was no such feud; Defendants simply made it up. As a teenager, Rubalcava, like hundreds of other kids in his community, had joined a local Norteño gang. But he had since grown up and had long been inactive—at the time of the shooting, he worked for his father's family business and was raising a young son. By fabricating evidence that Rubalcava shot Rodriguez as part of a fictitious inter-Norteño gang feud, Defendants enabled the prosecution to paint a false portrait of Rubalcava as a ruthless, violent gangbanger. Defendants thereby

turned evidence of Rubalcava's innocence—that the shooter, unlike him, was a Sureño—into false evidence of guilt.

8.  The so-called gang evidence was not superfluous or cumulative: It lay at the heart of the prosecution's case, which (given Rubalcava's innocence) was incredibly weak. No physical or forensic evidence linked Rubalcava to the crime; he had an alibi; and the only evidence presented against him at trial was the three false and fabricated eyewitness identifications. One of the eyewitnesses even admitted on the stand that Rubalcava was not the shooter— only to be impeached by Defendants' fabricated police reports. Defendants' witness-protection payments were never disclosed to the prosecutors or Rubalcava's defense, and the jury never learned that Defendants had bought the witnesses' testimony.

9.  Because of the weakness of the case, the jury deliberated for three days, only reaching a guilty verdict on the Wednesday before Thanksgiving. Defendants' false and fabricated eyewitness identifications and fabricated evidence of a fictional gang war tipped the scales and caused Rubalcava's wrongful conviction. As the direct result of Defendants' misconduct, Rubalcava was torn away from his family and community. He spent 17 years in prison for a crime he did not commit.

10.  Years after his wrongful conviction, Rodriguez, the victim, admitted that Rubalcava was innocent and that his identification had been the product of police pressure and coercion.

11.  In 2018, the Northern California Innocence Project filed a new post-conviction petition on Rubalcava's behalf, prompting the Santa Clara County District Attorney's Office to conduct a thorough re-investigation. In 2019, after the reinvestigation convinced the prosecution that Rubalcava was innocent, it joined Rubalcava's motion to vacate. After Rubalcava was freed,

COMPLAINT AND JURY DEMAND

4

the prosecution and Rubalcava's attorneys jointly obtained a finding of factual innocence from the California Superior Court.

## JURISDICTION AND VENUE

12. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Rubalcava's rights as secured by the United States Constitution.

13. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14. Supplemental jurisdiction over Rubalcava's state law claims exists pursuant to 28 U.S.C. § 1367(a).

15. Venue is properly laid in the Northern District of California under U.S.C. § 1391(b), in that this is the District in which the claim arose.

16.  Rubalcava respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

17.  Rubalcava has complied with the requirements of Cal. Gov't Code § 900 et seq. and served Defendants with a Notice of Claim on October 24, 2019. The City of San Jose rejected the claim on January 6, 2020.

## PARTIES

18. Plaintiff **Lionel Rubalcava** is 41 years old and lives in San Jose, California. Rubalcava was wrongfully incarcerated from his arrest in 2002 until his release in 2019.

19. Defendant **City of San Jose** is a municipality incorporated in the State of California. The City of San Jose was responsible for the training, supervision, and discipline of individual

COMPLAINT AND JURY DEMAND

5

defendants and for the policies and practices regarding police investigations that were used in this case.

20. Defendant **County of Santa Clara** is a municipality incorporated in the State of California. County of Santa Clara was responsible for the training, supervision, and discipline of individual defendants and for the policies and practices regarding the use and disclosure of witness payments that were used in this case.

21. At all relevant times, Defendant **Joseph Perez** was employed by the San Jose Police Department ("SJPD"), acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

22. At all relevant times, Defendant **Rafael Nieves** was employed by the SJPD under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

23. At all relevant times, Defendant **Steven Spillman** was employed by the SJPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

COMPLAINT AND JURY DEMAND

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

24. At all relevant times, Defendant **Topui Fonua** was employed by the SJPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

25. At all relevant times, Defendant **Edgardo Garcia** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

26. At all relevant times, Defendant **Michael Brown** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

27. At all relevant times, Defendant **Ramon Avalos** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

28. At all relevant times, Defendant **Lieutenant Tibbet (first name unknown)** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of

COMPLAINT AND JURY DEMAND

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

29. At all relevant times, Defendant **Sergeant Hafley (first name unknown)** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30. At all relevant times, Defendant **Rich Torres** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

31. At all relevant times, Defendant **Ron Baldal** was employed by the SJPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of San Jose and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

32. At all relevant times, Defendant **Douglas Kaleas** was employed by the County of Santa Clara, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of

COMPLAINT AND JURY DEMAND

8

Santa Clara County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

33. At all relevant times, Defendant **Brian C. Geer** was employed by the County of Santa Clara, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Santa Clara County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

34. At all relevant times, all Defendants were acting under color of state law.

## FACTUAL ALLEGATIONS

### Sureño gang members shoot Raymond Rodriguez in a drive-by shooting.

35. On April 5, 2002, just before 5:30 pm, San Jose Sureño gang members, wearing Sureño blue, drove a stolen Toyota 4Runner into a neighborhood affiliated with their rivals, the Norteños. They saw a young man, Raymond Rodriguez, standing outside his house on Mastic Street wearing Norteño red and a large "N" shaped belt buckle—signaling Norteño affiliation.

36. Rodriguez had just gotten home from a movie and was chatting with his 12-year-old brother, Eric Millan, and a friend, Daniel Cerecerez. He thought somebody had followed them on the way home from the movie. Elsewhere on the street were Rodriguez's next-door-neighbor David Gonzalez and two other men, Alejandro Borrego and Nicholas Faría.

37. As the stolen 4Runner drove slowly down Mastic Street, Gonzalez, also a Norteño, recognized the driver as a Sureño and realized something was wrong. He told children near him to get inside and ran into his backyard.

COMPLAINT AND JURY DEMAND

9

38. The 4Runner stopped in front of Rodriguez's home, and Rodriguez, thinking the driver was a friend, approached the car and made eye contact with the driver. When he realized the driver was not a friend, but in fact a Sureño, Rodriguez stopped, raised his hands, and asked "What's up?"

39. The driver shot Rodriguez in the chest, and the 4Runner sped off. The SUV was later found about two miles away; the interior was gutted, and the vehicle had been burned.

40. Rodriguez was rushed to the hospital. He survived but was permanently paralyzed from the waist down.

**Lionel Rubalcava was in Hollister, 45 miles away, the evening of the shooting.**

41. Rubalcava is actually innocent of the Rodriguez shooting.

42. In 2002, Rubalcava lived a quiet life and spent most of his time with his tight-knit family. He worked as a driver for his father's fledgling family business, a warehouse pallet company, and made enough money through that work to support himself and his 5-year-old son, whom he saw every weekend in a shared-custody arrangement.

43. Unfortunately, Rubalcava had grown up in a part of San Jose where kids were pressured to join a gang. Like hundreds of other boys in his neighborhood, Rubalcava made the mistake of joining a Norteño street gang, the West Side Mob. As he matured, Rubalcava regretted his decision, became inactive in the gang, and reoriented his life around more positive sources of pride—his work, his family, and his son. By the time of the Rodriguez shooting, he was actively avoiding members of his old gang.

COMPLAINT AND JURY DEMAND

10

44. Rubalcava spent the day of the shooting preparing for a first date with a girl named Stephanie Leon. He and a friend, Peter Esqueda, got their hair cut, worked out at the local YMCA, and then went to Rubalcava's home so he could freshen up for the date.

45.  Rubalcava and Leon had plans to meet in Hollister for a 7:00 pm movie. Hollister is approximately 45 miles from San Jose, about a 50-minute drive without traffic. With traffic at 5:00 pm on a Friday, the drive takes around an hour and a half.

46. A little before 5:00 pm, Leon warned Rubalcava by phone to leave early because the rush-hour traffic between San Jose and Hollister was especially bad. After getting off the phone, Rubalcava parted company with Esqueda and started out on the road.

47.  At 6:22 pm, Rubalcava paged Leon to let her know he had arrived in Hollister. Cell phone tower data confirms that Rubalcava paged Ms. Leon from Hollister at 6:22 pm—less than an hour after the 5:30 pm shooting in San Jose. They purchased movie tickets at 6:55 pm, watched the movie together, and parted ways at approximately 10:00 pm.

**Defendants begin their investigation and run into a dead-end.**

48. Back in San Jose, minutes after the shooting, Defendants Fonua and Spillman and other SJPD officers arrived at the scene and identified several witnesses who could make identifications, including Daniel Cerecerez, Alejandro Borrego, Nicholas Faría, and David Gonzalez. Defendants Lieutenant Tibbet and Sergeant Torres supervised the investigation, and Defendant Garcia oversaw the canvass.

49. Defendants quickly learned that the shooting had the hallmarks of a Sureño-on-Norteño drive-by: the victim was wearing Norteño colors and a large, N-shaped belt buckle, and the

COMPLAINT AND JURY DEMAND

11

occupants of the 4Runner were young Latino men wearing Sureño colors. Hours later, Garcia learned that the 4Runner had been recovered blocks away, trashed and burned.

50. Defendants Garcia, Brown, and Baldal each interviewed the victim, Rodriguez, in the hospital, and Rodriguez confirmed what Defendants had already suspected: that he was shot by a Sureño. Rodriguez described his assailants as "a bunch of fucking scraps," a derogatory term Norteños use for Sureños. Rodriguez told Garcia that the Sureños and Norteños were feuding.

51. Upon learning that the shooting was gang-related, Lieutenant Tibbet and Sergeant Torres contacted Sergeant Hafley, a supervisor with the SJPD gang unit, who assigned gang investigator Detective Perez to lead the investigation.

52. Defendants' investigation quickly ran into a dead-end. Despite multiple interviews with the victim and other witnesses, Defendants had not identified a suspect and had no solid leads.

**Rubalcava becomes a suspect after visiting a friend on Mastic Street.**

53. Two days after the Rodriguez shooting, Rubalcava dropped by to see a friend on Mastic Street, where the shooting had taken place. As he was driving away, he noticed Jennifer Rodriguez, the victim's sister, standing outside her home, and stopped to talk to her.

