1
2
3 **UNITED STATES DISTRICT COURT**
4 **NORTHERN DISTRICT OF CALIFORNIA**
5 **SAN JOSE DIVISION**
6

7 LIONEL RUBALCAVA,

Case No. 20-cv-04191-BLF

8 Plaintiff,

**ORDER (1) GRANTING IN PART AND
DENYING IN PART CITY
DEFENDANTS' MOTION TO
DISMISS, WITH LEAVE TO AMEND;
AND (2) GRANTING COUNTY
DEFENDANTS' MOTION TO
DISMISS, WITH LEAVE TO AMEND
IN PART AND WITHOUT LEAVE TO
AMEND IN PART**

9 v.

10 CITY OF SAN JOSE, et al.,

11 Defendants.

12

13 [Re: ECF 57, 60]

14

15     This action arises out of a tragic miscarriage of justice that resulted in Plaintiff Lionel

16 Rubalcava serving more than seventeen years in prison for a crime he did not commit: the

17 attempted murder of a man named Raymond Rodriguez. Rubalcava's conviction was vacated in

18 2019 by the Santa Clara County Superior Court, which also made an express finding of his actual

19 innocence. Rubalcava thereafter filed this suit, claiming that San Jose Police Department

20 ("SJPD") officers and Santa Clara County investigators fabricated evidence and committed other

21 misconduct that led to his wrongful conviction. He asserts federal and state law claims against

22 those individuals and *Monell*[1] claims against the City of San Jose and the County of Santa Clara.

23     Before the Court are two motions to dismiss the complaint pursuant to Federal Rule of

24 Civil Procedure 12(b)(6), one brought by the City of San Jose and individual SJPD officers

25 (collectively, "City Defendants"), and the other brought by the County of Santa Clara and

26 individual County investigators (collectively, "County Defendants").

27

28 _____
[1] *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

For the reasons discussed below, the City Defendants' motion is GRANTED IN PART AND DENIED IN PART, WITH LEAVE TO AMEND, and the County Defendants' motion is GRANTED, WITH LEAVE TO AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART.

## I.   BACKGROUND

The following facts are drawn from the complaint and are accepted as true for purposes of the motions to dismiss.

*Drive-By Shooting of Rodriguez*

At approximately 5:30 p.m. on April 5, 2002, Raymond Rodriguez was standing in front of his home on Mastic Street in San Jose, California, chatting with his twelve-year-old brother, Eric Millan, and a friend, Daniel Cerecerez. Compl. ¶¶ 35-36. Rodriguez was wearing red and had a large N-shaped belt buckle, both indicating affiliation with the Norteño gang. *Id.* ¶ 35. Also standing on the street were Rodriguez's neighbor, David Gonzalez – also a Norteño – and two other men, Alejandro Borrego and Nicholas Faría. *Id.* ¶ 36.

Gonzalez noticed a Toyota 4Runner driving along Mastic Street. Compl. ¶ 37. Its occupants were wearing blue, the color of the rival Sureño gang. *Id.* ¶ 35. Gonzalez recognized the 4Runner's driver as a Sureño and ran into his backyard. *Id.* ¶ 37. The 4Runner stopped in front of Rodriguez's house, and when Rodriguez realized that its occupants were Sureños, he raised his hands and asked, "what's up?" *Id.* ¶ 38. The driver shot Rodriguez in the chest and sped off. *Id.* ¶ 39. Rodriguez survived but he was paralyzed from the waist down. *Id.* ¶ 40.

*Initial Investigation*

Lieutenant Walt Tibbet and Sergeant Rich Torres of the SJPD supervised the investigation while Officer Edgardo Garcia oversaw the canvass of the neighborhood. Compl. ¶ 48. When interviewed at the hospital, Rodriguez identified the 4Runner's occupants as "scraps," which is a derogatory term that Norteños use for Sureños. *Id.* ¶ 50. Rodriguez also stated that the Norteños and Sureños were feuding. *Id.* Upon learning that the shooting was gang-related, Lieutenant Tibbet and Sergeant Torres contacted Sergeant Gary Hafley, a supervisor with the SJPD gang unit, who assigned gang investigator Detective Joseph Perez to lead the investigation. *Id.* ¶ 51. Perez

did not turn up any leads on the Sureño shooter. *Id.* ¶ 52. The 4Runner was recovered blocks away from Rodriguez's home, trashed and burned. *Id.* ¶ 49.

Two days after the shooting, Rubalcava saw Rodriguez's sister, Jennifer Rodriguez, standing outside her home on Mastic Street and stopped to speak with her. Compl. ¶ 53. Jennifer Rodriguez was unnerved by the interaction and told SJPD officers that she thought Rubalcava might be connected to the shooting. *Id.* ¶ 54. The police had no other leads, so they focused on Rubalcava. *Id.* ¶ 55. Rubalcava had joined the Norteño gang when he was a boy. Compl. ¶ 43. However, he had become inactive in the gang as he got older. *Id.* At the time of the shooting, Rubalcava – then in his early 20s – was driving from San Jose, California to Hollister, California for a first date with a woman named Stephanie Leon. Compl. ¶¶ 18, 44. Rubalcava and Leon saw a movie and parted ways at approximately 10:00 pm. *Id.*

Although Rubalcava was a Norteño and not a Sureño, and was not near Mastic Street at the time of the shooting, SJPD officers "began putting together a case against Rubalcava by using coercion, suggestion, and outright fabrication to muster false evidence of his guilt." Compl. ¶ 55.

*Eye-Witness Gonzalez*

Detective Perez, along with SJPD officers Steven Spillman and Topui Fonua, took Rodriguez's neighbor, Gonzalez, to an empty parking lot and threatened to search his family's apartment if he did not cooperate in their investigation. *Id.* ¶ 56. Gonzalez stated that the shooter was a Sureño who had harassed him (Gonzalez) in the past for being a Norteño. *Id.* ¶ 58. Gonzalez thought that he was the intended target of the shooting. *Id.* Perez, Spillman, and Fonua nonetheless showed Gonzalez photo arrays and pressured him into identifying Rubalcava as the shooter. *Id.* ¶¶ 59-60. Perez, Spillman, and Fonua falsely stated in their report that Gonzalez immediately identified Rubalcava as the shooter, omitting the manner in which Gonzalez was coerced into making the identification. *Id.* ¶ 61. Sergeants Torres and Hafley "reviewed and approved the false report." *Id.* ¶ 63.