54. Jennifer Rodriguez had been inside her house during her brother's shooting and had not seen the stolen 4Runner or the shooter. But the incident had her on edge, and the police had instructed her to notify them of anything out of the ordinary. She mistook Rubalcava's flirtation for a threat and ran inside her house to contact the police. She told Sergeant Brown and Detective Baldal that she believed the driver of the truck, Rubalcava, might be connected to the shooting.

55. The police investigation had yet to turn up any suspects, and Jennifer Rodriguez's tip about Rubalcava was Defendants' only lead. Although Defendants knew that Jennifer Rodriguez had not seen the shooter and had no reason to think Rubalcava was involved in the shooting, in the absence of other leads he became an attractive target. They began putting together a case against Rubalcava by using coercion, suggestion, and outright fabrication to muster false evidence of his guilt.

**Perez, Spillman, and Fonua fabricate an identification from Gonzalez using coercion, suggestion, and bribery.**

56. Shortly after the interview with Ms. Rodriguez, Defendants Perez, Spillman, and Fonua tracked down Gonzalez, the next-door-neighbor, drove him to an empty parking lot and threatened to search his family's apartment if he did not cooperate in their investigation. A methamphetamine user on probation, Gonzalez felt pressured by these threats to cooperate and agreed to speak to Defendants again the next day. Defendants did not document threatening Gonzalez in their police report and did not audio-record their interaction.

57. Before interrogating Gonzalez further, Perez, Spillman, and Fonua consulted with Sergeant Hafley to inform him of the investigation thus far and discuss strategy. On information and belief, Perez, Spillman, and Fonua fully informed Sergeant Hafley of the threats they had made to get Gonzalez to cooperate. On information and belief, Sergeant Hafley instructed Perez, Spillman, and Fonua to continue their campaign of coercion until they got an identification.

58. The next day, Gonzalez truthfully told Perez, Spillman, and Fonua that the shooter was a Sureño who had previously come to his house and harassed him because he was a Norteño. He thought the bullet was meant for him. As Defendants would know from pulling his

COMPLAINT AND JURY DEMAND

13

criminal history, Gonzalez had been arrested mere weeks before the shooting after threatening a group of Sureños with a knife.

59. Perez, Spillman, and Fonua then showed Gonzalez at least three different photo arrays and pressured him to identify a photograph of Rubalcava. Gonzalez told Defendants that none of the men pictured were the shooter but picked out two or three photos that he thought looked like the shooter.

60. Unsatisfied, Perez, Spillman, and Fonua used a combination of threats, coercion, and suggestion to cause Gonzalez to circle Rubalcava's photograph and identify him as the shooter.

61. Perez, Spillman, and Fonua then fabricated a false report of Gonzalez's identification. Instead of reporting, truthfully, that Gonzalez had failed to make an identification, Defendants falsely claimed that Gonzalez "immediately pointed" to Rubalcava's photograph and identified him as the shooter. Instead of reporting that Gonzalez had been shown three separate photo arrays, they falsely reported that he had only been shown one. And the report omitted any mention of the multiple photographs Gonzalez picked of people who resembled the shooter.

62. Although Defendants had portable recording equipment and recorded interviews with multiple witnesses during the course of the investigation, Perez, Spillman, and Fonua did not preserve any recording of the identification procedure or interview with Gonzalez. On information and belief, Defendants either intentionally failed to record this interaction so that they could misrepresent what occurred in their report, or they did create a recording and intentionally destroyed it to hide their misconduct.

COMPLAINT AND JURY DEMAND

63. Torres and Hafley reviewed and approved the false report. On information and belief, both Defendants knew that the report was false.

64. At a meeting less than a week later, Gonzalez told Defendant Perez in no uncertain terms that he did not believe Rubalcava was the shooter. Instead of accepting this clear exculpatory statement, Perez pressured Gonzalez to stick with the false identification; he claimed that other witnesses had identified Rubalcava (which was false) and told Gonzalez that he would have to identify Rubalcava at trial. In the police report of the interrogation, Perez omitted any mention of Gonzalez's recantation or that Perez improperly told Gonzalez that other witnesses had identified Rubalcava.

65. Defendants used a carrot-and-stick approach to force Gonzalez to testify. In the ensuing weeks, Defendant Perez repeatedly met with Gonzalez's mother and offered her money to move her family to a better neighborhood if Gonzalez stood by his false and fabricated identification of Rubalcava. Perez also made direct promises to Gonzalez of witness-protection payments in exchange for testimony.

66. To ensure his compliance, Defendants had Gonzalez arrested just before Rubalcava's preliminary hearing as an accessory to the attempted murder of Rodriguez. There was no evidence implicating Gonzalez in the crime; Defendants arrested and charged Gonzalez solely to force him to testify at Rubalcava's preliminary hearing.

67. While in jail, Gonzalez was made to wear a brown jail uniform—a color that indicated he was a "snitch" and exposed him to serious danger.

68. When Gonzalez saw Rubalcava in the courtroom at the preliminary hearing, he was certain that Rubalcava could not be the shooter—he was much shorter and had different facial

COMPLAINT AND JURY DEMAND

15

features. Perez and other Defendants told Gonzalez that if he did not testify against Rubalcava at the hearing he would be returned to jail, where his safety was at serious risk because he had been identified as a snitch. In fear for his life, and under serious pressure from Defendants, Gonzalez attempted to thread the needle. He testified that Rubalcava looked like the shooter, omitting the crucial clarification that he was certain Rubalcava was *not* the shooter. The court treated this ambiguous testimony as an identification and ordered Rubalcava bound over for trial.

69. Perez fabricated a cover-up story to explain Gonzalez's failure to make an unambiguously positive identification. In a report about the preliminary hearing, Perez falsely stated that Rubalcava had intimidated Gonzalez from the defense table by shaking his head "no." In reality, Gonzalez's ambiguity was the product of his own conscience—he was trying to balance the pressure from Defendants to implicate Rubalcava with his own knowledge Rubalcava was innocent.

70. In the same report, Perez also falsely stated that Gonzalez asked to be taken off witness-protection assistance because he wanted to move back to his old neighborhood. This was a lie; Perez actually withdrew all offers of financial support in retaliation for Gonzalez's disappointing preliminary hearing testimony.

71. At trial, Gonzalez truthfully testified that Rubalcava was not the shooter. He was impeached, however, by his prior "identification" at the preliminary hearing and Defendants' fabricated police reports, and the jury was left with the misimpression that Gonzalez had freely and unambiguously identified Rubalcava without police coercion or suggestion.

COMPLAINT AND JURY DEMAND

16

**Perez, Spillman, and Fonua fabricate a false identification from Millan, the victim's brother.**

72. Although Eric Millan, the victim's 12-year-old brother, was present for the shooting, he did not see the shooter well enough to identify him. Millan was looking at his brother during the shooting and did not get a good look at the people inside the 4Runner.

73. Shortly after obtaining Gonzalez's false and fabricated identification, Perez, Spillman, and Fonua brought a photo array to show Millan. On information and belief, Defendants used the same coercion and suggestion they had used on Gonzalez to pressure Millan to select Rubalcava's photograph.

74. On information and belief, Millan either did not identify anyone in the photo array or tentatively complied with Defendants' suggestion or coercion to identify Rubalcava.

75. Perez, Spillman, and Fonua then fabricated a false report of their interaction with Millan. Just as they had done with Gonzalez, they falsely reported that Millan immediately made a positive identification of Rubalcava—the innocent man whom police suspected—from a fair photo array and was "sure" that Rubalcava was the shooter. But, in fact, Millan had not seen the shooter and could not make any identification, let alone an immediate and unequivocal one. Rather, Millan's "identification" was the result of police suggestion or coercion.

76. Torres and Hafley reviewed and approved the false report. On information and belief, both Defendants knew that the report was false.

77. Although Defendants had portable recording equipment and recorded interviews with multiple witnesses during the course of the investigation—including Millan's mother Contreras—Perez, Spillman, and Fonua did not preserve any audio recording of the interview with Millan.

COMPLAINT AND JURY DEMAND

17

**Perez fabricates a false identification from Rodriguez, the victim.**

78. Shortly after the shooting, Rodriguez, the victim, told police that he had looked the shooter directly in the eye and saw that he was a Sureño. Rodriguez, a Norteño, said he thought he was a victim of the raging gang war between the Norteños and Sureños.

79. Perez brought a photo array to Rodriguez in the hospital, where he was heavily medicated recovering from his paralyzing gun shot, and used suggestion or coercion to direct him to select Rubalcava's photo. Despite Perez's improper suggestion or coercion and Rodriguez's medicated state, Rodriguez said only that Rubalcava *looked like* the shooter—he did not make a positive identification.

80. Perez falsely told Rodriguez that Rubalcava *was* the shooter and that Perez had additional evidence proving it. He wore Rodriguez down with suggestion or coercion until he agreed to say that Rubalcava was the shooter.

81. Precisely as he had done with Gonzalez and Millan, Perez falsely reported that Rodriguez had viewed the nonsuggestive photo array for five seconds before pointing to Rubalcava's photo and saying, "that's the guy." In fact, Rodriguez did not make any positive identification at all and only said that Rubalcava looked like the shooter after Perez pressured him. Perez's report omitted any mention of the false statements, coercion, or suggestion Perez used to pressure Rodriguez into adopting the identification.

82. Torres and Hafley reviewed and approved the false report. On information and belief, both Defendants knew that the report was false.

83. Although Defendants had portable recording equipment and recorded interviews with multiple witnesses during the course of the investigation (including Rodriguez's mother Contreras) Perez did not preserve any audio recording of the interview with Rodriguez.

**Perez uses coercion, intimidation, and secret payments to Millan and Rodriguez's mother to keep them in line and suppresses evidence of their recantations.**

84. Neither Millan nor Rodriguez positively identified Rubalcava from the photo arrays, and each repeatedly expressed doubts concerning the identifications Defendants sought to attribute to them.

85. On information and belief, Perez instructed Millan and Rodriguez's mother, Jennifer Contreras, to inform him if anyone talked to her sons about their identifications of Rubalcava. Just as he had done with Gonzalez's mother, Perez offered Contreras money to relocate her family if her sons cooperated.

86. Two days later, a neighbor, David Holmes, visited Contreras and told her that Rubalcava was not the shooter, that he knew who the shooter was, and that he was afraid to go to the police. He also told Contreras that the shooter was the Sureño who had previously harassed Gonzalez, her next-door-neighbor.