Gonzalez attempted to recant his identification of Rubalcava, but Perez pressured him to stick with the identification. Compl. ¶ 64. Perez also offered Gonzalez's mother money to move her family to a better neighborhood if Gonzalez stood by his identification of Rubalcava, and

promised Gonzalez witness-protection payments in exchange for his testimony. *Id.* ¶ 65. To ensure Gonzalez's cooperation, Perez had Gonzalez arrested as an accessory to the attempted murder of Rodriguez, arranged for Gonzalez to wear a brown uniform in jail marking him as a "snitch," and threatened to return him to jail after the preliminary hearing if he did not identify Rubalcava as the shooter. *Id.* ¶¶ 66-68. Gonzalez, in fear for his life, testified at the preliminary hearing that Rubalcava "looked like" the shooter, and Rubalcava was bound over for trial. *Id.* ¶ 68. In retaliation for Gonzalez's failure to make a definite identification of Rubalcava, Perez withdrew the offers of financial support to Gonzalez and his family. *Id.* ¶ 70. Gonzalez thereafter testified truthfully at trial that Rubalcava was not the shooter, but his testimony was impeached with his prior identification of Rubalcava. *Id.* ¶ 71.

*Victim Rodriguez and his brother Millan*

Perez, Spillman, and Fonua also pressured the shooting victim, Rodriguez, and his brother, Millan, to identify Rubalcava as the shooter. Compl. ¶¶ 75, 79-80. Perez brought a photo array to Rodriguez when he was hospitalized and heavily medicated, and got him to identify Rubalcava as the shooter. *Id.* ¶ 79. The officers also reported that Millan positively identified Rubalcava when in fact Millan had not seen the shooter. *Id.* ¶¶ 73-75. Sergeants Torres and Hafley approved the false reports regarding identification of Rubalcava by Rodriguez and Millan. *Id.* ¶¶ 76, 82.

Perez offered Jennifer Contreras, the mother of Rodriguez and Millan, money to relocate her family if her sons cooperated. Compl. ¶ 85. In return, Contreras pressured her sons to maintain their false identifications of Rubalcava through trial. *Id.* ¶ 98. Perez and County investigator Doug Kaleas falsified an application for witness protection funding, stating that Contreras and her sons had relocated for safety reasons when Perez and Kaleas had helped move Contreras to a better apartment to induce her sons to testify against Rubalcava. *Id.* ¶ 99. Perez and Kaleas did not disclose the witness protection funding to the prosecution or defense. *Id.* ¶100.

*Witness Daniel Cecerez*

Daniel Cecerez, who witnessed the shooting, gave Fonua a description of the front passenger of the 4Runner and said he would recognize the passenger if he saw him again. Compl. ¶ 112. Fonua later showed Cecerez a photo array containing Rubalcava's photograph and

4

pressured him to identify Rubalcava as the shooter.  *Id.* ¶ 113.  Cerecerez recognized Rubalcava from his photo and told Fonua that Rubalcava was not the shooter.  *Id.*  Cerecerez stated that the shooter was the Sureño who had visited Gonzalez weeks earlier.  *Id.*  Fonua did not document showing Cerecerez the photo array or Cerecerez's denial of Rubalcava's involvement, and this information was not disclosed to the prosecution or the defense.  *Id.* ¶ 114.

*Witness Nicholas Faría*

At the time of the shooting, Nicholas Faría was standing in the street, having just parked his car.  Compl. ¶ 115.  Faría gave a detailed description of the shooter and other occupants of the 4Runner and its occupants.  *Id.*  Fonua later showed Faría a photo array and pressured him to identify Rubalcava, but Faría denied seeing Rubalcava in the 4Runner.  *Id.* ¶ 116.  Perez fabricated a report claiming that Faría could not identify Rubalcava because he had not seen inside the 4Runner, and coerced Faría into saying that he could not see into the 4Runner.  *Id.* ¶¶ 117-18.

*Witness Alejandro Borrego*

Alejandro Borrego was standing across the street at the time of the shooting.  Compl. ¶ 119.  He told Spillman that the men in the 4Runner were wearing blue and that he could identify them.  *Id.*  Perez showed Borrego a photo array and pressured him to identify Rubalcava, but Borrego said that Rubalcava was not the shooter.  *Id.* 120.  Perez fabricated a report stating that Borrego had not seen the perpetrators in the 4Runner and coerced Borrego to deny having seen the car or its occupants.  *Id.* ¶¶ 121-22.

*Fabrication of Gang War between Norteño Factions*

Perez collaborated with SJPD gang detectives Rafael Nieves and Ramon Avalos to fabricate the existence of a gang war between Norteño factions, in that manner explaining why Rubalcava, a Norteño, would shoot another Norteño.  Compl. ¶¶ 133-35.  The three detectives created a "gang relatedness report" stating that West Side Mob and Varrio Horseshoe, both Norteño factions, were feuding, and that Rubalcava had shot Rodriguez in an attempt to kill Gonzalez because of Gonzalez's involvement with Varrio Horseshoe.  *Id.* ¶ 135.  Perez also promised Cerecerez witness protection funding if Cerecerez cooperated in the investigation.  *Id.* ¶ 136.  Perez and Nieves, along with County investigator Brian Geer, essentially paid Cerecerez to

fabricate evidence of a war between Norteño factions. *Id.* ¶¶ 136-37. They did not disclose those payments to the prosecution or the defense. *Id.* ¶ 138. Cerecerez falsely testified at trial that he had been stabbed by members of Varrio Horseshoe because of his affiliation with West Side Mob, and that the shooting could have been "red-on-red," meaning Norteño-on-Norteño, when in fact Cerecerez knew that the shooter was a Sureño. *Id.* ¶ 139.