87. During this conversation, 12-year-old Millan admitted not only that he was uncertain of his purported identification of Rubalcava, but also that he was unable to identify the shooter at all. Millan admitted that he had not seen the shooter in the 4Runner because he was looking at his older brother, who had just been shot.

88. Contreras recorded the entire conversation, including Millan's admission he had not seen the shooter, and gave the recording to Perez. Perez failed to document its contents, including Millan's admission, anywhere in his police report and did no follow-up investigation.

COMPLAINT AND JURY DEMAND

19

89. Perez then went to talk to Holmes. But rather than asking Holmes for information on the real perpetrator, Perez threatened Holmes, who was a teenager, with arrest for interfering with the case and warned him to stay away from the investigation.

90. Later, Violet Mejia, Holmes' aunt, went to the victim's house with a photograph of Rubalcava to clear up what she viewed as a misunderstanding. She showed Millan the photo and asked if he recognized him as the shooter. Millan admitted he did not.

91. Contreras again called Perez, just as Perez had arranged with her. Perez went to admonish Mejia not to interfere with the investigation, and Mejia told him what Millan had admitted—that he could not identify Rubalcava as the shooter. The conversation was tape-recorded.

92. After speaking to Mejia, Perez destroyed or otherwise concealed the tape-recording in which Mejia reported that Millan had admitted—for the second time—that he did not know who the shooter was. Perez never disclosed this tape recording or its contents to either the prosecution or defense.

93. Perez then prepared a false report concerning his interview with Mejia. He did not report what Mejia told him—that Millan had said that he did not know who the shooter was—and wrote only that he had admonished Mejia not to interfere with the investigation. He also falsely represented that he had *not* recorded his conversation with Mejia.

94. About a month later, Rodriguez admitted to his mother that Rubalcava was not the shooter. She immediately told Perez, who, on information and belief, reiterated his promise to support the family financially if Rodriguez would identify Rubalcava at trial. On information and belief, Contreras agreed to exert more pressure on her sons to stick to their stories.

COMPLAINT AND JURY DEMAND

95. The next day, Perez spoke to Rodriguez again. Rodriguez repeatedly told Perez that Rubalcava was not the shooter, and that Perez had the wrong man. But Perez not only rejected Rodriguez's attempt to set the record straight, he used coercion and intimidation to convince Rodriguez to maintain his identification of Rubalcava. Perez also falsely told Rodriguez that the police had "other facts" implicating Rubalcava in order to persuade Rodriguez to maintain his false identification.

96. In his report, Perez omitted the crucial fact that he had lied to Rodriguez and told him that there were "other facts" that indicated the shooter was Rubalcava.

97. Perez made good on his promise to Contreras and helped move her family into a nicer neighborhood under the guise that they needed witness protection. Perez and Defendant Doug Kaleas, an SCDA investigator, jointly made witness protection payments to Contreras and her family. Perez and Kaleas each personally paid a portion of the security deposit and first month's rent for Contreras's new apartment before requesting reimbursement.

98. Perez and Kaleas also provided cash payments of at least $8,000 to the family. On information and belief, following instructions from Perez and Kaleas, Contreras pressured 12-year-old Millan and his brother to maintain their false identifications of Rubalcava through trial.

99. Perez and Kaleas then falsified an application for witness protection funding. In the application, Perez and Kaleas claimed that Contreras and her sons had relocated "to be safe from rival gang members." In fact, Perez and Kaleas had helped move Contreras to a better apartment to induce her sons to testify against Rubalcava. Contreras and her family members

COMPLAINT AND JURY DEMAND

21

were never under threat of gang retaliation—or any other kind of violence—for testifying against Rubalcava.

100.    Perez and Kaleas failed to disclose these payments to Rubalcava or his defense attorney. Following Santa Clara County's policies and procedures, Perez and Kaleas also failed to disclose these payments to the prosecutor handling Rubalcava's case, and no record of the payments was included anywhere in the prosecutor's file.

101.    Although Rodriguez and Millan both testified against Rubalcava at trial, Rodriguez later admitted that he had only identified Rubalcava in court because of pressure from police and his mother. During Rubalcava's post-conviction proceedings, Rodriguez admitted under oath that the person who shot him was "not Lionel Rubalcava" and that his identification of Rubalcava had been influenced by the police.

**Defendants arrest Rubalcava and disregard evidence of his innocence.**

102.    Spillman and Fonua informed Lieutenant Tibbet and Sergeant Torres about the false identifications from Gonzalez and Millan, including, on information and belief, the circumstances involved in obtaining them. Tibbet and Torres agreed that the false identifications were enough to arrest Rubalcava and authorized Spillman and Fonua to do so.

103.    On April 8, 2002, Spillman and Fonua stopped Rubalcava while he was driving and arrested him based solely on false and fabricated eyewitness identifications. Rubalcava cooperated fully with Defendants, provided his identification, and agreed to answer questions.

COMPLAINT AND JURY DEMAND

104.   Spillman and Fonua threw Rubalcava into their car, told him he was in deep trouble, and pressured him to confess to the Rodriguez shooting. Rubalcava truthfully denied any involvement.

105.   Sergeant Torres then contacted Sergeant Brown and Detective Baldal to inform them of the arrest and the identification evidence. On information and belief, Torres described to them how Perez, Spillman, and Fonua had obtained the identifications through coercion and suggestion.

106.   At the precinct, Sergeant Brown and Detective Baldal interrogated Rubalcava, and he truthfully reported that he had been preparing for and on his way to Hollister for a movie date with Leon on April 5. He gave a detailed description of his activities that day, including his hair cut and his trip to the YMCA, and gave Defendants the names and contact information of alibi witnesses, including Leon. An officer called Leon—who had only recently met Rubalcava and had no incentive to lie for him—and she confirmed Rubalcava's alibi.

107.   Sergeant Brown, Spillman, and Fonua searched Rubalcava's home and found no incriminating evidence because there was none—Rubalcava had nothing to do with the Rodriguez shooting.

108.   Despite Rubalcava's alibi and the absence of any bona fide evidence connecting him in any way to the crime, Spillman and Fonua booked Rubalcava into the county jail.

109.   On April 12—the same day that Millan admitted he could not identify the shooter—Defendants caused Rubalcava to be charged with the attempted murder of Raymond Rodriguez and related crimes. The sole basis for these charges was the three false and fabricated eyewitness identifications of Gonzalez, Millan, and Rodriguez.

COMPLAINT AND JURY DEMAND

23

**Defendants Fonua and Perez bury three non-identifications of Rubalcava.**

110.   Defendants recognized that the evidence they had against Rubalcava was, at best, extraordinarily weak. They had no physical or forensic evidence of his guilt; Rubalcava had a solid alibi; and the evidence indicated the shooter was a Sureño—a gang with which Rubalcava had no connection. Defendants' only evidence of guilt was three false and fabricated eyewitness identifications from Gonzalez, Millan, and Rodriguez.

111.   To bolster their case against Rubalcava, Defendants attempted to secure identifications from three other key witnesses to the crime: Daniel Cerecerez, who had been standing with Rodriguez when the shooting occurred, and Nicholas Faría and Alex Borrego, who had been standing across the street. All three witnesses had clear and unobstructed views of the 4Runner and its occupants. None of them identified Rubalcava.

### *Daniel Cerecerez*

112.   Immediately after the shooting, Cerecerez told Fonua that he had a clear view of the front right passenger in the vehicle, gave a detailed description, and said he would recognize the passenger if he saw him again.

113.   Days later, Fonua showed Cerecerez at least one photo array containing Rubalcava's photograph and pressured him to identify Rubalcava as the shooter. Cerecerez recognized Rubalcava from the photograph—they knew each other—but truthfully denied Rubalcava's involvement in the shooting. He told Fonua that the shooter was the Sureño who had visited Gonzalez weeks earlier.

114.   Fonua did not document showing Cerecerez any photo array, Cerecerez's denial of Rubalcava's involvement, or Fonua's efforts to pressure him into falsely identifying

COMPLAINT AND JURY DEMAND

24

Rubalcava. Even though it was exculpatory evidence, Defendants never disclosed this failed

identification or its circumstances to either the prosecution or defense.

### *Nicholas Faría*

115.    During the shooting, Faría had been standing in the street, having just parked his car, and

had an unobstructed view of the 4Runner and its occupants. Shortly after the shooting, he

gave detailed descriptions of the shooter, the front passenger, and the rear passengers.

116.    Perez later showed Faría a photo array and, on information and belief, pressured him to

identify Rubalcava. Faría truthfully denied seeing Rubalcava in the 4Runner.

117.    Perez fabricated a report claiming that Faría could not identify Rubalcava because he had

not seen inside the 4Runner. That is false; Faría had a clear view of all occupants of the

vehicle and had not identified Rubalcava because he was not the shooter. Perez's false report

minimized the exculpatory value of Faría's non-identification by undermining his ability to

make an identification in the first place.

118.    On information and belief, Perez and other Defendants used threats or secret promises of

financial compensation to cause Faría to adopt the false story that he had not been able to see

anything during the shooting—even though he had provided the officers at the scene detailed

descriptions of the perpetrators. As a result of this pressure, by the time of trial, Faría falsely

denied ever telling officers at the scene that he had seen the men in the 4Runner.

### *Alejandro Borrego*

119.    Similarly, the day of the shooting, Borrego had been standing across the street from the

shooting and had an unobstructed view of the whole event. He told Spillman just after the

shooting that the men in the car were wearing blue and that he could identify the men in the

COMPLAINT AND JURY DEMAND

front seat of the 4Runner. As did all the witnesses, Borrego understood the shooter to be a Sureño.

120. Just as he had with Faría, Perez showed Borrego a photo array and, on information and belief, pressured him to identify Rubalcava. Borrego truthfully denied recognizing Rubalcava as the shooter.

121. Just as he had with Faría, Perez fabricated a report stating that Borrego had not seen the perpetrators in the 4Runner. That report was false; Borrego had seen the occupants, described their Sureño blue clothing to police, and could identify the true perpetrator.

122. On information and belief, Perez then used threats or secret promises of financial compensation to pressure Borrego to adopt the false story that he not seen anything during the shooting. As a result of this pressure, by the time of trial, Borrego denied even having looked at the car.