*Rubalcaba's Arrest and Conviction*

Rubalcava was arrested on April 8, 2002. Compl. ¶ 103. Sergeant Michael Brown and Detective Ron Baldal interrogated Rubalcava at the precinct, and Rubalcava gave an account of his activities on the day of the shooting. *Id.* ¶ 106. Brown, Spillman, and Fonua searched Rubalcava's home and found no incriminating evidence. *Id.* ¶ 107. Despite his alibi and the absence of any legitimate evidence against him, Rubalcava was booked and charged with the attempted murder or Rodriguez. *Id.* ¶ 108.

After Rubalcava's arrest, Perez was told by a man named Michael Altamirano that a Sureño named Renan "Shadow" Martinez had admitted to being a passenger in the drive-by shooting of Rodriguez. *Id.* ¶ 143. Shadow was a Sureño. *Id.* The SJPD did not conduct any meaningful investigation of Shadow. *Id.* ¶ 144. At trial, the false and fabricated evidence discussed above led a jury to convict Rubalcava of the attempted murder of Rodriguez. *Id.* ¶ 151. The jury found true all enhancements, including that the offense was committed for the benefit of a criminal street gang. *Id.* Rubalcava was sentenced to an indeterminate term of imprisonment of twenty-five years to life and a consecutive six-year term of imprisonment. *Id.* ¶ 152.

*Reinvestigation and Finding of Actual Innocence*

In 2018, the Northern California Innocence Project filed a habeas petition on behalf of Rubalcava, arguing among other things that Rubalcava was actually innocent; the gang testimony offered at trial was improper; the failure to disclose thousands of dollars paid to witnesses was improper; and the shooting victim, Rodriguez, had admitted that his eyewitness identification of Rubalcava was false. Compl. ¶ 178. The Santa Clara County District Attorney's Office reinvestigated the case and ultimately joined with Rubalcava in a 2019 petition to vacate the conviction. *Id.* ¶ 182. The Santa Clara County Superior Court granted that petition and dismissed

all charges against Rubalcava on May 15, 2019. *Id.* ¶¶ 183-84. The Santa Clara District Attorney's Office and Rubalcava thereafter jointly moved the Santa Clara County Superior Court for a finding of factual innocence, which was granted on November 18, 2019. *Id.* ¶¶ 185-186.

### The Present Lawsuit

Rubalcava filed the present lawsuit on June 25, 2020, asserting federal civil rights claims and state law claims against SJPD officers and County investigators who allegedly engaged in the misconduct described above. Rubalcava also asserts *Monell* claims against the City of San Jose and the County of Santa Clara.

The complaint alleges the following claims: (1) § 1983 claim for Violation of the 14th Amendment (Fabrication of Evidence); (2) § 1983 claim for Violation of the 14th Amendment (Withholding Exculpatory and Impeachment Evidence); (3) § 1983 claim for Violation of the 4th and 14th Amendments (Malicious Prosecution); (4) § 1983 claim for Civil Rights Conspiracy; (5) § 1983 claim for Supervisory Liability; (6) § 1983 claim for Failure to Intervene; (7) § 1983 *Monell* Claim against City; (8) § 1983 *Monell* Claim against County; (9) Claim under Cal. Civ. Code § 52.1; (9)[2] Claim under Cal. Gov't Code § 815.2 for Respondeat Superior against City and County; and (10) Claim under Cal. Gov't Code § 825 against City and County.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

---

[2] The complaint lists two Claim 9s.

United States District Court
Northern District of California

When evaluating a Rule 12(b)(6) motion, the district court must consider the allegations of the complaint, documents incorporated into the complaint by reference, and matters that are subject to judicial notice. *Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### III.   CITY DEFENDANTS

The Court first addresses the motion to dismiss brought by the City Defendants, comprising the City of San Jose; members of the SJPD who conducted the investigation, including Perez, Fonua, Spillman, Baldal, Nieves and Avalos; and members of the SJPD who supervised the investigation, including Tibbet, Torres, Hafley, and Garcia.[3] Those defendants ask the Court to "dismiss Rubalcava's claims against them in their entirety." City Defs.' Mot., unnumbered first page, ECF 60.

At the hearing, the Court noted that the City Defendants have not offered any argument on Rubalcava's state law claims. In response, Counsel for the City Defendants suggested that the County Defendants' arguments on the state law claims are equally applicable to the City Defendants. The County Defendants seek dismissal of the state law claims for failure to comply with the claim presentation requirement of California's Government Claims Act ("GCA"). *See* Cal. Gov't Code §§ 905, 911.2, 945.4; *Baines Pickwick Ltd. v. City of Los Angeles*, 72 Cal. App. 4th 298, 307 (1999) (GCA applies to all actions seeking monetary relief). Rubalcava's asserted failure to present a tort claim *to the County* does not provide a basis for dismissal of the state law claims against the City Defendants. Moreover, the complaint indicates that Rubalcava presented a tort claim to the City, which was rejected on January 6, 2020. Compl. ¶ 17. Accordingly, the City Defendants have not provided a basis for dismissal of the state law claims asserted against them.

Rubalcava asserts seven § 1983 claims against the City Defendants, Claims 1-7. The City Defendants argue that those claims are subject to dismissal because they do not adequately allege

---

[3] The motion to dismiss is not brought on behalf of SJPD Officer Michael Brown, who is named as a defendant in this case. *See* City Defs.' Mot., ECF 60. It may be that Officer Brown has not been served with process. The docket does not reflect a proof of service or waiver of service for Brown.

a constitutional violation, the *Monell* claim is inadequate, and the individual City Defendants are entitled to qualified immunity. In opposition, Rubalcava argues that his complaint adequately alleges constitutional violations the *Monell* claim is sufficient, and the individual City Defendants are not entitled to qualified immunity.