**Defendants fabricate a gang war to further falsely incriminate Rubalcava.**

123. Defendants knew from the beginning that the shooting was committed by a Sureño. At the time, the Norteños and Sureños were engaged in a longstanding gang war, and shootings between the gangs were common. The victim, Rodriguez, was a Norteño who was dressed in Norteño red at the time of the shooting. At the hospital, he told police the shooters were "two fucking scraps"—a derogatory term Norteños use for Sureños—and that he believed he had been shot because of the gang war. Defendants also learned that at least one occupant of the 4Runner had been wearing blue—a Sureño color. And Gonzalez, another Norteño, told Defendants just days after the shooting that he thought the bullet was for meant him because the shooter was a Sureño with whom he had a history.

COMPLAINT AND JURY DEMAND

26

124.     This posed a problem for Defendants' fabricated case because Rubalcava had never been a Sureño. In fact, like hundreds of young men who grew up in his San Jose community, Rubalcava joined a local Norteño gang, West Side Mob, as a teenager. Although he never formally renounced the gang, Rubalcava had distanced himself from its criminal activities as he matured. At the time of the shooting, Rubalcava was actively avoiding his old Norteño associates, focusing on working in his family business and supporting his young son. Crucially, Rubalcava had absolutely no connection at all to the rival Sureños. Indeed, it would have been dangerous for someone like Rubalcava, who lived in a Norteño-dominated neighborhood, to affiliate with Sureños or even wear their gang colors.

125.     To explain away this inconsistency, Defendants shifted from the obvious motive for the shooting—Sureño-on-Norteño violence—and invented a fictitious internecine gang war between Norteño factions to explain why Rubalcava, an inactive Norteño, would shoot another Norteño.

126.     In reality, drive-by shootings among San Jose Norteños were virtually unheard of. At the time of the shooting, there was no gang war among Norteño sets—only between Norteños and Sureños.

127.     Nonetheless, Perez repeatedly pressured witnesses using threats and promises of financial compensation to cause them to falsely report that the shooting resulted from a feud between rival Norteño factions.

128.     After Defendants arrested Rubalcava, Perez re-interviewed Rodriguez, the victim, who had consistently reported that the shooter was Sureño. When Perez asked him point-blank if the shooter could have been a Norteño, Rodriguez rejected the idea out of hand. Perez's

COMPLAINT AND JURY DEMAND

27

report of the interview, however, falsely stated that Rodriguez told him that he had heard that the shooter could have been Norteño. Actually, Rodriguez knew the shooter was Sureño and consistently said so.

129.     Perez then re-interviewed Borrego, one of the bystanders to the shooting who had reported that the men in the shooter's 4Runner wore Sureño blue. Borrego was a vulnerable witness with a history of police involvement.

130.     On information and belief, Perez used threats of arrest, promises of financial compensation, or both to cause Borrego to change his story. Perez pressured Borrego into stating on tape that two Norteño factions, the West Side Mob and Varrio Horseshoe, were embroiled in a violent feud. Borrego claimed that he knew about this feud because he had read about it in the paper. Essentially, Perez pressured Borrego to repeat back to Perez a story that Perez himself had made up.

131.     But that story was completely false. The two factions were not at war—there was no history of armed violence between them—and no newspaper report claimed they were.

132.     Perez failed to document or disclose the threats or promises he made to obtain Borrego's false statement or the fact the he knew it was false.

***Avalos and Nieves write a false and fabricated gang relatedness report to falsely implicate Rubalcava.***

133.     Rafael Nieves and Ramon Avalos were experienced SJPD gang detectives who testified in dozens of trials to obtain gang enhancements and convictions against young Latino men. They professed to have accurate and current street-level knowledge of San Jose gang interactions and feuds.

134.    Nieves and Avalos worked with Perez to develop the gang-enhancement allegations for the prosecution to use at trial. A gang-enhancement charge greatly increased Rubalcava's sentencing exposure and made a conviction more likely by falsely painting him as a ruthless, violent predator to the jury.

135.    The three detectives collaborated on a false and fabricated "gang relatedness report" to be used against Rubalcava. The report falsely claimed that West Side Mob and Varrio Horseshoe, both Norteño factions, were feuding and asserted that Rubalcava had shot Rodriguez in an attempt to kill Gonzalez because of his involvement with Varrio Horseshoe. But, in fact, and as Defendants had to know, West Side Mob and Varrio Horseshoe were not feuding, and neither Gonzalez nor Rodriguez were members of Varrio Horseshoe. Based on their claimed experience, Nieves and Avalos knew or should have known that this report was completely false because there was no such gang war and because there was no factual support for the assertions contained in the report. Nonetheless, they never disclosed to the prosecution or the defense that the report was spurious and fabricated. Relying on Perez, Nieves, and Avalos's fabricated written and oral reports, the prosecution argued that Rodriguez's shooting was gang-related and that the gang evidence inculpated Rubalcava (when the true evidence exculpated him).

**Perez secretly pays Cerecerez approximately $15,000 in cash and other benefits in an attempt to coerce testimony against Rubalcava.**

136.    Shortly after Rubalcava's arrest, Perez contacted Cerecerez with a promise of secret financial compensation to cooperate in the investigation. Perez, Nieves, and Defendant Brian Geer, an SCDA investigator, bought Cerecerez's cooperation with witness protection funding. By the time of trial, Perez, Nieves, and Geer had paid the teenaged Cerecerez and

COMPLAINT AND JURY DEMAND

29

his mother nearly $15,000 for his anticipated cooperation, including the cost of a hotel, food, and a cell phone.

137.    Perez, Nieves, and Geer used this money to pressure Cerecerez into saying what they wanted him to say. For example, shortly after they entered into the arrangement, Perez tape recorded a conversation with Cerecerez in which Cerecerez said he heard on the street that the shooter was "Lionel," a West Side Mob member, and that witnesses were scared of the Mob. In fact, Cerecerez had heard from *Perez* that the shooter was named Lionel and was merely parroting information Perez had fed to him using the same modus operandi Perez had used with Borrego. Perez did not document his financial arrangements with Cerecerez or the fact that he fed him information.

138.    Perez, Nieves, and Geer did not disclose their payments to Cerecerez to Rubalcava or his defense counsel. Following SCDA policies and procedures, Perez, Nieves, and Geer did not inform the prosecuting attorney of the payments to Cerecerez, and no record of those payments was included anywhere in prosecutor's case file.

139.    At trial, Cerecerez falsely testified he had been stabbed by members of Varrio Horseshoe because of his affiliation with West Side Mob. In reality, Cerecerez was not a West Side Mob member and had been stabbed in a squabble on his block. Cerecerez also testified, falsely, that Rodriguez's shooting could have been "red-on-red," meaning Norteño-on-Norteño. In fact, Cerecerez knew from Gonzalez that the shooter was a Sureño.

140.    On information and belief, Cerecerez gave that false and fabricated testimony at the direction of Perez in exchange for secret payments. Neither the fact that Cerecerez had

received money, nor the amount of those payments, was disclosed to either the prosecution or defense.

141.    Years after Rubalcava's wrongful conviction, Cerecerez admitted in a sworn statement that his trial testimony was completely false.

**Defendants ignore a promising alternative suspect.**

142.    While they singularly focused on prosecuting the innocent Rubalcava for the attempted murder of Rodriguez, Defendants ignored and failed to investigate the real identity of the shooter, including by ignoring promising leads.

143.    After Defendants arrested Rubalcava, a man named Michael Altamirano told Perez that Altamirano's neighbor, Renan "Shadow" Martinez, had admitted he was a passenger in the drive-by shooting of Rodriguez. Altamirano provided specific, accurate details about Shadow's confession, including that the shooting had occurred on April 5, 2002, on Mastic Street, and that Shadow had burned the vehicle afterward. Like the shooter, Shadow was Sureño.

144.    Despite this promising lead, Defendants failed to conduct any meaningful investigation of Shadow.

145.    Months later, Perez interviewed Shadow after an unrelated arrest for grand theft auto. Shadow was initially cooperative and candidly admitted that he was a Sureño who had committed a string of auto thefts. But when Perez asked if he knew about a 4Runner used in a shooting on Mastic Street in April—the shooting Rubalcava was at that time wrongfully jailed for—Shadow paused for a long time before finally saying, vaguely, "Saul did that one." Perez asked no follow up questions and conducted no further investigation.

COMPLAINT AND JURY DEMAND

**The Trial**

***Defendants present their false and fabricated eyewitness identifications and fictitious gang war theory to the prosecution, who presents it at trial.***

146.    The only evidence offered at trial against Rubalcava was the false and fabricated eyewitness identifications from Gonzalez, Millan, and Rodriguez, and false and fabricated evidence of a fictitious gang war. Because Defendants personally participated in fabricating this evidence, they knew it was false.

147.    Neither the defense nor the jury ever learned that the three "identifications" were the product of police misconduct and that none of the witnesses had actually provided genuine, unsuggested, and uncoerced identifications of Rubalcava. The jury never learned that Defendants' reports claiming that the witnesses immediately and unequivocally made their identifications were false and fabricated by Defendants. Nor did they learn that Perez had secretly paid or promised to pay witnesses and their family members in order to obtain false testimony against Rubalcava.

148.    In fact, when Gonzalez truthfully testified that Rubalcava was *not* the shooter, the prosecution used the fabricated reports of his purported initial identification as rebuttal evidence, not knowing that those reports were false and fabricated.

149.    The jury also never learned that multiple witnesses, including Rodriguez, had independently told the police that the shooter was a Sureño. Indeed, under instruction from Defendants, Rodriguez testified that he did not remember telling the police that the shooter a Sureño, even though he had done so multiple times.

150.    Rubalcava took the stand in his own defense and truthfully insisted on his innocence. He told the jury that he had been on his way to a date over 45 miles away at the time of the

COMPLAINT AND JURY DEMAND

32

shooting, and that he had had nothing to do with the crime. He truthfully acknowledged that he had once been a member of the West Side Mob and explained that he had not associated with it for some time prior to his arrest.

### *Rubalcava is wrongfully convicted and sentenced.*

151.    The jury deliberated for three days, requested read-backs concerning the witness descriptions of the shooter and Rubalcava's alibi, and asked what would happen if a unanimous verdict could not be reached. On November 26, 2003, the Wednesday before Thanksgiving, the jury convicted Rubalcava of attempted murder based on Defendants' false and fabricated identifications and gang testimony and without hearing key exculpatory evidence. The jury also found true all enhancements, including that the offense was committed for the benefit of a criminal street gang.