### A. Judicial Notice / Incorporation by Reference

Before turning to these arguments, the Court addresses the City Defendants' submission of more than 1,400 pages of documents. *See* City Defs.' Mot. at 1 and Exhs. A-F. The documents include transcripts of Rubalcava's trial and other court proceedings, and briefing from Rubalcava's habeas proceedings. The City Defendants contend that the contents of the proffered documents render implausible Rubalcava's claims for fabrication of evidence and other wrongdoing. For example, the City Defendants cite Gonzalez's trial testimony that he told police officers two or three days after the shooting that the shooter was a man named Lionel. *See* City Defs.' Mot. at 2, ECF 60. According to the City Defendants, Gonzalez's trial testimony undermines Rubalcava's allegations that SJPD officers coerced Gonzalez into identifying Rubalcava. *See id.*

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Id*. The City Defendants request that the Court to apply both exceptions here.

### 1. Judicial Notice

Federal Rule of Evidence 201 permits the Court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court generally may take judicial notice of court filings and other matters of public record. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) "But a court cannot take judicial notice of disputed facts

contained in such public records." *Khoja*, 899 F.3d at 999. "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.*

The City Defendants argue that they are not asking the Court to accept the truth of the matters contained in the transcripts and other documentary evidence. However, that appears to be precisely what the City Defendants want. They challenge Rubalcava's claim that SJPD officers coerced Gonzalez by arresting him in June 2002, characterizing the claim as implausible in light of Gonzalez's trial testimony that he previously had identified Rubalcava in April 2002. *See* City Defs.' Mot. at 2, ECF 60. The Court cannot accept Gonzalez's trial testimony regarding his April 2002 identification of Rubalcava at face value. "It is improper to judicially notice a transcript when the substance of the transcript is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes." *Khoja*, 899 F.3d at 1000 (internal quotation marks and citation omitted). Rubalcava alleges that Gonzalez's April 2002 identification of him was obtained only after three SJPD officers drove Gonzalez to a vacant lot and pressured him to identify Rubalcava. Compl. ¶¶ 56-60. Counsel for the City Defendants suggested at the hearing that these allegations are insufficient to give rise to a plausible inference that Gonzalez's identification of Rubalcava was coerced. The Court has no difficulty finding that the account of Gonzalez's trip to a vacant lot with three law enforcement officers gives rise to a plausible inference of coercion.

The City Defendants attempt to use other portions of the submitted transcripts in similar fashion to challenge the facts alleged in Rubalcava's complaint. At the hearing, the City Defendants' counsel argued that the Court is not being asked to accept the truth of the testimony reflected in the trial transcripts, but only to consider whether Rubalcava's claims are plausible against the backdrop of that testimony. The Court finds this to be a distinction without a difference. At bottom, the City Defendants' request for judicial notice is an attempt to substitute their version of events for the one alleged in the complaint. Such use of extrinsic documents at the Rule 12(b)(6) stage has been rejected by the Ninth Circuit, which observed in *Khoja* that "[i]f defendants are permitted to present their own version of the facts at the pleading stage – and

district courts accept those facts as uncontroverted and true – it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja*, 899 F.3d at 999.

Accordingly, the City Defendants' request for judicial notice is DENIED.

### 2. Incorporation by Reference

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Id*. The doctrine is inapplicable here, as Rubalcava does not rely on the trial transcripts or any of the documents submitted by the City Defendants. Rubalcava's reference to events at trial, which are documented in the transcripts, does not constitute an incorporation by reference of the entire trial transcript. The Ninth Circuit has rejected the notion that a defendant may "use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Khoja*, 899 F.3d at 1002. "Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id*. at 1003.

Accordingly, the City Defendants' request for consideration of the documents under the incorporation by reference doctrine is DENIED.

### B. Sufficiency of Rubalcava's Claims

Having concluded that the documents proffered by the City Defendants may not be considered, the Court must determine whether the City Defendants have demonstrated deficiencies in Rubalcava's § 1983 claims based on the allegations contained within the four corners of the complaint. As noted above, the § 1983 claims asserted against the City Defendants are set forth in Claims 1-7.

### 1. Claim 1 – Fabrication of Evidence

Claim 1, for fabrication of evidence, is asserted against City Defendants Perez, Fonua, Spillman, Nieves, Avalos, Tibbet, Torres, and Hafley.

"To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). A plaintiff may prevail on this claim by presenting direct evidence that an investigator has fabricated evidence, for example, "direct misquotation of witnesses in investigative reports." *Id*. at 799. Alternatively, the plaintiff may show that the defendants continued their investigation of the plaintiff "despite the fact that they knew or should have known that he was innocent," or that the defendants "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001); *see also Spencer*, 857 F.3d at 799 (quoting *Devereaux*).

The Court has no trouble concluding that these pleading standards are met with respect to Perez, Fonua, Spillman, Nieves, and Avalos. Rubalcava alleges that Perez, Fonua, and Spillman pressed forward with their investigation of Rubalcava even after multiple witnesses told them that the shooter was not Rubalcava, but rather a Sureño gang member. Compl. ¶¶ 58, 79, 113, 116, 120. Perez, Fonua, and Spillman also are alleged to have used coercive and abusive investigative techniques to pressure witnesses to identify Rubalcava. *Id*. ¶¶ 56-60, 66-68, 79, 192. Perez, Fonua, and Spillman allegedly prepared police reports containing misrepresentations of fact regarding witness identifications. *Id*. ¶ 193. Perez, Nieves, and Avalos are alleged to have directly fabricated evidence by creating the "gang relatedness report" to document a non-existent gang war between Norteño factions. *Id*. ¶¶ 133-38, 195. The City Defendants' factual challenges to these allegations, and contention that their alleged misconduct did not cause Rubalcava's conviction, are based on the extrinsic evidence discussed above and thus are not well-taken.

A more difficult question is presented by Rubalcava's allegations regarding the supervisory defendants, Tibbet, Torres, and Hafley. Rubalcava alleges that "Supervisory Defendants Hafley, Tibbet, and Torres were informed of each false identification and reviewed each falsified report." Compl. ¶ 194. "On information and belief, they approved the reports despite knowing they were false and took no action to prevent the reports from being submitted to the prosecution. *Id*. Similar "information and belief" allegations that the supervisory defendants

knew of and ratified the wrongful conduct of Perez, Fonua, and Spillman appear throughout the complaint. *Id*. ¶¶ 57, 63, 76, 82, 102. The City Defendants argue that these "information and belief" allegations are insufficient to state a claim against Tibbet, Torres, or Hafley. Rubalcava argues that "information and belief" allegations are appropriate where, as here, the relevant facts are uniquely within the defendants' knowledge. Rubalcava also contends that the pervasive nature of the alleged wrongdoing gives rise to a plausible inference that the supervisory defendants knew of, and ratified, the misconduct.