152.    Due, in part, to the gang enhancement, Rubalcava was sentenced to an indeterminate term of imprisonment of twenty-five years to life and a consecutive determinate six-year term of imprisonment.

### Defendant City of San Jose had an unconstitutional pattern or practice of fabricating false identification evidence and withholding exculpatory evidence.

153.    Rubalcava's wrongful conviction was also the direct result of the SJPD's unconstitutional investigative policies, practices, customs, and failure to supervise.

154.    In the early 2000s and before, the SJPD had a pattern of coercing or suggesting witness statements or identifications, suppressing exculpatory evidence, fabricating evidence, and systematically failing to supervise and discipline officers, enabling such misconduct to persist. The City of San Jose, through its policymakers, had prior notice of this pattern of unconstitutional misconduct through citizen complaints, judicial decisions, and, on

COMPLAINT AND JURY DEMAND

information and belief, the open and notorious nature of the misconduct, which included the acquiescence and participation of many SJPD supervisors.

155.    This policy, practice, or custom involved the use of various techniques to coerce or fabricate incriminatory statements or identifications, including, without limitation: the use or threat of physical violence; authoritative, suggestive, or repeated assertions of a suspect's guilt; aggressively badgering witnesses into silence or false recantations; and leveraging or exploiting vulnerabilities of witnesses or suspects, including mental vulnerabilities and the threat of criminal penalties; and perjury and false statements in police and court documents and proceedings.

156.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: providing a witness or recklessly allowing a witness to learn details about the crime that only the real perpetrator or police could know, whether through leading questions or more direct communication; taking misleading steps to make coerced or suggested statements or identifications appear as though they originated from the suspect following a lawful procedure; selectively documenting a witness or suspect's eventual statement and not the preceding preparation or rehearsal; misrepresenting that a witness's formal statement was a verbatim statement in the witness's own words; and concealing promises for leniency or financial remuneration.

157.    The City of San Jose also had in force and effect a policy, practice, or custom of failing to adequately supervise and discipline SJPD officers in the exercise of their constitutional obligations, including their obligations not to fabricate evidence, commit perjury, or hide exculpatory evidence. This failure by policymakers to properly train, supervise or discipline

their subordinates amounted to a deliberate indifference to the rights of those who came into contact with SJPD officers.

158.    For example, Felix Solorio Valdovinos alleged that SJPD officers orchestrated his 1998 conviction in a strikingly similar set of circumstances, using manipulated eyewitness identifications and suppressing evidence that would undermine those identifications. When two eyewitnesses were unable to positively identify Valdovinos in two separate photo arrays (one witness tentatively identified Valdovinos and a second identified a different person), SJPD officers suppressed evidence of the photo arrays. Just as Defendants did here with Gonzalez, Millan, and Rodriguez, SJPD allegedly misrepresented the strength of the eyewitness evidence against Valdovinos and suppressed evidence that would have helped to undermine its reliability. SJPD officers also allegedly threatened a witness with arrest and coerced him into giving eyewitness testimony against Valdovinos that contradicted earlier statements he had made shortly after the shooting. This misconduct mirrors Defendants' misconduct with Cerecerez, Borrego, and Faría. Although these facts came out at trial in 1998, and thus the SJPD knew or should have known about them, on information and belief, no action was taken to discipline the officers involved, and the unconstitutional practices continued. In 2011, the Ninth Circuit ruled that the undisclosed evidence was material under *Brady* but denied Valdovinos's habeas petition under the deferential standard of review applicable to federal habeas. *See Valdovinos v. McGrath*, 423 F. App'x 720 (9th Cir. 2011).

159.    Also in 1998, SJPD police officers caused the wrongful arrest and conviction of Bobby Herrera of a gang-related shooting Herrera had no involvement in. Despite evidence that witnesses had recanted their identifications of Herrera, he was forced to plead guilty and

received a five-year sentence. Two years later, his attorneys uncovered evidence of his innocence, and he was exonerated. Although the SJPD knew or should have known about Herrera's wrongful conviction by 2000, on information and belief, no action was taken to discipline the officers involved or to end the SJPD's unconstitutional investigative practices.

160.    At the time of Rubalcava's wrongful conviction, the SJPD had affirmatively altered the classification of citizen complaints so that the vast majority would be resolved without investigation. The result was to render the SJPD, and the City of San Jose, willfully blind to misconduct allegations from the general public, including, on information and belief, other allegations of fabricating evidence and suppressing exculpatory evidence. Rather than address and correct the manifest and widespread misconduct in its ranks, the SJPD hid its head in the sand and avoided gathering any evidence of its officers' unconstitutional investigatory practices. As a result, the SJPD failed to discipline officers, including Defendants in this case, who fabricated witness identifications and suppressed exculpatory evidence.

161.    And the SJPD's unconstitutional practices continued after Rubalcava's wrongful conviction. In 2005, an SJPD officer fabricated a laboratory report falsely claiming that a suspect's semen had been found on a blanket and testified that the report was authentic. The report and the officer's false testimony were the sole (false) basis of probable cause to arraign the suspect. When it was discovered that the report was falsified, and the officer's testimony perjurious, the Santa Clara District Attorney's Office dropped all charges, and the erstwhile suspect sued. *See Kerkeles v. City of San Jose*, 199 Cal. App. 4th 1001 (2011).

COMPLAINT AND JURY DEMAND

36

**Defendant City of San Jose had an unconstitutional pattern or practice of fabricating false evidence of gang involvement to obtain convictions and sentencing enhancements.**

162.    The SJPD also had a pattern or practice of fabricating gang evidence and reports and forwarding that evidence to prosecutors in order to obtain convictions—by painting criminal defendants as remorseless, gangbanging predators—or sentencing enhancements. Often, this gang evidence would be invented out of whole cloth, or, it would be untruthful distortions of the available facts.

163.    To create this evidence, the SJPD had a cadre of dedicated detectives, including Defendants Nieves and Avalos, who professed to be experts in San Jose gang culture. These so-called gang experts would tailor gang evidence to fit the police theory of the case even where, as here, there was no factual support for their conclusions. For example, the experts would regularly fabricate non-existent gang feuds so that prosecutors could obtain gang enhancements even in cases not involving gangs at all.

164.    The SJPD would disproportionately deploy so-called gang expert testimony in cases against low-income Latino men. The so-called gang experts relied on gang designation information in the SJPD's gang database, but the gang database was notoriously over-inclusive. It was the policy or practice of SJPD police officers to include young, Latino men in the gang database on pretexts, including the neighborhood or street on which they lived, regardless of actual gang affiliation or activity. The so-called gang experts, including Nieves and Avalos, would then rely on "information" in the gang database to claim in written reports and testimony that criminal defendants were gang-affiliated. That evidence, in turn, was known to inflame juries to convict.

COMPLAINT AND JURY DEMAND

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

165.    In 2016, after decades of abuses by gang experts from the SJPD and other major California police departments, the California Supreme Court found testimony by such experts to be unconstitutional hearsay. *See People v. Sanchez*, 63 Cal. 4th 665 (2016).

**Defendant County of Santa Clara failed to ensure that confidential witness payments were disclosed to criminal defendants.**

166.    Rubalcava's wrongful conviction was also the result of Santa Clara County's failure to ensure that confidential witness payments were disclosed to criminal defendants.

167.    In 2002 and 2003, Santa Clara County had policies for handling witness protection payments made to witnesses in criminal cases that were substantially certain to cause *Brady* violations. In particular—and unlike the policies and practices in other counties—in Santa Clara County, witness protection payments could be processed without the knowledge or involvement of the prosecuting attorney and recorded separately from the criminal prosecution file. The County's policies and practice permitted SCDA investigators to process and provide witness payments without ever informing the line prosecutor. The County also failed to require that the investigator or other person approving the payment inform the prosecuting attorney, such as by requiring that records of witness protection payments be included in the prosecuting attorney's file, sent to the prosecuting attorney, or provided to criminal defendants or defense attorneys.

168.    The County's policy and practice disregarded the substantial risk that prosecuting attorneys would never learn of witness protection payments made in their cases and would therefore fail to disclose those payments to criminal defendants. In 2002 and 2003, SCDA prosecuting attorneys oversaw delivery of discovery to criminal defendants and their

COMPLAINT AND JURY DEMAND

38

attorneys. When prosecuting attorneys did not learn of witness protection payments, they could not disclose those payments to their adversaries.

169.    In 2002 and 2003, it was obvious to the County that failing to disclose witness protection payments to criminal defendants violated prosecutors' obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. The County therefore had a constitutional responsibility to ensure that it had adequate policies and procedures to ensure that such payments were disclosed in every case.

170.    In contrast to Santa Clara County, district attorneys throughout California and the United States had policies in place in 2002 and 2003 to ensure that all witness protection payments were disclosed to criminal defendants. Such policies included mandatory reporting of all witness payments to the prosecuting attorney, mandatory inclusion in the case file of memoranda concerning all witness payments, and mandatory involvement of line prosecutors in approving every request for witness protection payments.

171.    In Rubalcava's case, SCDA investigator Kaleas obtained and disbursed payments to Jennifer Contreras, the mother of the only two eyewitnesses to identify Rubalcava at trial, without disclosing those payments to the attorney who prosecuted Rubalcava's case. The prosecuting attorney was not consulted and did not approve the payments, and no record of the payments was included anywhere in the Rubalcava case file.

172.    Similarly, SCDA investigator Geer obtained and disbursed payments to witness Cerecerez and his mother without disclosing those payments to the attorney who prosecuted Rubalcava's case. The prosecuting attorney was not consulted and did not approve the payments, and no record of the payments was included anywhere in the Rubalcava case file.

173.     Given the absence of any physical evidence, impeachment material concerning these witnesses—including the only two witnesses to identify Rubalcava—would have changed the result at trial. Had the jury known that the prosecution's witnesses had been paid for their testimony, Rubalcava could have prevailed at trial.

**Rubalcava continues to fight to prove his innocence and Rodriguez admits that his identification was false.**

174.     Even after his conviction, Rubalcava fought to prove his innocence through a direct appeal, a motion for a new trial, and a habeas petition. Rubalcava's parents, who never lost faith in their son's innocence, sold their house to pay for his lawyers.