There is no question that a supervisory law enforcement official may be subject to liability under § 1983 where the official knows of and acquiesces in the unconstitutional conduct of subordinates. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The law is equally clear that supervisory liability may not be based *solely* on conclusory allegations made on "information and belief." *See Blantz v. CDCR*, 727 F.3d 917, 926 (9th Cir. 2013). In *Blantz*, a nurse sued the California Department of Corrections and Rehabilitation ("CDCR"), the chief medical officer for the CDCR's receiver, and others, alleging that her due process rights were violated when she was terminated from her independent-contractor position and not rehired in another position. The plaintiff's allegations against the chief medical officer, Hill, were summarized by the Ninth Circuit as follows: "The only allegations that mention Hill are that, 'on information and belief,' he 'direct[ed]' the other defendants to take the actions that form the basis of the complaint." *Id*. The Ninth Circuit held that "[c]onclusory allegations such as these are insufficient to state a claim against Hill." *Id*. at 927. One judge in this district has gone so far as to opine that use of the phrase "information and belief" creates an "inference that plaintiff likely lacks knowledge of underlying facts to support the assertion, and is instead engaging in speculation to an undue degree." *Delphix Corp. v. Actifo, Inc.*, No. C 13-4613 RS, 2014 WL 4628490, at *2 (N.D. Cal. Mar. 19, 2014).

Based on this authority, this Court concludes that Rubalcava's allegations against the supervisory defendants are insufficient. Rubalcava's counsel argued at the hearing that because the supervisory defendants in this case directly supervised the investigation, and were informed of facts indicating that the shooter was a Sureño, a reasonable inference may be drawn that they

13

knew the reports identifying Rubalcava as the shooter were false. It may be that factual allegations regarding each supervisor's knowledge of Sureño responsibility for the shooting can be added to the current "information and belief" allegations to make out viable claims against the supervisors. As the complaint currently is framed, however, those dots have not been connected to the degree necessary to raise the allegations against Tibbet, Torres, and Hafley beyond mere speculation.

The City Defendants' motion to dismiss Claim 1 is GRANTED WITH LEAVE TO AMEND as to Tibbet, Torres, and Hafley, and DENIED as to Perez, Fonua, Spillman, Nieves, and Avalos.

### 2.      Claim 2 – Withholding Exculpatory Evidence

Claim 2, for withholding exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), is asserted against City Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Torres, and Hafley.

"To state a claim under *Brady*, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff." *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011). The nondisclosure must be "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* (internal quotation marks and citation omitted).

Rubalcava alleges facts sufficient to meet these standards with respect to Perez, Fonua, Spillman, and Nieves. Perez, Fonua, and Spillman allegedly suppressed numerous witness statements that the shooter was a Sureño and not Rubalcava. Compl. ¶¶ 58, 61, 73-75, 113, 116-18, 121-22. Perez and Nieves also allegedly withheld information from both the prosecution and the defense regarding payments and promises of payments to witnesses in return for witness identifications and false testimony. *Id.* ¶¶ 65, 85, 99-100, 136. Rubalcava asserts that had any of this suppressed exculpatory or impeachment evidence been disclosed, he would not have been convicted, pointing out that the jury deliberated for three days before reaching a verdict. *Id.* ¶¶ 9, 203. The Court finds that these factual allegations give rise to a reasonable inference that the

verdict would have been different had the defense been informed about the witness statements identifying a shooter other than Rubalcava, and the payments to witnesses. The City Defendants' factual challenges to Rubalcava's allegations based on extrinsic evidence are not well-taken for the reasons discussed above.

Rubalcava has not alleged sufficient facts to establish a *Brady* violation against either Avalos or Baldal. Avalos and Baldal are not alleged to have been involved in suppression of witness testimony or payment of funds to witnesses and their families. The only misconduct attributed to Avalos is his participation in creating the "gang relatedness report" that fabricated a war between Norteño factions. Compl. ¶ 133-35. The only conduct attributed to Baldal is interviewing Rodriguez in the hospital and questioning Rubalcava after his arrest. *Id*. ¶¶ 50, 106. Rubalcava alleges "on information and belief" that Baldal was told about the wrongful conduct of other defendants, but for the reasons discussed above those allegations are insufficient to give rise to liability.

Rubalcava also has not alleged sufficient facts to establish liability on the part of supervisory defendants Tibbet, Garcia, Torres, and Hafley, for the reasons discussed above.

The City Defendants' motion to dismiss Claim 2 is GRANTED WITH LEAVE TO AMEND as to Avalos, Baldal, Tibbet, Garcia, Torres, and Hafley, and DENIED as to Perez, Fonua, Spillman, and Nieves.

### 3. Claim 3 – Malicious Prosecution

Claim 3, for malicious prosecution, is asserted against City Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Torres, and Hafley.

"A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others – including police officers and investigators – who wrongfully caused his prosecution." *Smith*, 640 F.3d at 938. "To maintain a § 1983 action for malicious prosecution, a plaintiff must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right." *Id*. (internal quotation marks and citation omitted).

The City Defendants assert that Rubalcava's malicious prosecution claim is premised on

15

the same arguments and allegations as his fabrication of evidence claim, and thus that it fails for the same reasons as the fabrication of evidence claim. As discussed above, the fabrication of evidence claim is adequately alleged against Perez, Fonua, Spillman, Nieves, and Avalos. The motion to dismiss the malicious prosecution claim against these defendants based on the asserted failure of the fabrication claim therefore is without merit. The City Defendants' additional argument that independent evidence of Rubalcava's guilt supported a finding of probable cause is not well-taken, as the argument is based on extrinsic evidence that cannot be considered by the Court on this motion.