175.     During one of Rubalcava's many post-conviction proceedings, an investigator for Rubalcava's counsel located and interviewed Rodriguez. Rodriguez admitted that his identification of Rubalcava was false, and that, when he had expressed concerns about Rubalcava's prosecution to Perez, Perez had pressured him to identify Rubalcava at trial.

176.     In 2005, Rodriguez admitted under oath that the shooter was "not Lionel Rubalcava" and that he had identified Rubalcava under pressure from Perez.

177.     After Rodriguez's admission that Rubalcava was not the shooter, in 2007, Rubalcava filed multiple habeas petitions, first in the California Supreme Court and then in federal court. These petitions were denied.

178.     In 2018, the Northern California Innocence Project filed another habeas petition on behalf of Rubalcava. That petition argued that Rubalcava was actually innocent of the crime and that Nieves's gang testimony was disallowed under California law. It also raised Defendants' failure to disclose to the defense the thousands of dollars of witness protection

COMPLAINT AND JURY DEMAND

money paid to the victim and to witnesses and Rodriguez's admission that his eyewitness identification of Rubalcava was false.

**Santa Clara County District Attorney Conviction Integrity Unit reinvestigates the case and Rubalcava is finally exonerated.**

179.   Following this habeas petition, the SCDA's Conviction Integrity Unit began reinvestigating the case in a joint effort with the Northern California Innocence Project.

180.   As part of that investigation, the Conviction Integrity Unit provided the Northern California Innocence Project with the SCDA's copy of Rubalcava's original, unaltered trial prosecution file.

181.   The Northern California Innocence Project informed the SCDA that it had heard multiple times from witnesses that the victim's family had received a house or money as a result of the case, but that that the District Attorney's file did not contain any records of payments. The SCDA then searched for records from the California Witness Protection and Relocation Program (CalWRAP) and located documents showing that both the victim's family and Daniel Cerecerez had received previously undisclosed benefits through CalWRAP.

182.   The Conviction Integrity Unit conducted its own independent reinvestigation of the conviction. After re-examining Rubalcava's alibi and the witnesses' recantations of their false identifications, the Office concluded that Rubalcava was innocent. On April 18, 2019, the Santa Clara District Attorney joined Rubalcava's petition to vacate his conviction.

183.   On April 24, 2019, the Superior Court of California County of Santa Clara granted the joint request to vacate the judgment and vacated Rubalcava's conviction in its entirety.

184.   On May 15, 2019, the court dismissed all charges against Rubalcava. On that day, for the first time in over 17 years, Rubalcava walked free.

COMPLAINT AND JURY DEMAND

**Rubalcava is found factually innocent by the Superior Court of California, County of Santa Clara.**

185.    On September 30, 2019, Rubalcava and the Santa Clara District Attorney's office jointly moved for a finding of factual innocence before the Superior Court of California, County of Santa Clara.

186.    At a hearing on that stipulated motion on November 18, 2019, the court stated: "I find that Rubalcava is factually innocent of the offense because he was not the person who committed it." The court then granted the stipulated motion and issued a finding of actual innocence to Rubalcava.

## DAMAGES

187.    Lionel Rubalcava spent more than 17 years incarcerated for a crime he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences and resources that normally equip adults for that task.

188.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Rubalcava sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 17 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic

COMPLAINT AND JURY DEMAND

42

opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

189.     Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, Rubalcava was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Rubalcava missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love, to marry, to have a family, and the fundamental freedom to live one's life as an autonomous human being.

**FEDERAL CLAIMS**

**COUNT I**

**42 U.S.C. § 1983 claim for deprivation of liberty without due process of law and violation of right to a fair trial under the Fourteenth Amendment based on fabrication of false evidence against Defendants Perez, Fonua, Spillman, Nieves, Avalos, Tibbet, Torres, and Hafley**

190.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

191.   Defendants fabricated false evidence of Rubalcava's guilt, thereby violating Rubalcava's right to a fair trial and causing him to be deprived of his liberty without due process of law. Defendants caused this false evidence to be used against Rubalcava in his prosecution and at trial and failed to disclose to either the prosecution or defense that this evidence was false and fabricated.

192.   Among this fabricated false evidence were three false and fabricated eyewitness identifications obtained through coercion, threats, suggestion, and promises of financial compensation:

COMPLAINT AND JURY DEMAND

43

a. Following instructions from supervisor Hafley, Defendants including Perez, Spillman, and Fonua used coercion, threats, suggestion, and promises of financial compensation to fabricate a false eyewitness identification of Rubalcava from Gonzalez. Defendants including Perez used coercion, promises of financial compensation, and a trumped-up arrest to pressure Gonzalez into maintaining his false identification.

b. Defendants including Perez, Spillman, and Fonua fabricated a second false eyewitness identification from Millan using suggestion and coercion. Defendants including Perez also used coercion and promises of financial compensation to pressure Millan into maintaining his false identification.

c. Defendants including Perez fabricated a false identification from Rodriguez using suggestion and coercion. Defendants including Perez also used coercion and promises of financial compensation to pressure Rodriguez into maintaining his false identification.

193.    Defendants also deliberately misrepresented facts in false and fabricated police reports in order to make the false identifications appear to the prosecution, defense, and jury, to be reliable. Among those misrepresentations are the following:

a. Following instructions from Hafley, their supervisor, Perez, Spillman, and Fonua misrepresented in a written police report that Gonzalez identified Rubalcava immediately and unequivocally from a single photo array. In fact, Gonzalez was shown multiple photo arrays and told Perez, Spillman, and Fonua that the shooter was not in the arrays.

COMPLAINT AND JURY DEMAND

44

b.  Perez, Spillman, and Fonua misrepresented in a written police report that Millan made an immediate and unequivocal identification of Rubalcava as the shooter. In fact, Millan had not seen the shooter and could not make any identification, let alone an immediate and unequivocal one.

c.  Perez misrepresented in a written police report that Rodriguez made an immediate and unequivocal identification of Rubalcava from a photo array. In fact, Rodriguez did not make a positive identification at all and said only that Rubalcava looked like the shooter after Perez pressured him to identify Rubalcava.

194.  Supervisory Defendants Hafley, Tibbet, and Torres were informed of each false identification and reviewed each falsified report. On information and belief, they approved the reports despite knowing they were false and took no action to prevent the reports from being submitted to the prosecution.

195.  Defendants including Perez, Avalos and Nieves also fabricated evidence that Rodriguez had been shot as part of a Norteño-on-Norteño gang war in order to further falsely incriminate Rubalcava. Among other misconduct:

a.  Defendants including Perez repeatedly pressured witnesses, including Rodriguez, Cerecerez, and Borrego, to cause them to falsely report that the shooting resulted from a feud between rival Norteño factions.

b.  Perez, Avalos, and Nieves fabricated a false gang relatedness report, which falsely claimed that Norteño factions were feuding and that Rubalcava had shot Rodriguez as a result of that fabricated feud.

COMPLAINT AND JURY DEMAND

45

196.    Perez secretly offered multiple witnesses, including Gonzalez, Rodriguez, Millan,

Contreras, and Cerecerez, financial compensation in exchange for false testimony, and used

threats or secret promises to procure false testimony from others including Faría and

Borrego. He made secret payments of well over $22,000 to influence witnesses' testimony.

And Perez created fabricated written reports misrepresenting what witnesses had said to him.

197.    The criminal case against Rubalcava was weak, and the only evidence against him was

the foregoing false evidence fabricated by Defendants. Had evidence of Defendants'

misconduct been disclosed, it would have cast doubt on the only evidence presented as to

Rubalcava's guilt, would have been used at trial to impeach Defendants and other witnesses,

and would have demonstrated the invalidity of Defendants' entire investigation. Defendants'

actions, individually and cumulatively, played a direct and decisive role in the jury's guilty

verdict and were highly prejudicial to Rubalcava's defense. In consequence, without the false

evidence that Defendants fabricated, or had Defendants' misconduct been disclosed,

Rubalcava's trial would most likely have had a different result.

198.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by

evil motive or intent, done in bad faith, or involved callous indifference to Rubalcava's

federally protected constitutional rights. These acts were perpetrated while Defendants were

acting in their capacities as employees or agents of the City of San Jose and under color of

state law. No reasonable officer would have believed this conduct was lawful in 2002.

199.    As a direct and proximate result of Defendants' actions, Rubalcava was wrongly arrested,

detained, and charged with attempted murder; prosecuted, convicted, and sentenced to an

indeterminate prison term of twenty-five-years-=--to-life and a consecutive, determinate six-

COMPLAINT AND JURY DEMAND

46

year term of imprisonment; incarcerated for over 17 years, and suffered the other grievous

injuries and damages set forth above.

### COUNT II
**42 U.S.C. § 1983 claim for deprivation of liberty without due process of law and violation of right to a fair trial under the Fourteenth Amendment based on withholding material exculpatory and impeachment evidence against Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer**

200.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth

herein, and further alleges as follows:

201.    Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown,

Torres, Hafley, Kaleas, and Geer deprived Rubalcava of his right to a fair trial by

withholding material exculpatory and impeachment evidence from prosecutors and the

defense in violation of the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963) and its

progeny.

202.    Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown,

Torres, Hafley, Kaleas, and Geer either directly participated or knew about the fabrication of

false inculpatory evidence and concealment of exculpatory evidence described herein and

intentionally failed to disclose it to prosecutors and the defense. Defendants' misconduct in

withholding material exculpatory and impeachment evidence included but is not limited to:

  a.   Withholding from prosecutors and the defense that Perez, Spillman, and Fonua

       fabricated false reports concerning the Gonzalez, Millan, and Rodriguez

       identifications, failing to disclose that each of those witnesses failed to positively

       identify Rubalcava from photo arrays, and failing to disclose the coercion,

suggestion, and promises of financial remuneration that caused their identifications;

b.  Withholding from prosecutors and the defense that the recording of the interview Mejia had provided which confirmed that Millan had not seen the shooter;

c.  Withholding from prosecutors and the defense that Fonua showed Cerecerez a photo array and he did not identify Rubalcava as the shooter;

d.  Withholding from prosecutors and the defense that Perez pressured Faría and Borrego to identify Rubalcava, fabricated that Faría and Borrego had been unable to see inside the 4Runner, and, on information and belief, used threats or secret promises of financial support to cause them to adopt that false story;

e.  Withholding from prosecutors and the defense that Perez repeatedly pressured witnesses, including Rodriguez and Borrego, to cause them to falsely report that the shooting resulted from a feud between rival Norteño factions;

f.  Withholding from prosecutors and the defense that Defendants, including Perez Nieves, Kaleas, and Geer, had offered multiple witnesses, including Rodriguez, Millan, Contreras, and Cerecerez, thousands of dollars in financial benefits in exchange for false testimony, and that Perez secured more than $22,000 for Contreras and Cerecerez in order to influence the false and fabricated testimony of Rodriguez, Millan, and Cerecerez himself;

g.  Withholding evidence of Defendants' misconduct throughout the investigation, which undermined their credibility and the reliability of the investigation as a whole.