With respect to Baldal, the complaint alleges only that Baldal interviewed Rodriguez in the hospital and questioned Rubalcava after his arrest. *Id.* ¶¶ 50, 106. Rubalcava alleges "on information and belief" that Baldal was told about the wrongful conduct of other defendants, but for the reasons discussed above those allegations are insufficient to give rise to liability.

The complaint also does not allege sufficient facts to establish liability on the part of supervisory defendants Tibbet, Garcia, Torres, and Hafley, for the reasons discussed above.

The City Defendants' motion to dismiss Claim 3 is GRANTED WITH LEAVE TO AMEND as to Baldal, Tibbet, Garcia, Torres, and Hafley, and DENIED as to Perez, Fonua, Spillman, Nieves, and Avalos.

### 4. Claim 4 – Conspiracy

Claim 4, for conspiracy, is asserted against City Defendants Perez, Nieves, Avalos, Baldal, Spillman, Fonua, Tibbet, Garcia, Torres, and Hafley.

The elements of a § 1983 claim for conspiracy are: "(1) the existence of an express or implied agreement among the defendant officers to deprive [the plaintiff] of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement." *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010). "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached a understanding to achieve the conspiracy's objectives." *Mendocino Env't Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999) (internal

quotation marks and citation omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id*. at 1302 (internal quotation marks and citation omitted).

Rubalcava's allegations are sufficient to state a conspiracy claim against Perez, Fonua, Spillman, Nieves, and Avalos. As discussed above, these defendants are alleged to have acted in concert to fabricate incriminating evidence and suppress exculpatory evidence. Perez, Fonua, and Spillman allegedly coerced false witness identifications and suppressed witness statements that the shooter was a Sureño. Compl. ¶¶ 58, 61, 73-75, 113, 116-18, 121-22. Perez, Nieves, and Avalos allegedly fabricated a gang war between Norteño factions to explain why Rubalcava, a Norteño, would have shot Ramirez, another Norteño. *Id*. ¶¶ 133-38. A reasonable jury could infer from these concerted violations of Rubalcaba's civil rights that these defendants had a meeting of the minds to pin the shooting on Rubalcava.

The complaint does not allege similar concerted conduct on the part of Baldal, who is alleged only to have interviewed Rodriguez and questioned Rubalcava. Compl. ¶¶ 50, 106. Rubalcava alleges "on information and belief" that Baldal was told about the wrongful conduct of other defendants, but for the reasons discussed above those allegations are insufficient to give rise to liability on the part of Baldal.

The complaint also does not allege sufficient facts to establish liability on the part of supervisory defendants Tibbet, Garcia, Torres, and Hafley, for the reasons discussed above.

The City Defendants' motion to dismiss Claim 4 is GRANTED WITH LEAVE TO AMEND as to Baldal, Tibbet, Garcia, Torres, and Hafley, and DENIED as to Perez, Fonua, Spillman, Nieves, and Avalos.

### 5. Claim 5 – Supervisory Liability

Claim 5, for supervisory liability, is alleged against City Defendants Tibbet, Garcia, Torres, and Hafley. Rubalcava alleges that these supervisory defendants failed to "supervise, discipline, or train Perez, Spillman, Fonua, Nieves, and Avalos," and that as a result "Rubalcava was deprived of his clearly established rights under the Fourth and Fourteenth Amendments." Compl. ¶ 219. Rubalcava's allegations of supervisory liability, which are based on "information

and belief," fail for the reasons discussed above.

The City Defendants' motion to dismiss Claim 5 is GRANTED WITH LEAVE TO AMEND as to Tibbet, Garcia, Torres, and Hafley.

### 6. Claim 6 – Failure to Intervene

Claim 6, for failure to intervene, is alleged against City Defendants Perez, Spillman, Avalos, Nieves, Fonua, Baldal, Tibbet, Garcia, Torres, and Hafley.

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (internal quotation marks and citation omitted). "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id*. Such liability generally has been limited to the excessive force context. *See Gillette v. Malheur Cty.*, No. 2:14-CV-01542-SU, 2016 WL 3180228, at *7 (D. Or. May 3, 2016), report and recommendation adopted, No. 2:14-CV-01542-SU, 2016 WL 3190560 (D. Or. June 6, 2016), aff'd, 737 F. App'x 811 (9th Cir. 2018) (observing that the duty to intercede has been limited to the context of excessive force); *Dental v. City of Salem/Salem Police Dep't*, No. 3:13-CV-01659-MO, 2015 WL 1524476, at *5 (D. Or. Apr. 2, 2015) (same). Some cases suggesting that liability for failure to intercede may extend beyond excessive force cases to other constitutional violations, such as violation of due process rights. *See, e.g., Lu Huang v. Cty. of Alameda*, No. C11-01984 TEH, 2011 WL 5024641, at *3 (N.D. Cal. Oct. 20, 2011). Even assuming that Rubalcava properly may assert a claim for failure to intervene in constitutional violations other than excessive force, he has failed to allege such a claim against any of the City Defendants with adequate specificity.

Claim 6 asserts that "Defendants" collectively are liable for the following failures to intervene:

> a. Failing to intervene to prevent or stop the fabrication of eyewitness identifications by Gonzalez, Millan, and Rodriguez;
>
> b. Failing to intervene to prevent or stop the pressure, threats, and bribery employed to coerce Gonzalez, Millan, and Rodriguez to maintain their false identifications by Perez;
>
> c. Failing to intervene to prevent or stop the fabrication of reports on the false and fabricated eyewitness identifications by Gonzalez, Millan, and Rodriguez;

d. Failing to intervene to prevent or stop the concealment and suppression of exculpatory evidence from Borrego and Faría;

e. Failing to intervene to prevent or stop the concealment and suppression of evidence of thousands of dollars of payments made to witnesses including Cerecerez, Rodriguez, and Contreras;

f. Failing to intervene to prevent or stop the concealment and fabrication of Perez's interviews with Mejia and Holmes; and

g. Failing to intervene to prevent or stop the fabrication of a false gang war and the creation of a false and fabricated gang relatedness report.

Compl. ¶ 226.