COMPLAINT AND JURY DEMAND

48

203.    The criminal case against Rubalcava was weak, and the only evidence against him was the false evidence fabricated by Defendants. Had any of this suppressed exculpatory or impeachment evidence been disclosed, Rubalcava would never have been wrongly convicted.

204.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Rubalcava's federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City of San Jose or the County of Santa Clara and under color of state law. No reasonable officer in 2002 and 2003 would have believed the foregoing conduct was lawful.

205.    As a direct and proximate result of Defendants' actions, Rubalcava was wrongly arrested, detained, charged with attempted murder, prosecuted, convicted, sentenced to indeterminate term of imprisonment of twenty-five years to life and a consecutive determinate six-year term of imprisonment, incarcerated for over 17 years and suffered the other grievous injuries and damages set forth above.

## COUNT III
### 42 U.S.C. § 1983 Claim for Malicious Prosecution and Violation of the Fourth and Fourteenth Amendments Against Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer

206.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

207.    Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer caused criminal proceedings to be brought against Rubalcava without probable cause and without any reasonable belief in guilt. Rubalcava is completely innocent of the attempted murder of Rodriguez. As Defendants knew, the sole

COMPLAINT AND JURY DEMAND

basis for the criminal action against Rubalcava was the false evidence that Defendants fabricated. No reasonable officer in 2002 would have believed that fabricated evidence provided probable cause to arrest, and no reasonable officer in 2002 would have believed that an arrest without probable cause was justified.

208.   Defendants also continued the prosecution against Rubalcava on the basis of this false and fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby subjecting Rubalcava to an ongoing seizure in violation of the Fourth and Fourteenth Amendments.

209.   The criminal proceedings against Rubalcava were initiated with malice. Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer caused the charges against Rubalcava to be filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Rubalcava when they knew there was no probable cause.

210.   Defendants initiated the action against Rubalcava for the purpose of denying Rubalcava's constitutional rights, including his right to be free from unreasonable searches and seizures, and his right to not be deprived of liberty without due process of law.

211.   As a direct and proximate result of Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer's actions, Rubalcava was wrongly arrested, detained, charged with attempted murder, prosecuted, convicted, sentenced to indeterminate term of imprisonment of twenty-five years to life and a consecutive

COMPLAINT AND JURY DEMAND

1   determinate six-year term of imprisonment, incarcerated for over 17 years and suffered the

2   other grievous injuries and damages set forth above.

3   212.   The criminal proceedings against Rubalcava terminated in his favor. The prosecution

4   joined a request to vacate the conviction and dismiss the indictment based on its independent

5   investigation establishing Rubalcava's innocence. On April 24, 2019, the California Superior

6   Court of California granted the parties' request and vacated Rubalcava's conviction in its

7   entirety. On May 15, 2019, the court dismissed all charges against Rubalcava, and, on

8   November 18, 2019, the court granted a joint motion and issued a finding of factual

9   innocence in Rubalcava's favor.

**COUNT IV**
**42 U.S.C. § 1983 Civil Rights Conspiracy Claim Against Defendants Perez, Nieves,**
**Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and**
**Geer**

213.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth

herein, and further alleges as follows:

214.   Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown,

Torres, Hafley, Kaleas, Geer, and others yet unknown agreed among themselves and others,

including Jennifer Contreras and Daniel Cerecerez, to act in concert to deprive Rubalcava of

his clearly established constitutional rights as protected by the Fourth and Fourteenth

Amendments, including his right not to be deprived of liberty without due process of law and

to be free from illegal seizure.

215.   As described in detail above, in furtherance of the conspiracy, Defendants Perez, Nieves,

Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, Geer, and

COMPLAINT AND JURY DEMAND

others, including Contreras and Cerecerez, engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to, the following misconduct:

a.  Defendants, including but not limited to Perez, Spillman, Fonua, Hafley, Brown, Baldal, Tibbet, and Torres, acted in concert to fabricate false eyewitness identifications of Rubalcava from Gonzalez, Millan, and Rodriguez using coercion, threats, suggestion, and bribery. They also acted in concert to fabricate police reports falsely representing that these identifications were made immediately and unequivocally when, in fact, none of the witnesses made an unequivocal identification.

b.  Defendants, including but not limited to Perez, Spillman, Fonua, Hafley, Brown, Baldal, Tibbet, Torres, Kaleas, and Geer, acted in concert with Contreras to use coercion and financial compensation to pressure Millan and Rodriguez into maintaining their false identifications and testifying against Rubalcava at trial.

c.  Defendants, including but not limited to Fonua, Perez, and Nieves, acted in concert to coerce Cerecerez to identify Rubalcava and conceal Cerecerez's lack of identification of Rubalcava.

d.  Defendants, including but not limited to Fonua, Perez, Nieves, Kaleas, and Geer acted in concert with Cerecerez by giving Cerecerez secret financial compensation in order to testify falsely against Rubalcava.

e.  Defendants, including but not limited to Perez and Spillman, acted in concert to pressure Borrego to identify Rubalcava, fabricate that Borrego had been unable to see inside the 4Runner to minimize the exculpatory value of Borrego's

nonidentification, and, on information and belief, use threats and secret promises of financial support to cause Borrego to adopt the false story.

f. Defendants, including but not limited to Perez and Spillman, acted in concert to fabricate a false report claiming that Borrego could not identify Rubalcava because he had not seen inside the 4Runner to minimize the exculpatory value of Borrego's nonidentification.

g. Defendants, including but not limited to Perez, Avalos, and Nieves, acted in concert to fabricate a false Norteño-on-Norteño gang war to falsely implicate Rubalcava.

h. Defendants, including but not limited to Perez, Avalos, and Nieves, acted in concert to repeatedly pressure witnesses, including Rodriguez and Borrego, to cause them to falsely report that the shooting resulted from a feud between rival Norteño factions.

i. Defendants, including but not limited to Perez, Avalos, and Nieves, acted in concert to fabricate a false gang relatedness report, which falsely claimed that Norteño factions were feuding and that Rubalcava had shot Rodriguez as a result of that fabricated feud.

j. Defendants, including but not limited to Perez, Fonua, Nieves, Kaleas, and Geer acted in concert to conceal that they had offered multiple witnesses, including Rodriguez, Millan, Contreras, and Cerecerez, thousands of dollars in financial benefits in exchange for false testimony.

COMPLAINT AND JURY DEMAND

216.   No reasonable officer in 2002 would have believed this conduct was lawful. As a direct and proximate result of Defendants' actions, Rubalcava was wrongly arrested, detained, charged with attempted murder, prosecuted, convicted, sentenced, and incarcerated for over 17 years. As a result, Rubalcava suffered the grievous injuries and damages set forth above.

**COUNT V**
**42 U.S.C. § 1983 Supervisory Liability Claim**
**Against Defendants Tibbet, Torres, Garcia, Hafley, and Brown**

217.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

218.   Rubalcava's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of SJPD supervisors Tibbet, Torres, Garcia, Hafley, and Brown acting in their individual capacities and under color of law.

219.   Because Tibbet, Torres, Garcia, Hafley, and Brown's failure to supervise, discipline, or train Perez, Spillman, Fonua, Nieves, and Avalos, Rubalcava was deprived of his clearly established rights under the Fourth and Fourteenth Amendments. No reasonable officer in 2002 would have believed this conduct was lawful. Tibbet, Torres, Garcia, Hafley, and Brown's misconduct included but is not limited to:

a.   Hafley, Brown, Tibbet, and Torres knew or had reason to know that Perez, Spillman, and Fonua had fabricated a false eyewitness identifications from Gonzalez, Millan, and Rodriguez using coercion, threats, suggestion; that Perez, Spillman, and Fonua fabricated police reports concerning the eyewitness identification procedures; and that Perez had used threats and promises of

COMPLAINT AND JURY DEMAND

54

financial compensation to pressure Gonzalez, Millan, and Rodriguez to maintain their false identifications. Yet Hafley, Brown, Tibbet, and Torres failed to discipline or supervise Perez, Spillman, or Fonua, and failed to act to prevent or stop these fabrications from causing the wrongful prosecution and conviction of Rubalcava.

b.   Perez, Fonua, and Spillman consulted with Hafley regarding their efforts to use coercion or suggestion to cause Gonzalez to falsely identify Rubalcava. Rather than disciplining them for their proposed misconduct, Hafley actively encouraged them.

c.   Hafley, Tibbet, and Torres each knew or had reason to know that Perez, Fonua, and Spillman had fabricated false identifications and false reports concerning their identification procedures. Yet, rather than supervising and disciplining the officers for their misconduct, Hafley, Tibbet, and Torres reviewed and approved their fabricated reports.

d.   Garcia and Brown knew that Perez had fabricated a report of Rodriguez's false identification of Rubalcava. Yet Garcia and Brown failed to discipline or supervise Perez and failed to act to prevent or stop this misconduct.

e.    Tibbet, Torres, Garcia, Hafley, and Brown knew of or should have known of, or willfully tolerated a policy, practice, or custom by SJPD officers, including Perez, Nieves, Avalos, Spillman, and Fonua, in which SJPD officers used various techniques to coerce or fabricate incriminatory statements or identifications. Yet,

they did nothing to supervise or discipline Defendants or to prevent Rubalcava's wrongful conviction.

f.   Tibbet, Torres, Garcia, Hafley, and Brown knew of or should have known of the policy, practice or custom of SJDP officers, including Perez, Avalos, and Nieves, of fabricating gang evidence against defendants, and yet did nothing to supervise or discipline Perez, Avalos, and Nieves or to prevent Rubalcava's wrongful prosecution and conviction by the fabricated gang evidence.

g.   Tibbet, Torres, Garcia, Hafley, and Brown failed to discipline, train, or adequately supervise Perez, Nieves, Avalos, Baldal, Spillman, and Fonua regarding their constitutional obligations not to fabricate evidence, commit perjury, or hide exculpatory evidence.