Rubalcava does not specify which individual defendants are liable for which failures to intervene. Nor does he allege facts demonstrating that each individual had an opportunity to intervene in the conduct of the other individual defendants. In particular, the City Defendants argue that the "information and belief" allegations against Tibbet, Torres, Garcia, and Hafley are insufficient to plead a failure to intervene. The Court agrees that Rubalcava fails to state a claim against the supervisory defendants, but it also concludes that he fails to allege sufficient facts with respect to the opportunity to intervene and failure to do so as to any of the individual City Defendants.

The City Defendants' motion to dismiss Claim 6 is GRANTED WITH LEAVE TO AMEND as to Perez, Spillman, Avalos, Nieves, Fonua, Baldal, Tibbet, Garcia, Torres, and Hafley.

### 7. Claim 7 – *Monell* Liability against City

Claim 7 is a *Monell* claim against the City. Rubalcava alleges that the City failed to train its officers in constitutional identification procedures and *Brady* disclosure requirements, and that the City had a custom of fabricating evidence of gang involvement. Compl. ¶¶ 232-33, 235.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Id.* (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)) (alterations in original). "Failure to train an employee who had caused a constitutional violation can be the basis for section 1983 liability where the failure to train amounts to deliberate indifference to the rights of the person with whom the employee comes into contact." *Long v. City of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

The City Defendants argue that Rubalcava has failed to allege facts sufficient to show that the City had actual or constructive notice of the necessity for more or better training regarding identification procedures or *Brady* disclosure requirements, or that the City had a custom of fabricating gang reports. The Court agrees. Rubalcava alleges in cursory fashion that "[t]he unconstitutional customs, policies, patterns, and practices of the City of San Jose have caused numerous individuals, other than Rubalcava himself, to be prosecuted or convicted on the basis of false and fabricated evidence, including but not limited to: a. Felix Solorio Valdovinos, b. Bobby Herrera, c. Michael Kerkeles." Compl. ¶ 234. It is unclear whether these individuals were prosecuted or convicted due to a failure to train regarding identification procedures, a failure to train regarding *Brady* disclosure requirements, or a custom of fabricating false gang reports. Rubalcava simply has not provided sufficient clarity regarding his theories of *Monell* liability or adequate factual support for his *Monell* claim.

The City Defendants' motion to dismiss Claim 7 is GRANTED WITH LEAVE TO AMEND.

### C. Qualified Immunity

The City Defendants seek dismissal of all Rubalcava's claims against the individual SJPD officers on the basis of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Demaree v. Pederson*, 887 F.3d 870, 878 (9th Cir. 2018) (quotation marks and citation omitted). Courts "use a two-step test to evaluate claims of qualified immunity, under which

summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the violation." *Id*. (quotation marks and citation omitted).

The City Defendants devote a single paragraph to their assertion of qualified immunity, arguing that Rubalcava cannot identify case law prior to 2002 that would have put the City Defendants on notice that their conduct was unconstitutional. *See* City Defs.' Mot. at 14-15, ECF 60. This argument is without merit. Pre-2002 case law clearly established that fabrication of evidence, *Brady* violations, and other misconduct alleged to have been committed by the City Defendants rises to the level of constitutional violations. *See, e.g., Devereaux*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."); *Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (It was "clearly established that police officers were bound by Brady's disclosure requirement").

The City Defendants' motion to dismiss based on qualified immunity is DENIED.

## IV. COUNTY DEFENDANTS

The Court next takes up the motion to dismiss brought by the County Defendants, comprising the County of Santa Clara and two investigators for the Santa Clara County District Attorney's Office, Doug Kaleas and Brian Geer. The County Defendants have taken a much more targeted approach than the City Defendants, moving to dismiss only Claim 1 for fabrication of evidence, Claim 6 for failure to intervene, Claim 8 for *Monell* liability, and Claims 9-10 for violation of state law. Rubalcava's counsel clarified at the hearing that Claim 1 is not intended to be asserted against the County Defendants. Rubalcava also concedes his state law claims against the County Defendants and agrees to voluntary dismissal of those claims. *See* Opp. at 2 n.1, ECF 64. Rubalcava opposes the County Defendants' motion only with respect to Claim 6 for failure to intervene and Claim 8 for *Monell* liability.

In light of the foregoing, the County Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND as to Claims 1, 9 (both claims numbered as Claim 9), and 10.

## A. Claim 6 – Failure to Intervene

Claim 6, for failure to intervene, is alleged against County Defendants Kaleas and Geer, as well as a number of individual City Defendants, as discussed above.

Law enforcement officers have a duty to intercede when their fellow officers violate an individual's constitutional rights. *Cunningham*, 229 F.3d at 1289. "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.* As discussed above, such liability generally has been limited to the excessive force context. *See Gillette*, 2016 WL 3180228, at *7; *Dental*, 2015 WL 1524476, at *5. Rubalcava cites cases suggesting that liability for failure to intercede may extend beyond excessive force cases to other constitutional violations, such as violation of due process rights. *See, e.g., Lu Huang*, 2011 WL 5024641, at *3. Even assuming that Rubalcava is correct that he properly may assert a claim for failure to intervene in constitutional violations other than excessive force, he has failed to allege such a claim against Kaleas and Geer with adequate specificity.

Claim 6 is asserted against Kaleas, Geer, and several SJPD officers for failure to intervene in numerous allegedly unconstitutional acts. As set forth above in the discussion of the City Defendants' motion, and repeated again here for ease of discussion, Rubalcava alleges that "Defendants" collectively are liable for the following failures to intervene:

> a. Failing to intervene to prevent or stop the fabrication of eyewitness identifications by Gonzalez, Millan, and Rodriguez;
>
> b. Failing to intervene to prevent or stop the pressure, threats, and bribery employed to coerce Gonzalez, Millan, and Rodriguez to maintain their false identifications by Perez;
>
> c. Failing to intervene to prevent or stop the fabrication of reports on the false and fabricated eyewitness identifications by Gonzalez, Millan, and Rodriguez;
> d. Failing to intervene to prevent or stop the concealment and suppression of exculpatory evidence from Borrego and Faría;
>
> e. Failing to intervene to prevent or stop the concealment and suppression of evidence of thousands of dollars of payments made to witnesses including Cerecerez, Rodriguez, and Contreras;
>
> f. Failing to intervene to prevent or stop the concealment and fabrication of Perez's interviews with Mejia and Holmes; and
>
> g. Failing to intervene to prevent or stop the fabrication of a false gang war and the creation of a false and fabricated gang relatedness report.