220.   Tibbet, Torres, Garcia, Hafley, and Brown knowingly refused to terminate the wrongful prosecution of Rubalcava, which they knew or should have known had been initiated based on the coerced, fabricated, or suggested identifications by Rodriguez, Millan, and Gonzalez and false and fabricated gang testimony, and despite suppressed exculpatory information. As a result, Tibbet, Torres, Garcia, Hafley, and Brown knew or reasonably should have known that Rubalcava's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

221.   Tibbet, Torres, Garcia, Hafley, and Brown culpably failed to adequately train, supervise, an/or control their subordinates, Perez, Nieves, Avalos, Baldal, Spillman, and Fonua, who obtained coerced, fabricated, or suggested identifications, and suppressed exculpatory information.

COMPLAINT AND JURY DEMAND

56

222.   Tibbet, Torres, Garcia, Hafley, and Brown violated Rubalcava's constitutional rights by acquiescing in the deprivation of Rubalcava's constitutional rights by their subordinates, and by showing a reckless and callous indifference to Rubalcava's rights.

223.   Tibbet, Torres, Garcia, Hafley, and Brown's failure to train, supervise, or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Rubalcava's rights, encouraged and permitted their subordinates to fabricate inculpatory evidence and to fail to document and to disclose exculpatory evidence.

224.   The actions and omissions of Defendants Tibbet, Torres, Garcia, Hafley, and Brown, in their individual capacities, caused Rubalcava to be wrongly arrested, detained, charged with attempted murder, prosecuted, convicted, sentenced, and incarcerated for over 17 years. As a result, Rubalcava suffered the constitutional deprivations and grievous personal injuries and damages described above.

**COUNT VI**
**42 U.S.C. § 1983 Failure to Intervene Against Defendants Perez, Spillman, Avalos, Nieves, Fonua, Baldal, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer**

225.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

226.   By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Rubalcava to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so. No reasonable officer in 2002 or 2003 would have believed this conduct was lawful. Defendants' failures included but are not limited to:

COMPLAINT AND JURY DEMAND

57

   a.   Failing to intervene to prevent or stop the fabrication of eyewitness identifications by Gonzalez, Millan, and Rodriguez;

   b.   Failing to intervene to prevent or stop the pressure, threats, and bribery employed to coerce Gonzalez, Millan, and Rodriguez to maintain their false identifications by Perez;

   c.   Failing to intervene to prevent or stop the fabrication of reports on the false and fabricated eyewitness identifications by Gonzalez, Millan, and Rodriguez;

   d.   Failing to intervene to prevent or stop the concealment and suppression of exculpatory evidence from Borrego and Faría;

   e.   Failing to intervene to prevent or stop the concealment and suppression of evidence of thousands of dollars of payments made to witnesses including Cerecerez, Rodriguez, and Contreras;

   f.   Failing to intervene to prevent or stop the concealment and fabrication of Perez's interviews with Mejia and Holmes; and

   g.   Failing to intervene to prevent or stop the fabrication of a false gang war and the creation of a false and fabricated gang relatedness report.

227.   These Defendants' failures to intervene violated Rubalcava's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable officer or investigator in 2002 or 2003 would have believed that failing to intervene to prevent Defendants from fabricating inculpatory evidence, concealing and withholding exculpatory evidence, or causing Rubalcava to be arrested and prosecuted without probable cause, were lawful.

COMPLAINT AND JURY DEMAND

228.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Rubalcava's injuries. Defendants knew, or should have known, that their conduct would result in Rubalcava's wrongful arrest, prosecution, conviction, and incarceration.

229.    The actions and omissions of Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Brown, Torres, Hafley, Kaleas, and Geer, in their individual capacities, caused Rubalcava to be wrongly arrested, detained, charged with attempted murder, prosecuted, convicted, sentenced, and incarcerated for over 17 years. As a result, Rubalcava suffered the constitutional deprivations and grievous personal injuries and damages described above.

### COUNT VII
**42 U.S.C. § 1983 *Monell* Claim Against the City of San Jose, for Failure to Train, Supervise, or Discipline in Constitutionally Adequate Investigation Techniques, Identification Procedures, or *Brady* duties**

230.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

231.    The City of San Jose, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline their employees and agents, including Defendants, regarding constitutionally adequate investigation techniques.

232.    The City of San Jose, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline their employees and agents, including Defendants, regarding constitutionally proper identification procedures and to ensure that unreliable, discredited, and improper identification techniques were not utilized, including but not limited to fabrication.

COMPLAINT AND JURY DEMAND

233.     The City of San Jose, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline their employees and agents, including Defendants, regarding their obligations to document and disclose exculpatory evidence pursuant to their *Brady* obligations.

234.     The unconstitutional customs, policies, patterns, and practices of the City of San Jose have caused numerous individuals, other than Rubalcava himself, to be prosecuted or convicted on the basis of false and fabricated evidence, including but not limited to:

      a.   Felix Solorio Valdovinos

      b.   Bobby Herrera

      c.   Michael Kerkeles

235.     The City of San Jose, by and through its policymakers, created and maintained a custom, policy, or practice of fabricating false evidence of gang involvement in order to obtain convictions and sentencing enhancements by deploying so-called gang experts to tailor gang evidence to fit the police theory of the case, even when there was no factual support for their conclusions.

236.     In support of this custom, policy, or practice, the City of San Jose also maintained an over-inclusive database in which SJPD officers included young Latino men on pretexts including the neighborhood they lived in or the street on which they lived, regardless of actual gang affiliation or activity.

237.     These unconstitutional customs, policies, and practices of the City of San Jose proximately and directly caused Rubalcava's physical and constitutional injuries, including

his false arrest, illegal confinement, unfair trial, wrongful conviction, and other damages described above.

### COUNT VIII
**42 U.S.C. § 1983 *Monell* Claim Against the County of Santa Clara For Its Policy and Practice of Failing to Disclose *Brady* Material Concerning Witness Protection Payments to Prosecuting Attorneys, Criminal Defendants, and Defense Counsel**

238.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

239.    The County of Santa Clara, by and through its policymakers, created policies and procedures for handling witness protection payments that were substantially certain to cause *Brady* violations, and maintained these policies and procedures in deliberate indifference to the obvious risk these constitutional violations would result.

240.    These unconstitutional customs, policies, and practices of the County of Santa Clara proximately and directly caused Rubalcava's physical and constitutional injuries, including his false arrest, illegal confinement, unfair trial, wrongful conviction, and other damages described above.

### CALIFORNIA LAW CLAIMS

### COUNT IX
**Claim under California Civil Code § 52.1 Against Defendants Perez, Nieves, Spillman, Fonua, Kaleas, and Geer**

241.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

242.    Defendants Perez, Nieves, Spillman, and Fonua interfered or attempted to interfere with Rubalcava's rights secured by the U.S. and California constitution and laws. These

COMPLAINT AND JURY DEMAND

constitutional violations were accompanied by threats, intimidation, or coercion. This misconduct included but was not limited to:

    a.   Perez's use of threats, intimidation, or coercion in an attempt to prevent Holmes and Mejia from offering exculpatory information;

    b.   Perez, Nieves, Spillman, and Fonua's use of threats, intimidation, or coercion to fabricate false eyewitness identifications from Rodriguez, Gonzalez, and Millan;

    c.   On information and belief, Perez and Spillman's use of threats, intimidation, or coercion to cause Borrego to falsely testify that he had not seen the perpetrator;

    d.   On information and belief, Perez's use of threats, intimidation, or coercion to cause Faría to falsely testify that he had not seen the perpetrator;

    e.   Perez's use of threats and coercion to cause Cerecerez to testifying against Rubalcava.

    f.   Kaleas and Geer's use of witness protection payments to coerce Rodriguez, Millan, and Cerecerez to testify falsely against Rubalcava.

243.   As a direct and proximate result of Perez, Nieves, Spillman, Fonua, Kaleas, and Geer's threats, intimidation, or coercion, Rubalcava was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over 17 years; and subjected to other grievous injuries and damages as set forth above.

## COUNT IX
### Claim under California State Law, Cal. Gov. Code § 815.2, for Respondeat Superior and Vicarious Liability against the City of San Jose and County of Santa Clara

244.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

COMPLAINT AND JURY DEMAND

245.    Rubalcava suffered the aforementioned injuries as a proximate result of the misconduct of the individual Defendants.

246.    During all relevant times, Defendants were employees of the San Jose Police Department and the City of San Jose or the Santa Clara District Attorney's Office and the County of Santa Clara.

247.    Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

248.    The acts and omissions of Defendants that proximately caused Rubalcava's injuries were within the scope of Defendants' employment with the San Jose Police Department and the City of San Jose or the Santa Clara District Attorney's Office and the County of Santa Clara.

**COUNT X**
**Claim under California State Law, Cal. Gov. Code § 825, against City of San Jose and County of Santa Clara**

249.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

250.    California law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

251.    At all relevant times, the Defendants were employees of the City of San Jose Police Department or the County of Santa Clara who acted within the scope of their employment in committing the misconduct described herein.

COMPLAINT AND JURY DEMAND

**JURY DEMAND**

252.     Pursuant to the Seventh Amendment of the United States Constitution, Rubalcava

requests a jury trial on all issues and claims set forth in this Complaint.

COMPLAINT AND JURY DEMAND

**PRAYER FOR RELIEF**

WHEREFORE, Rubalcava demands judgment jointly and severally against Defendants as follows:

A. That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial but that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this action;

B. That the Court award punitive damages to him, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which he may be entitled.


Respectfully submitted,

Dated: June 25, 2020

By:
    Nick Brustin
    Anna Benvenutti Hoffmann
    Richard Sawyer
    Kate Fetrow
    ***Pro Hac Vice Applications Forthcoming***
    Neufeld Scheck & Brustin, LLP
    99 Hudson Street, 8th Floor
    New York, NY 10013

    /s/ Lara Bazelon
    Lara Bazelon
    2139 Fulton Street, Suite 211
    San Francisco, California 94117

    *Attorneys for Plaintiff Lionel Rubalcava*

COMPLAINT AND JURY DEMAND

65