Compl. ¶ 226.

Rubalcava does not specify which individual defendants are liable for which failures to intervene. To the extent he asserts that Kaleas and Geer are liable for failing to prevent or stop constitutional violations committed by SJPD officers, Rubalcava does not cite any authority for the proposition that an officer of one agency may be liable for failure to prevent conduct by an officer of another agency. Nor does Rubalcava allege facts demonstrating that Kaleas and Geer had an opportunity to intervene in the SJPD officers' alleged coercion of false identifications and fabrication of evidence. To the extent the claim against Kaleas and Geer is limited to conduct relating to the alleged payment of funds to witnesses, Kaleas and Geer are alleged to be directly liable for that conduct. A claim that Kaleas and Geer failed to intervene to prevent their own wrongful conduct would not make sense. *Marble v. Missoula Cty.*, No. CV 20-89-M-DLC, 2020 WL 6043858, at *8 (D. Mont. Oct. 13, 2020) ("Arguing that Giffin failed to intervene in Giffin's own act does not provide a factual basis for this claim.").

Accordingly, the County Defendants' motion to dismiss Claim 6 is GRANTED WITH LEAVE TO AMEND.

### B. Claim 8 – *Monell* Liability against County

Claim 8 is a *Monell* claim against the County. Rubalcava alleges that "[t]he County of Santa Clara, by and through its policymakers, created policies and procedures for handling witness protection payments that were substantially certain to cause *Brady* violations, and maintained these policies and procedures in deliberate indifference to the obvious risk these constitutional violations would result." Compl. ¶ 239.

Two types of policies can give rise to *Monell* liability: "those that result in the municipality itself violating someone's constitutional rights or instructing its employees to do so, and those that result, through omission, in municipal responsibility for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). "A policy of inaction or omission may

be based on failure to implement procedural safeguards to prevent constitutional violations."

The Court understands Rubalcava to be alleging that the County's policy was deficient because it does not contain specific procedures for ensuring that prosecutors are informed of witness protection payments. Thus, Rubalcava asserts a policy of inaction or omission. To make out this claim, Rubalcava must allege facts showing that the County "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Tsao*, 698 F.3d at 1145 (internal quotation marks and citation omitted). Rubalcava's *Monell* claim against the County, which consists of three short paragraphs, does not set forth any such facts. Compl. ¶¶ 238-240. Accordingly, the claim is insufficient.

Rubalcava's reliance on *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) is misplaced. While *Goldstein* makes clear that that a plaintiff may assert a viable *Monell* claim based on the failure to implement administrative procedures that ensure prosecutors have knowledge of benefits provided to witnesses, *Goldstein* does not speak to the requirement that the municipality have actual or constructive notice that such failure likely will result in a constitutional violation. None of the cases cited by Rubalcava, including *Mateos-Sandoval v. County of Sonoma*, 942 F. Supp. 2d 890, 899-900 (N.D. Cal. 2013), stand for the proposition that a municipality may be subject to *Monell* liability for a policy of inaction or omission absent the municipality's actual or constructive notice that the lack of an affirmative policy is likely to lead to a constitutional violation.

The County Defendants' motion to dismiss Claim 8 is GRANTED WITH LEAVE TO AMEND.

**V.  ORDER**

(1)  The City Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART, WITH LEAVE TO AMEND, as follows:

(a)  The City Defendants' motion to dismiss Claim 1 is GRANTED WITH LEAVE TO AMEND as to Tibbet, Torres, and Hafley, and DENIED as to Perez, Fonua, Spillman, Nieves, and Avalos;

(b)     The City Defendants' motion to dismiss Claim 2 is GRANTED WITH
        LEAVE TO AMEND as to Avalos, Baldal, Tibbet, Garcia, Torres, and
        Hafley, and DENIED as to Perez, Fonua, Spillman, and Nieves;

(c)     The City Defendants' motion to dismiss Claim 3 is GRANTED WITH
        LEAVE TO AMEND as to Baldal, Tibbet, Garcia, Torres, and Hafley, and
        DENIED as to Perez, Fonua, Spillman, Nieves, and Avalos;

(d)     The City Defendants' motion to dismiss Claim 4 is GRANTED WITH
        LEAVE TO AMEND as to Baldal, Tibbet, Garcia, Torres, and Hafley, and
        DENIED as to Perez, Fonua, Spillman, Nieves, and Avalos;

(e)     The City Defendants' motion to dismiss Claim 5 is GRANTED WITH
        LEAVE TO AMEND as to Tibbet, Garcia, Torres, and Hafley;

(f)     The City Defendants' motion to dismiss Claim 6 is GRANTED WITH
        LEAVE TO AMEND as to Perez, Spillman, Avalos, Nieves, Fonua, Baldal,
        Tibbet, Garcia, Torres, and Hafley;

(g)     The City Defendants' motion to dismiss Claim 7 is GRANTED WITH
        LEAVE TO AMEND;

(h)     The City Defendants' motion to dismiss state law Claims 9-10 is DENIED;
        and

(i)     The City Defendants' motion to dismiss based on qualified immunity is
        DENIED.

(2)     The County Defendants' motion to dismiss is GRANTED, WITH LEAVE TO
        AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART, as follows:

(a)     The County Defendants' motion to dismiss is GRANTED WITHOUT
        LEAVE TO AMEND as to Claims 1, both Claim 9s, and Claim 10; and

(b)     The County Defendants' motion to dismiss is GRANTED WITH LEAVE
        TO AMEND as to Claims 6 and 8.

(3)     Plaintiff shall have twenty-one days after the date of this order, or until August 5,
        2021, to file an amended complaint.  Leave to amend is limited to the deficiencies

identified in this order.  Plaintiff may not add new claims or parties without obtaining leave of court.

(4)     This order terminates ECF 57 and 60.

Dated:  July 15, 2021

BETH LABSON FREEMAN
United States District Judge