# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| LIONEL RUBALCAVA,<br><br>       Plaintiff,<br><br>  v.<br><br>CITY OF SAN JOSE, et al.,<br><br>       Defendants. | Case No.  20-cv-04191-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Re:  ECF 199] |

Seventeen years after Plaintiff Lionel Rubalcava was imprisoned for the crime of attempted murder, his conviction was vacated by the Santa Clara County Superior Court, which also made an express finding of his actual innocence.  Rubalcava thereafter filed this suit, claiming that San Jose Police Department ("SJPD") officers and Santa Clara County investigators fabricated evidence and committed other misconduct that led to his wrongful conviction.

A number of parties and claims have been dismissed since the suit was filed in 2020.  The remaining defendants are the City of San Jose and five SJPD officers – Joseph Perez, Topui Fonua, Steven Spillman, Rafael Nieves, and Ramon Avalos.  Rubalcava asserts civil rights claims against the individual officers under federal and state law, and seeks to establish the City's liability for the conduct of its officers under state law.  Defendants now move for summary judgment.

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

**United States District Court**
**Northern District of California**

## I.   BACKGROUND

*Drive-By Shooting of Raymond Rodriguez*

Shortly before 5:30 p.m. on Friday, April 5, 2002, 19-year old Raymond Rodriguez was the victim of a drive-by shooting in front of his home on Mastic Street in San Jose, California.  *See* Police Report Compilation at 2-3,[1] Matthias Decl. Ex. 69, ECF 220-6.  The driver of a SUV pulled up and shot Rodriguez while he was in front of his house with his younger brother, Eric Millan, and a friend, Daniel Cerecerez.  *See id.* at 2-3, 10.  Rodriguez survived the shooting but he was paralyzed from the waist down.  *See* Trial Tr. 126:14-22, Matthias Decl. Ex. 23, ECF 215-7.  Other witnesses to the shooting included Rodriguez's neighbor, David Gonzalez, who was in his own front yard, and two men, Alejandro Borrego and Nicholas Faría, who were across the street.  *See* Police Report Compilation at 2-3, 8-9, 19-20, Matthias Decl. Ex. 69.

At the time of the shooting, Rodriguez was wearing a red belt hanging down to mid-thigh with an N on the belt buckle, indicating affiliation with the Norteño street gang.  *See* Trial Tr. 108:2-109:23, 118:14-119:18, Matthias Decl. Ex. 23.  Witness descriptions of the shooters were inconsistent, with some saying that the SUV's occupants wore white shirts, while at least one witness said that SUV's occupants wore blue clothing that was possibly Dallas Cowboys gear. *See* Police Report Compilation at 2-10, Matthias Decl. Ex. 69.  The color blue typically is worn by members of the Sureño street gang.  *See* Trial Tr. 58:5-10, Matthias Decl. Ex. 23.  The Norteños and Sureños are rivals.  *See id.* 56:13-15.  Shortly after the shooting, Rodriguez told officers that he thought the shooters must have been "scraps," meaning Sureños.  *See* Police Report Compilation at 19, Matthias Decl. Ex. 69; Trial Tr. 132:6-12, 500:16-19, Matthias Decl. Ex. 23.

*Investigation Led by Fonua, Spillman, and Perez*

SJPD Officers Topui Fonua and Steven Spillman were assigned to lead the investigation.  *See* Fonua Dep. 32:12-17, 87:5-7, Matthias Decl. Ex. 13, ECF 214-7; Spillman Dep. 122:13-16, Matthias Decl. Ex. 14, ECF 214-8.  Because of possible gang involvement, Fonua and Spillman looped in the SJPD Gang Investigations Unit, including Detective Joe Perez of that Unit.  *See*

---

[1] All citations are to documents' internal (not ECF) pagination.

1    Fonua Dep. 34:6-25, 81:3-25, 82:1-83:4, 85:23-86:1, Matthias Decl. Ex. 13.  Approximately three

2    days into the investigation, Detective Perez took over as the lead investigator, a role he held

3    through Rubalcava's criminal trial.  *See* Perez Dep. 207:21-208:4, Matthias Decl. Ex. 11, ECF

4    214-5; Fonua Dep. 83:6-11, Matthias Decl. Ex. 13.

5           *Jennifer Rodriguez's Interaction with Rubalcava*

6           Shortly after 8:00 p.m. on Sunday, April 7, 2002 – two days after the shooting – a dark

7    colored truck pulled up in front of the Rodriguez home on Mastic Street.  *See* Trial Tr. 213:8-

8    214:28, Matthias Decl. Ex. 23.  Rodriguez's younger sister, Jennifer, was outside the house.  *See*

9    *id.*  The driver called out to Jennifer to come over to the truck, but Jennifer was frightened because

10   of the recent shooting and because it appeared that the driver was holding something in his left

11   hand below the level of the truck window.  *See id*. 219:12-221:12.  The family called the police,

12   but the truck drove off before the police arrived.  *See id.*

13          Detective Perez interviewed Jennifer on April 10, 2002.  *See* Perez Police Report at 2-3,

14   Matthias Decl. Ex. 19, ECF 215-3.  Perez's police report indicates that Jennifer did not know who

15   the driver of the truck was, that he held an item in his left hand "as if it were a gun," and that

16   Jennifer believed the item was a gun.  *Id.*  The police report also indicates that Jennifer viewed a

17   photo line-up and identified Rubalcava as the driver of the truck.  *See id.*

18          Rubalcava does not deny that he stopped his truck in front of the Rodriguez home on the

19   night of April 7, 2002.  He claims that he stopped to flirt with a girl he saw outside, who he later

20   learned was Jennifer Rodriguez.  *See* Rubalcava Decl. ¶ 4, ECF 207-2.  He denies having a gun.

21   *See id.*  In a deposition conducted in May 2022, Jennifer testified that she never told the police that

22   the driver of the truck had a gun.  *See* Jennifer Dep. 75:21-79:12, Matthias Ex. 9, ECF 214-3.

23          *David Gonzalez's Identification of Rubalcava as the Shooter*

24          At about 9:00 p.m. on Sunday, April 7, 2002, Officers Fonua and Spillman went to Mastic

25   Street in search of Rodriguez's neighbor, David Gonzalez.  *See* Trial Tr. 539:8-541:3, Matthias

26   Decl. Ex. 23.  Fonua and Spillman had received information that Gonzalez witnessed the shooting

27   but did not come forward to make a statement at the scene.  *See id.*  Fonua and Spillman

28   encountered Gonzalez outside his home and interviewed him there.  *See id.* 542:3-543:1.

United States District Court
Northern District of California

3

1    Spillman's police report reflects that Gonzalez said he recognized the shooter as a gang member

2    from the area, and that he believed the shooter was the same man who had just pulled up in front

3    of the Rodriguez home in a black truck.  *See* Spillman Police Report at 1-2, Matthias Decl. Ex. 17,

4    ECF 215-1.  Gonzalez agreed to ride around the neighborhood with Fonua and Spillman to see if

5    he could spot the black truck.  *See id.* at 3.  Gonzalez and the officers were unable to locate the

6    truck, and they agreed to meet up the following day to try again.  *See id.*

7            On April 8, 2002, Fonua and Spillman met up with Gonzalez at the Tamien train station in

8    San Jose to continue looking for the black truck.  *See* Spillman Police Report at 3-4, Matthias

9    Decl. Ex. 17.  According to Spillman's police report, when Gonzalez got in the officers' vehicle he

10   said he had spoken with Daniel Cerecerez the prior night and learned from Cerecerez that a man

11   named Lionel Rubalcava drove a black truck like the one they were looking for.  *See id.* at 4.  The

12   police report indicates that Gonzalez did not know Rubalcava by sight, but had heard that

13   Rubalcava was a member of West Side Mob.  *Id.*  West Side Mob is a Norteño street gang.  *See*

14   Fonua Police Report at 3, Matthias Decl. Ex. 16, ECF 214-10.  Officer Fonua's police report states

15   that the officers took Gonzalez to the police station to view a photo line-up, and that Gonzalez

16   "immediately" picked out Rubalcava as the driver of the SUV when Rodriguez was shot.  *See id.*

17   A records check revealed that Rubalcava was on parole and had a black GMC truck.  *See id.*

18           Gonzalez denies that he gave the police Rubalcava's name.  *See* Gonzalez Dep. 171:12-

19   172:14, Matthias Decl. Ex. 10, ECF 214-4.  During a 2022 deposition, Gonzalez stated that when

20   he met the officers at the Tamien train station, they already had a suspect in mind and showed him

21   a photo line-up in the car.  *See id.* 96:21-98:17.  Gonzalez's deposition testimony was that he

22   picked out Rubalcava's photo as someone who "looked like" the shooter, but did not make an

23   instant or positive identification.  *See id.* 44:16-46:8.  At trial, Officer Fonua admitted that he and

24   Spillman already had a photo line-up ready to go when they met Gonzalez at the Tamien train

25   station.  *See* Trial Tr. 575:18-576:21, Matthias Decl. Ex. 23.  Fonua testified that he and Spillman

26   showed Gonzalez the photo line-up in the vehicle in the parking lot of the train station.  *See id.*

27           Gonzalez claims that he first saw Rubalcava in person at the preliminary hearing.  Trial Tr.

28   516:22-25, Matthias Decl. Ex. 23.  Gonzalez further claims that when he saw Rubalcava in person,

United States District Court
Northern District of California

4

1   he realized that Rubalcava was not the shooter, and so informed Detective Perez.  *See* Gonzalez

2   Dep. 28:9-29:19, Matthias Decl. Ex. 10.  Gonzalez did not testify to that realization at the

3   preliminary hearing, however; he testified that Rubalcava looked like the SUV driver who shot

4   Rodriguez, but he could not say for sure that Rubalcava was the shooter.  *See* Prelim. Hrg. Tr.

5   133:23-135:2., Matthias Decl. Ex. 22, ECF 215-6.  Gonzalez later testified at trial that he was sure

6   Rubalcava was *not* the shooter.  *See* Trial Tr. 516:3-28, Matthias Decl. Ex. 23.  The prosecutor

7   argued that Gonzalez had positively and correctly identified Rubalcava as the shooter, and was

8   recanting after the fact because he feared retribution.  *See id.* 981:11-982:6.  When he was deposed

9   in 2022, Gonzalez denied having any fear of retribution, asserting that he had seen the actual

10   shooter on the streets during Rubalcava's incarceration, and that the shooter was not a Norteño.

11   *See* Gonzalez Dep. 176:15-179:16, Matthias Decl. Ex. 10.

12         *Eric Millan's Identification of Rubalcava as the Shooter*

13         Officer Fonua's police report indicates that after Gonzalez identified Rubalcava in a photo

14   line-up on April 8, 2002, Fonua and Spillman went to the Rodriguez residence to show the photo

15   line-up to Millan, Rodriguez's younger brother.  *See* Fonua Police Report at 3, Matthias Decl. Ex.

16   16.  According to the report, Fonua asked Millan if he could remember the person who shot his

17   brother, and Millan answered "yeah."  *Id.*  The report reflects that Millan "looked over the photos

18   and pointed at photo #1," Rubalcava, and said that was the person who shot his brother.  *Id.*

19   Finally, the report states that Fonua asked Millan if he was sure, and Millan said "yes."  *Id.*

20         Millan, who was 11 years old when his brother was shot, claims that he never got a good

21   enough look at the shooter to identify him, because everything happened so fast and he was

22   focused on his brother rather than the driver of the SUV.  *See* Millan Dep. 42:15-43:15, 46:15-

23   48:15, 86:11-88:11, Matthias Decl. Ex. 8.  During a deposition taken in 2022, Millan testified that

24   he told the police repeatedly he did not see the shooter well enough to make an identification.  *See*

25   *id.* 88:21-89:4.  He stated that to the extent the police report says he did not hesitate to make a

26   positive identification of Rubalcava, the report was untrue.  *See id.* 137:6-10.

27         Millan also testified at his deposition that Detective Perez told him there was evidence

28   proving Rubalcava was the shooter.  *See* Millan Dep. 90:6-91:1, Matthias Decl. Ex. 8.  Millan

United States District Court
Northern District of California

1    thereafter identified Rubalcava as the shooter at both the preliminary hearing and at trial.  *See*

2    Prelim. Hrg. Tr. 72:18-27, Matthias Decl. Ex. 22; Trial Tr. 172:4-17, Matthias Decl. Ex. 23.

3    Millan says that when he made the in-court identifications of Rubalcava, he was just going along

4    with what he was being told, which was that the police had the person who shot his brother.  *See*

5    Millan Dep. 102:5-18, Matthias Decl. Ex. 8.

6            *Raymond Rodriguez's Identification of Rubalcava as the Shooter*

7            On April 9, 2002, Detective Perez visited Rodriguez in the hospital and showed him a

8    photo line-up.  *See* Perez Police Report at 1, Matthias Decl. Ex. 18, ECF 215-2.  Perez's police

9    report states that Rodriguez "viewed the line-up for about 5 seconds" before picking Rubalcava

10   out as the shooter.  *Id.*  Perez's report reflects that Rodriguez then said, "Yeah, that's the guy that

11   was there.  He's the one that was driving and shot me."  *Id.*

12           Rodriguez claims that he actually told Perez that he could *not* make a positive

13   identification of the shooter, and that statements to the contrary in the police report were not true.

14   *See* Rodriguez Dep. 22:19-24:14, Matthias Decl. Ex. 6, ECF 207-10.  At a 2022 deposition,

15   Rodriguez testified that he told Detective Perez more than once that he (Rodriguez) was not sure

16   Rubalcava was the person who shot him.  *See id.* 24:9-25:28.  Rodriguez claims that he

17   nonetheless identified Rubalcava as the shooter at trial for two reasons:  first, because Rubalcava

18   looked like the person who shot him, and second, because Perez told him that there were facts

19   proving Rubalcava was the shooter.  *See id.* 60:21-62:2.  According to Rodriguez, Perez said that

20   other people had positively identified Rubalcava.  *See id.* 62:23-63:7.  Rodriguez also remembers

21   Perez telling him that he (Perez) thought Rubalcava was lying about going on a date the night of

22   the shooting.  *See id.* 64:1-25.

23           *Rubalcava's Arrest and Assertion of Alibi*

24           After completing the photo line-ups with Gonzalez and Millan on April 8, 2002, Fonua and

25   Spillman consulted with other officers and decided to arrest Rubalcava.  *See* Fonua Police Report

26   at 3-4, Matthias Decl. Ex. 16.  Fonua and Spillman made a stop of Rubalcava's vehicle, took him

27   into custody, and transported him to the police department for booking.  *See id.*

28           Rubalcava was interviewed by other officers on April 9, 2002.  *See* Interview Tr., Matthias

United States District Court
Northern District of California

6

1  Decl. Ex. 36, ECF 216-10.  Rubalcava said that he left San Jose at about 5:00 p.m. on April 5,

2  2002, and drove to Hollister for a first date with a woman named Stephanie.  *See id.* at 5.

3  Rubalcava said he arrived in Hollister at about 6:00 p.m., met Stephanie at a McDonald's,

4  purchased movie tickets at about 6:30 p.m., and saw a 7:00 p.m. movie.  *See id.* at 20-22.

5      Detective Perez was concerned about Rubalcava's statement, because it did not make sense

6  to him that Rubalcava could have shot Rodriguez in San Jose at 5:30 p.m. and then been in

7  Hollister on a date by 6:30 p.m.  *See* Perez Dep. 351:1-8, Matthias Decl. Ex. 11.  Based on the

8  timeline Rubalcava had provided, Perez doubted that he could have shot Rodriguez and made it to

9  Hollister for his date, given the distance and Friday night traffic.  *See id.* 351:21-352:22.  Perez

10  became skeptical as to whether Rubalcava actually went on the date with Stephanie.  *See id.*

11  Detective Perez interviewed Stephanie Leon on April 10, 2002.  *See* Police Report Compilation at

12  21.  Perez's police report states that he showed Stephanie a single photo of Rubalcava, and asked

13  if it was the man she went on a date with on April 5, 2002.  *See id.*  Stephanie stated that she was

14  97% sure it was.  *See id.*

15      Perez arranged for Stephanie to participate in a live witness showing to get more certainty

16  about her identification.  *See* Perez Dep. 311:19-312:21, Matthias Decl. Ex. 11.  However,

17  unbeknownst to her, the person he presented at the live witness showing was not Lionel

18  Rubalcava, but rather Lionel's brother, Rolando Rubalcava.  *See id.*  Perez made the switch

19  because he believed it was possible that Plaintiff Rubalcava provided a false alibi, and that

20  actually his brother had gone on the date with Stephanie.  *See id.*  Stephanie stated that Rolando

21  Rubalcava was not the person she went on a date with.  *See id.*  When Stephanie eventually was

22  shown Lionel Rubalcava in person, she confirmed that he was the person who took her to the

23  movies in Hollister on April 5, 2002.  *See* Stephanie Leon Dep. 74:4-14, Matthias Decl. Ex. 31,

24  ECF 216-5.

25      *Felony Complaint*

26      Detective Perez filed a felony complaint against Rubalcava on April 12, 2002, one week

27  after the shooting.  *See* Perez Dep. 444:10-21, Matthias Decl. Ex. 11.  In addition to the charge of

28  attempted murder, the complaint included a gang enhancement charge that Rubalcava shot

United States District Court
Northern District of California

7

Rodriguez for the benefit of, at the direction of, and in association with a criminal street gang, West Side Mob.  *See id.* at 448:1-449:17.

*Preliminary Hearing*

The Santa Clara County Superior Court held a preliminary hearing on June 4, 2002 and June 5, 2002.  *See* Prelim. Hrg. Tr., Matthias Decl. Ex. 22, ECF 215-6.  The prosecutor, Deputy District Attorney Mark Duffy, presented several witnesses, including Rodriguez, Millan, and Gonzalez.  *See id.*  Rodriguez identified Rubalcava, who was seated in the courtroom, as the person who shot him.  *See id.* 21:20-22:3.  Millan identified Rubalcava as the person who shot his brother.  *See id.* 72:18-27.  Gonzalez testified that Rubalcava looked like the SUV driver who shot Rodriguez, but he could not say for sure if Rubalcava was the shooter.  *See id.* 133:23-135:2.

SJPD Detective Ramon Avalos was qualified as a gang expert, and testified that sometimes different "sets" of the Norteño gang attack each other.  *See* Prelim. Hrg. Tr. 160:2-21, Matthias Decl. Ex. 22.  In particular, Avalos testified that West Side Mob, a Norteño street gang in San Jose, was in conflict with Varrio Horseshoe, another Norteño street gang in San Jose.  *See id.* 165:4-166:26.  Avalos testified that Rubalcava was a member of West Side Mob and that his shooting of Rodriguez, another Norteño, could have been related to that conflict.  *See id.* 160:22-163:1, 170:1-171:24.

The court found that there was probable cause to believe that Rubalcava committed the attempted murder of Rodriguez, and that the charged offense was committed for the benefit of a criminal street gang.  *See* Prelim. Hrg. Tr. 250:28-251:20, Matthias Decl. Ex. 22.

*Trial*

A jury trial commenced on November 14, 2003.  *See* Trial Tr. 32, Matthias Decl. Ex. 23.  No physical or forensic evidence was presented linking Rubalcava to the shooting.  The prosecutor focused largely on eyewitness testimony, including testimony of Rodriguez and Millan identifying Rubalcava as the shooter. *See id.* 115:25-116:9, 172:4-17.  Gonzalez testified that Rubalcava was *not* the shooter, and stated that when he first saw Rubalcava in person at the preliminary hearing, he knew the police had the wrong guy.  *See id.* 516:3-28.  However, the prosecutor attacked the credibility of Gonzalez's testimony by questioning him extensively about his prior identification

1   of Rubalcava and highlighting inconsistencies between Gonzalez's trial testimony and preliminary

2   hearing testimony.  *See id.* 517:1-535:12.

3       Detective Rafael Nieves testified as an expert in the area of criminal street gangs in San

4   Jose.  *See* Trial Tr. 55:24-56:4, Matthias Decl. Ex. 23.  He opined that Ramirez's shooting could

5   have been related to a feud between two Norteño gangs, West Side Mob and Varrio Horseshoe.

6   *See id.* 603:1-605:9.  Nieves stated that Rubalcava was associated with West Side Mob, his

7   neighbor Gonzalez was associated with Varrio Horseshoe, and Rodriguez could have been

8   perceived as guilty by association with Gonzalez and thus become a target of West Side Mob.  *See*

9   *id.* 604:28-606:7.

10      The prosecutor also presented testimony of Jennifer Rodriguez regarding Rubalcava's

11  appearance outside the Rodriguez home two days after the shooting.  *See* Trial Tr. 213:12- 221:12,

12  Matthias Decl. Ex. 23.  In his closing argument, the prosecutor asked the jury to consider "[w]hat

13  are the odds" that Rubalcava was not involved in the shooting but just happened drive up to the

14  victim's home two days later, and just happened be positively identified by multiple witnesses as

15  the shooter.  *Id*. 984:20-985:2.

16      Rubalcava contends that his defense counsel could not effectively counter the

17  prosecution's argument because defense counsel did not know that the investigating officers had

18  falsified their police reports to present three independent and reliable eyewitness identifications of

19  Rubalcava, when in fact that the eyewitness identifications were entirely unreliable, if made at all.

20  Rubalcava testified, denying involvement in the shooting and stating that he was traveling to

21  Hollister for a date when the shooting occurred.  *See* Trial Tr. 754:5-761:9, 773:6-11, Matthias

22  Decl. Ex. 23.  That testimony was corroborated by Stephanie's testimony.  *See id*. 658:11-665:25.

23  Rubalcava also explained that he stopped in front of the Rodriguez home to flirt with Jennifer, and

24  not for any nefarious purpose.  *See id*. 827:12-828:16.  However, after deliberating for three days,

25  the jury found Rubalcava guilty of attempted murder and the charged gang enhancement.  *See*

26  Trial Tr. 1034:27-1036:8, Matthias Decl. Ex. 23.

27      *Vacating of Conviction and Finding of Actual Innocence*

28      Years later, the Santa Clara District Attorney's Office conducted a reinvestigation of

*United States District Court*
*Northern District of California*

9

1    Rubalcava's case, after which the District Attorney's Office "didn't think he was guilty."  *See*

2    Angel Dep. 157:4-12, 160:21-164:10, Matthias Decl. Ex. 54, ECF 219-1.  The District Attorney's

3    Office agreed that Rubalcava's conviction should be vacated, and stipulated to a finding of factual

4    innocence.  *See* Stipulated Motion, Matthias Decl. Ex. 1, ECF 207-5.  In 2019, Rubalcava's

5    conviction was vacated, all charges were dismissed, and the court made an express finding that he

6    was factually innocent.  *See* Order, Matthias Decl. Ex. 3, ECF 207-7; Tr., Matthias Decl. Ex. 2,

7    ECF 207-6.  He had served seventeen years of his prison sentence.

8                 *Present Action*

9         Rubalcava filed the present action in June 2020, claiming that misconduct of SJPD officers

10   and others led to his wrongful conviction.  *See* Compl., ECF 1.  Following dismissal of some

11   parties, the only remaining defendants are the City and SJPD officers Joseph Perez, Topui Fonua,

12   Steven Spillman, Rafael Nieves, and Ramon Avalos.  The operative first amended complaint

13   ("FAC") asserts the following claims against Defendants under 42 U.S.C. § 1983 and state law:

14   (1) § 1983 Claim for Fabrication of Evidence in violation of the Fourteenth Amendment against

15   Perez, Fonua, Spillman, Nieves, and Avalos; (2) § 1983 Claim for Withholding Evidence in

16   violation of the Fourteenth Amendment against Perez, Fonua, Spillman, and Nieves; (3) § 1983

17   Claim for Malicious Prosecution in violation of the Fourth and Fourteenth Amendments against

18   Perez, Fonua, Spillman, Nieves, and Avalos; (4) § 1983 Claim for Conspiracy against Perez,

19   Fonua, Spillman, Nieves, and Avalos; (5) Claim under the Bane Act, Cal. Civ. Code § 52.1,

20   against Perez, Fonua, Spillman, and Nieves; (6) Claim for Respondeat Superior and Vicarious

21   Liability under Cal. Gov. Code § 815.2 against the City; and (7) Claim for Employer Liability

22   under Cal. Gov. Code § 825 against the City.

23   **II.    LEGAL STANDARD**

24        A party may obtain summary judgment by showing that "there is no genuine dispute as to

25   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

26   "The moving party initially bears the burden of proving the absence of a genuine issue of material

27   fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "Where the moving party

28   meets that burden, the burden then shifts to the non-moving party to designate specific facts

United States District Court
Northern District of California

1    demonstrating the existence of genuine issues for trial." *Id*. "The court must view the evidence in

2    the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's

3    favor." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).

4    "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

5    party, there is no genuine issue for trial." *Id*. (quotation marks and citation omitted).

6    **III.    DISCUSSION**

7          Defendants assert that they are entitled to summary judgment because "[t]he reality is that

8    Rubalcava was convicted not because of any police misconduct, but because there was strong

9    evidence of his guilt." Mot. at 1, ECF 199. They contend that Rubalcava cannot prove the

10   constitutional violations alleged in Claims 1-4, which are the § 1983 claims against the officers,

11   and that in any event the officers are entitled to qualified immunity with respect to those claims.

12   Defendants also argue that Rubalcava cannot prove an essential element of Claim 5, which is the

13   state law claim against the officers under the Bane Act, because he cannot show that the officers

14   used violence or threats against him personally. Finally, Defendants argue that Claims 6 and 7,

15   seeking to hold the City liable for the officers' alleged violations of the Bane Act, cannot stand

16   once summary judgment is granted on the Bane Act claim.

17         In his opposition, Rubalcava abandons his claims against Defendant Ramon Avalos. *See*

18   Opp. at 1 n.1, ECF 207. The motion for summary judgment is GRANTED on all claims against

19   Avalos. With respect to the § 1983 claims against the remaining officer defendants, Rubalcava

20   argues that the record contains sufficient evidence to allow him to proceed to trial, and that the

21   officers are not entitled to qualified immunity. With respect to the Bane Act claim against the

22   officers, and derivative claims against the City, Rubalcava asserts that summary judgment is

23   precluded by the same factual disputes that preclude summary judgment on the § 1983 claims.

24         **A.    Claim 1 – § 1983 Claim for Fabrication of Evidence**

25         Claim 1, for fabrication of evidence, is asserted against Perez, Fonua, Spillman, and

26   Nieves. "To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the

27   defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the

28   plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Defendants contend that Rubalcava cannot prove either element, and that even if he could, the

2   officers are entitled to qualified immunity.

3           Before addressing those contentions, the Court observes that Defendants' opening brief

4   addresses some alleged misconduct that was encompassed by earlier iterations of Rubalcava's

5   deliberate fabrication claim but does not currently form the basis of the claim, for example,

6   coercion and bribery of witnesses.  Rubalcava's opposition clarifies that his fabrication claim

7   against Perez, Fonua, and Spillman is grounded in those officers' alleged fabrication of police

8   reports regarding witness identifications of Rubalcava as the shooter.[2]  His claim against Nieves is

9   grounded in Nieves' alleged fabrication of a police report setting forth his expert opinion that the

10  shooting of Rodriguez was part of a feud between two Norteño factions.  The Court limits its

11  discussion of the fabrication claim to these theories.  The Court first discusses the claim against

12  Perez, Fonua, and Spillman, then the claim against Nieves, and lastly the issue of qualified

13  immunity.

14                  1.      **Perez, Fonua, and Spillman**

15                          a.      **First Element – Official Deliberately Fabricated Evidence**

16          A plaintiff may establish the first element of a fabrication claim – that the defendants

17  deliberately fabricated evidence – by direct evidence such as "direct misquotation of witnesses in

18  investigative reports."  *Spencer*, 857 F.3d at 799.  Alternatively, a plaintiff may show that the

19  defendants continued their investigation of the plaintiff "despite the fact that they knew or should

20  have known that he was innocent," or that the defendants "used investigative techniques that were

21  so coercive and abusive that they knew or should have known that those techniques would yield

22

23  ───────────────

24  [2] Rubalcava also asserts that Perez fabricated a police report stating Perez's opinion that
    Rubalcava shot Rodriguez for the benefit of, at the direction of, or in association with West Side
    Mob.  *See* Perez Gang Enhancement Report, Matthias Ex. 21, ECF 215-5.  In addition, Rubalcava
25  asserts that Perez, Fonua, and Spillman are liable for deliberate fabrication based on their alleged
    use of improper suggestion to elicit false witness identifications of Rubalcava both in and out of
26  court.  The Court need not reach those additional theories of liability, because as discussed herein,
    the Court finds that Rubalcava's deliberate fabrication claim survives summary judgment based on
27  disputed facts regarding the officers' alleged fabrication of the police reports regarding witness
    identifications.  The Court's decision not to address all possible bases for Rubalcava's deliberate
28  fabrication claim against Perez, Fonua, and Spillman does not preclude Rubalcava from asserting
    his additional theories at trial.

1   false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001); *see also Spencer*,

2   857 F.3d at 799 (quoting *Devereaux*).

3       As the parties moving for summary judgment, Defendants have the initial burden to show

4   that Rubalcava cannot prove that Perez, Fonua, and Spillman deliberately fabricated evidence.

5   Defendants attempt to meet their burden by: (1) asserting that all contemporaneous, admissible

6   evidence shows that the police reports were accurate; (2) asking the Court to disregard contrary

7   witness testimony as internally inconsistent and inconsistent with prior statements and testimony;

8   (3) seeking to exclude contrary witness testimony as the product of inappropriate leading

9   questions; (4) characterizing the alleged falsehoods in the police reports as non-actionable

10   "inaccuracies"; and (5) asserting that the fabrication claim based on the police reports is barred by

11   absolute witness immunity.

12                    **i.      Contemporaneous, Admissible Evidence**

13       Perez authored a police report stating that he showed Rodriguez a photo line-up at the

14   hospital, and that Rodriguez viewed the photos for about five seconds before picking Rubalcava

15   out and stating, "Yeah, that's the guy that was there.  He's the one that was driving and shot me."

16   Perez Police Report at 1, Matthias Decl. Ex. 18.  Spillman's police report states that Gonzalez

17   provided the name Lionel Rubalcava as the driver of the black truck, and also provided the

18   information that Rubalcava was a member of West Side Mob.  *See* Spillman Police Report at 3-4,

19   Matthias Decl. Ex. 17.  Fonua's police report states that he and Spillman took Gonzalez to the

20   police station to view a photo line-up, and that Gonzalez "immediately" picked out Rubalcava as

21   the driver of the SUV when Rodriguez was shot.  Fonua Police Report at 3, Matthias Decl. Ex. 16.

22   Fonua's report also states that when showed the same photo line-up, Millan picked out Rubalcava

23   and said he was sure that was the person who shot his brother.  *See id*.

24       In their depositions taken in 2022, Rodriguez, Gonzalez, and Millan testified that these

25   statements in the police reports are false.  Rodriguez testified that he told Perez that he could *not*

26   make a positive identification of the shooter, and that statements to the contrary in the police

27   report were not true.  *See* Rodriguez Dep. 22:19-24:14, Matthias Decl. Ex. 6.  Gonzalez testified

28   that he did not give the police Rubalcava's name, and that when he picked out Rubalcava's photo

United States District Court
Northern District of California

as someone who "looked like" the shooter, he did not make an immediate or positive identification.  *See* Gonzalez Dep. 44:16-46:8, 171:12-172:14, Matthias Decl. Ex. 10.  Millan testified that he told the police repeatedly he did not see the shooter well enough to make an identification, and that to the extent the police report says he did not hesitate to make a positive identification of Rubalcava, the report was untrue.  *See* Millan Dep. 88:21-89:4, 137:6-10, Matthias Decl. Ex. 8.

Rather than conceding that the 2022 deposition testimony of Rodriguez, Gonzalez, and Millan create a factual dispute regarding the accuracy of the police reports, Defendants argue that the accuracy of the police reports cannot be disputed because the reports are corroborated by all contemporaneous, admissible evidence.  Defendants have not cited, and the Court has not discovered, any authority for the proposition that the Court may disregard later testimony about an event in favor of contemporaneous testimony.  Defendants may argue to a jury that the witnesses' testimony and recorded statements made close to the time of the shooting are more credible than the witnesses' deposition testimony twenty years later.  In fact, Defendants have retained a memory expert to support just such an argument.  However, this Court cannot make such a credibility determination at the summary judgment stage.  Viewing all of the evidence, including the witnesses' 2022 deposition testimony, in the light most favorable to Rubalcava, the Court finds that there are disputed issues of fact as to whether Perez, Fonua, and Spillman fabricated their police reports.

## ii.    Inconsistencies in Testimony

Defendants argue that the Court should disregard Rodriguez, Gonzalez, and Millan's testimony regarding false statements in the police reports on the grounds that the testimony is internally inconsistent and inconsistent with the witnesses' prior recorded statements and testimony.  Defendants cite *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), and *Foster v. Metro. Life Ins. Co.*, 243 F. App'x 208, 210 (9th Cir. 2007), for the proposition that a witness cannot create disputed facts through contradictory testimony.  *Cleveland* and *Foster* hold that *a party* cannot create disputed facts through contradictory testimony.  *See Cleveland*, 526 U.S. at 1603-04 ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment

simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); *Foster v. Metro. Life Ins. Co.*, 243 F. App'x 208, 210 (9th Cir. 2007) ("[W]hen determining whether a party has created facts sufficient to defeat a motion for summary judgment, a court may disregard the party's sworn testimony if the testimony is internally inconsistent, but otherwise the judge must view the evidence in the light most favorable to the nonmoving party.").

The Ninth Circuit has explained that the rationale underlying this rule "is that a party ought not be allowed to manufacture a bogus dispute with himself to defeat summary judgment." *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009). However, "[t]hat concern does not necessarily apply when the dispute comes from the sworn deposition testimony of another witness" who is not a party. *Id.* In that circumstance, the Ninth Circuit has held, "[t]he more appropriate analysis is the traditional summary judgment standard" under which "[a] district court has the responsibility to construe all facts in the light most favorable to the non-moving party." *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009).

Accordingly, the Court finds that there is no basis to disregard the witnesses' testimony based on any internal inconsistencies or any inconsistencies with prior statements and testimony.

### iii.     Testimony Elicited by Leading Questions

Defendants argue that Rodriguez, Gonzalez, and Millan's testimony regarding falsehoods in the police reports should be excluded on the basis that the testimony was elicited by leading questions. Federal Rule of Evidence 611(c) provides that, "Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c). Defendants cite *Weil v. Citizens Tel. Servs.*, 922 F.3d 993, 998 (9th Cir. 2019), for the general rule that courts may consider only admissible evidence on summary judgment, and *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1210 (N.D. Cal. 2017), in which the district court excluded testimony elicited by leading questions when deciding a summary judgment motion. Defendants

1    have not established that all of the witness testimony at issue – that is, all of the testimony in

2    which Rodriguez, Gonzalez, and Millan dispute the police reports' descriptions of their

3    identifications of Rubalcava – was the product of leading questions.

4         Moreover, even if some of the relevant testimony was elicited by leading questions, the

5    same testimony could be presented at trial through proper questioning of the witnesses.  "At the

6    summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead

7    focus on the admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.

8    2003).  In *Fraser*, the Ninth Circuit found it proper to consider the contents of the plaintiff's diary

9    on summary judgment, even though the diary itself was inadmissible hearsay, because the

10   information in the diary could be presented at trial through the plaintiff's direct testimony.  *See id*.

11   In the present case, all of the testimony in question is within the witnesses' personal knowledge

12   and could be presented at trial in admissible form through proper questioning.

13        The Court thus finds that the witnesses' testimony is not subject to exclusion as the product

14   of leading questions.

15                          **iv.    False Statements as Non-Actionable Inaccuracies**

16        Defendants characterize the alleged falsehoods in the police reports as non-actionable

17   "inaccuracies" that cannot support a claim for deliberate fabrication under *Gausvik v. Perez*, 345

18   F.3d 813 (9th Cir. 2003).  In *Gausvik*, the Ninth Circuit held that an affidavit for probable cause

19   containing errors was insufficient to support a claim for deliberate fabrication of evidence.  *See id*.

20   at 817.  The affidavit represented that three children had tested "positive" for sexual abuse when

21   really the tests were only "suggestive" or "consistent" with abuse, and also represented that eight

22   children had accused the suspect of abuse when only two had done so.  *Id*.  The Ninth Circuit held

23   that although the affidavit indicated that the officer had been careless with the facts, that

24   carelessness did not rise to the level of deliberate fabrication of evidence.  Defendants appear to be

25   asking this Court to find as a matter of law that, like the alleged falsehoods in the *Gausvik*

26   affidavit, the alleged falsehoods in the police reports do not rise beyond the level of mere

27   carelessness.  However, more recent Ninth Circuit cases limit application of *Gausvik* and support

28   Rubalcava's contention that there are triable issues of fact.

One such case is *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105 (9th Cir. 2018), cited by Rubalcava.  In *Caldwell*, the plaintiff spent nearly twenty years in prison on a murder conviction before obtaining his release by means of a petition for writ of habeas corpus. *See id*. at 1108 & n.1.  Upon release, the plaintiff brought a § 1983 action against police officers, the city, and the county, alleging that officers fabricated evidence against him during the murder investigation.  *See id*. at 1108.  The Ninth Circuit held that an officer's alleged fabrication of a statement by the plaintiff, and memorialization of that statement in falsified notes, was sufficient to support a claim for deliberate fabrication of evidence.  *See id*. at 1114.  The Ninth Circuit distinguished the facts before it from those in *Gausvik*, finding summary judgment to be inappropriate where "the potential 'errors' are not obviously the product of carelessness," and there was a factual dispute as to whether the officer "intentionally fabricated his notes." *Id*. at 1114-15.

In light of *Caldwell*'s limitation of *Gausvik*, and viewing the evidence in the light most favorable to Rubalcava, this Court finds that Defendants have failed to show that the asserted errors in the police reports were obviously the product of carelessness rather than intentional fabrication.  Accordingly, Defendants have failed to show that Perez, Fonua, and Spillman are entitled to summary judgment on the ground that the asserted errors in the police reports are merely non-actionable inaccuracies.

### v.    Absolute Witness Immunity

Defendants argue that Rubalcava's claim for deliberate fabrication of the police reports is barred by absolute witness immunity.  "Witnesses, including police officers, are absolutely immune from liability for testimony at trial[.]" *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241 (9th Cir. 2015) (citing *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983)).  "Absolute witness immunity also extends to preparatory activities 'inextricably tied' to testimony[.]" *Lisker*, 780 F.3d at 1241 (citing *Franklin v. Terr*, 201 F.3d 1098, 1102 (9th Cir. 2000).  In *Franklin*, the plaintiff obtained relief from a murder conviction through a petition for writ of habeas corpus, and thereafter brought a § 1983 action against a psychiatrist and therapist who testified at the plaintiff's criminal trial.  *See Franklin*, 201 F.3d at 1100.  The plaintiff attempted to circumvent

the psychiatrist's absolute witness immunity by alleging that the psychiatrist conspired with others to present false testimony. *See id*. 1101. The Ninth Circuit held that the psychiatrist's absolute witness immunity extended to the conspiracy claim, because her "alleged conspiratorial behavior is inextricably tied to her testimony." *Id*. at 1102.

In *Lisker*, the Ninth Circuit clarified that immunity for pre-testimony conduct does not extend to fabricating reports, investigative notes, and similar documents. The plaintiff in *Lisker* served twenty-six years of a prison term after being convicted of second degree murder, but he was released after a federal judge granted a petition for writ of habeas corpus and the state dismissed the charges. *See Lisker*, 780 F.3d at 1238. The plaintiff thereafter brought a § 1983 action against two detectives for fabricating reports, investigative notes, and photographs of the crime scene that were placed in the detectives' "Murder Book" during the homicide investigation. *See id*. at 1239. The detectives testified during preliminary proceedings and at trial, and argued that the notes and reports in the Murder Book were "inextricably tied" to their testimony because their purpose was to memorialize the substance of eventual testimony. *See id*. 1242. The Ninth Circuit rejected the detectives' argument, holding that "police investigative materials have evidentiary value wholly apart from assisting trial testimony – they comprise part of the documentary record before the prosecution and defense and affect charging decisions, plea bargaining, and cross-examination of the investigating officers." *Id*. (internal quotation marks and citation omitted). The Ninth Circuit stated that "[t]his non-testimonial evidentiary value distinguishes the materials in the Murder Book from pre-trial activity aimed exclusively at influencing testimony." *Id*. The *Lisker* court held that the detectives could not bring those materials within the scope of absolute witness immunity by testifying, opining that "a pretrial, out-of-court effort to . . . fabricate physical evidence . . . is not inextricably tied – or tied at all – to any witness' own testimony, even [i]f a potential witness does happen to be involved." *Id*. (internal quotation marks and citation omitted).

Following *Lisker*, this Court concludes that the potentially fabricated police reports do not fall within the scope of absolute witness immunity, even though the officers who prepared the reports testified at Rubalcava's criminal trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

United States District Court
Northern District of California

19
20
21
22
23
24
25
26
27
28

###### vi.      Conclusion re First Element

The Court concludes that Defendants have not met their initial burden on summary judgment to show that Rubalcava cannot satisfy the first element of his deliberate fabrication claim against Perez, Fonua, and Spillman.

#### b.      Second Element – Causation

"To establish the second element of causation, the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the 'proximate cause' or 'legal cause' of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer*, 857 F.3d at 798.

As the parties moving for summary judgment, Defendants have the initial burden to show that Rubalcava cannot satisfy the causation element. Defendants argue that Rubalcava cannot prove that the alleged fabrication of the police reports was the cause of his conviction and incarceration, because the police reports were not introduced as evidence at trial, and therefore could not have been considered by the jury in rendering a guilty verdict. In opposition, Rubalcava argues that he can satisfy the causation element by proving that the prosecutor considered the fabricated police reports when deciding whether to prosecute, because if Rubalcava had not been prosecuted, he would not have been convicted and incarcerated.

In *Caldwell*, the plaintiff (Caldwell) spent nearly twenty years in prison on a murder conviction before obtaining his release through a petition for writ of habeas corpus. *See Caldwell*, 889 F.3d at 1108 & n.1. After his release, Caldwell filed a § 1983 action alleging that investigating police officers fabricated evidence during the murder investigation. *See id*. at 1108. The district court granted summary judgment for the defendants. *See id*. The district court held that Caldwell had raised a triable issue as to whether one officer, Crenshaw, had fabricated evidence. *See id*. at 1111-12. However, district court concluded that the prosecutor's "presumptively independent decision to charge and prosecute Caldwell broke the chain of causation between the fabricated evidence and Caldwell's injury." *Id*.

The Ninth Circuit reversed and remanded. Addressing the question of "what constitutes an

1    injury" in the context of the § 1983 claim, the Ninth Circuit held that a "plaintiff need not be

2    convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty – being

3    criminally charged is enough." *Caldwell*, 889 F.3d at 1115.  The Ninth Circuit went on to find

4    that there was a disputed issue of fact whether the prosecutor relied on the potentially fabricated

5    evidence in deciding to charge and prosecute Caldwell.  *Id*. at 1115-18.  The *Caldwell* court

6    concluded that "a jury could reasonably conclude that the prosecutor relied on the falsified

7    statement in deciding to charge Caldwell," and that as a result, " Caldwell raises a triable issue as

8    to causation[.]"  *Id*. at 1118.

9            Applying *Caldwell*, this Court concludes that Rubalcava may satisfy the causation element

10   by proving that the prosecutor relied on the allegedly fabricated police reports in making the

11   decision to prosecute.  Defendants argue that *Caldwell*'s holding on causation is limited to cases in

12   which the plaintiff claims injuries flowing solely from the charging decision and not from the

13   plaintiff's subsequent conviction and incarceration.  Nothing in *Caldwell* suggests that the plaintiff

14   there, who brought a deliberate fabrication claim after being incarcerated for almost twenty years,

15   limited his claim to injuries flowing solely from the charging decision and not from the subsequent

16   conviction and incarceration.  Accordingly, the Court declines to apply the narrow reading of

17   *Caldwell* urged by Defendants.

18           Defendants argue that Rubalcava cannot prove that the prosecutor relied on the allegedly

19   fabricated police reports when making the prosecution decision.  Thus, Defendants argue, the

20   chain of causation between the allegedly fabricated police reports and Rubalcava's injuries is

21   broken.  In support of this argument, Defendants submit several excerpts from the deposition of

22   the prosecutor, Mark Duffy, discussing the evidence he considered in deciding whether to go

23   forward with prosecution of Rubalcava.  *See* Duffy Dep. 322:16-335:2, 342:18-23, 350:7-370:2,

24   Pritchard Decl. Ex. 38, ECF 199-7.

25           The cited excerpts do not indicate whether or not the potentially fabricated police reports

26   were part of the evidentiary record that Mr. Duffy reviewed prior to authorizing the prosecution of

27   Rubalcava.  "A prosecutor's judgment cannot be said to be independent where the prosecutor

28   considers potentially fabricated evidence without knowing that the evidence might be

fundamentally compromised and misleading." *Caldwell*, 889 F.3d at 1117.  A prosecutor's "consideration of potentially fabricated evidence rebuts any presumption of independent judgment and creates a factual issue for the jury" on the issue of causation. *Id*. at 1117-18.  Thus, Defendants' failure to establish that the police reports were not in the evidentiary record reviewed by Mr. Duffy constitutes a failure to meet their initial burden to show that there are no disputed facts as to causation.

Even if Defendants had met their initial burden, Rubalcava submits excerpts of Mr. Duffy's deposition – not cited by Defendants – in which Mr. Duffy stated that he relied on the police reports in determining that there was probable cause to pursue the charge of attempted murder against Rubalcava. *See* Duffy Dep. 75:21-76:25, Matthias Decl. Ex. 55, ECF 219-2.  Mr. Duffy also stated that he relied on the police reports in good faith, assuming that the reports were accurate and written in good faith. *See id*.  Under *Caldwell*, this evidence would be sufficient to create a triable issue for the jury.

The Court concludes that Defendants have not met their initial burden on summary judgment to show that Rubalcava cannot satisfy the second element of his deliberate fabrication claim against Perez, Fonua, and Spillman.  Even if they had, Rubalcava has demonstrated the existence of disputed facts with respect the issue of causation.

### 2.    Nieves

Rubalcava's deliberate fabrication claim against Nieves is based on Nieves' alleged fabrication of a police report setting forth his expert opinion that the shooting of Rodriguez was part of a feud between two Norteño factions, West Side Mob and Varrio Horseshoe. *See* Nieves Police Report, Matthias Decl. Ex. 20, ECF 215-4.  Under a subheading titled "Gang Relatedness," Nieves' report states, "Based on the details documented in the investigation of this case, it is my opinion that the criminal conduct committed by suspect Rubalcava was for the benefit of West Side Mob (WSM) with the intent to promote, further, and assist in criminal conduct by West Side Mob members." *Id*. at 1.  The report provides the bases for Nieves' opinion, including a description of the circumstances of the shooting, information regarding Norteño gangs, and a statement that "[c]urrently both West Side Mob and Varrio Horseshoe have been involved in an

1    on-going feud." *Id*. at 1-2.

2        Defendants contend that Rubalcava cannot prove either element of his deliberate

3    fabrication claim against Nieves.  Again, those elements are that (1) the defendant deliberately

4    fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty.

5    *See Spencer*, 857 F.3d at 798.

6                    **a.        First Element – Official Deliberately Fabricated Evidence**

7        Rubalcava may establish the first element of his fabrication claim against Nieves by direct

8    evidence, for example by proving that his police report contains a direct misquotation of

9    witnesses; or by proving that Nieves continued his investigation of Rubalcava despite the fact that

10   he knew or should have known Rubalcava was innocent; or by proving that Nieves used

11   investigative techniques that were so coercive and abusive that Nieves knew or should have

12   known that those techniques would yield false information.  *See Spencer*, 857 F.3d at 799;

13   *Devereaux*, 263 F.3d at 1076.  Unlike the police reports regarding witness identification authored

14   by Perez, Fonua, and Spillman, Nieves' report does not contain any alleged misquotations of

15   witnesses.  Accordingly, Rubalcava will have to prove the first element of his deliberate

16   fabrication claim by showing that Nieves continued investigating Rubalcava even though Nieves

17   knew or should have known he was innocent, or by showing that Nieves' police report was so

18   coercive and abusive that Nieves knew or should have known it would yield false information.

19       Defendants argue that Rubalcava cannot make these showings for several reasons.  First,

20   Defendants contend that Nieves' police report falls within the scope of absolute witness immunity,

21   because it is inextricably tied to the expert testimony he gave a trial.  Second, Defendants argue

22   that Nieves' report was not baseless but was, in fact, accurate.  Third, Defendants assert that an

23   expert cannot be held liable for deliberate fabrication based on an opinion, even if the opinion later

24   turns out to be wrong.

25                          **i.        Absolute Witness Immunity**

26       The Ninth Circuit recently addressed the application of absolute witness immunity to

27   expert reports in *Krause v. Peele*, 851 F. App'x 36 (9th Cir. 2021).  The Ninth Circuit stated the

28   general rule that "[t]estifying witnesses are entitled to absolute immunity for their testimony,

United States District Court
Northern District of California

22

1  although that immunity does not shield non-testimonial conduct or conduct that is not inextricably

2  tied to their testimony." *Id*. (internal quotation marks and citation omitted).  The Ninth Circuit

3  also stated that the timing of the challenged conduct informs the determination whether it falls

4  within the scope of absolute witness immunity.  *See id*.  In *Krause*, the expert report at issue was

5  found to be inextricably tied to the expert's trial testimony, because the report had to be prepared

6  in order for the expert to be allowed to testify at trial under Arizona law.  *See id*.  The Ninth

7  Circuit noted that the expert prepared the report several months after the investigation had been

8  completed, when the defendant had already been arrested and indicted.  *See id*.  The expert's role

9  was limited to evaluation of evidence that had already been collected.  *See id*.  Under those

10  circumstances, the Ninth Circuit determined that the expert report was "best seen as testimonial in

11  nature prepared with an eye towards trial," and therefore was within the scope of absolute witness

12  immunity.  *Id*.

13    *Krause* is distinguishable from the present case, in which the report at issue is not merely

14  the report of a trained expert, drafted in preparation for trial after completion of the investigation.

15  Here, Nieves prepared the report in his role as a police officer, as part of the investigation.  Under

16  these circumstances, the Court is not persuaded that the report is shielded by absolute witness

17  immunity simply because Nieves later was qualified as an expert and testified to some of the

18  opinions contained in the report.  Unlike the expert report in *Krause*, Nieves' police report is not

19  "testimonial in nature prepared with an eye toward trial."  Accordingly, the Court finds that on the

20  facts of this case, absolute witness immunity does not apply.

21          **ii.**  **Not Baseless**

22    The Court finds much stronger Defendants' argument that the record evidence does not

23  support Rubalcava's position that Nieves' report was baseless and prepared for the purpose of

24  fabricating a motive for the shooting.  Defendants point to evidence that there was, in fact, a feud

25  between the Norteño gangs West Side Mob and Varrio Horseshoe.  For example, Daniel Cerecerez

26  testified at Rubalcava's trial that there were problems between West Side Mob and Varrio

27  Horseshoe in San Jose in 2001 and 2002.  *See* Trial Tr. 295:14-297:25, Pritchard Decl. Ex. 1, ECF

28  199-3.  Cerecerez testified that he was stabbed by members of Varrio Horseshoe because he

1  associated with West Side Mob members. *See id*. Nieves had significant experience as a gang

2  investigator with SJPD, and testified as an expert in that subject at Rubalcava's trial. *See* Trial Tr.

3  55:24-56:4, Matthias Decl. Ex. 23. Nieves' report explains the bases for his opinion that

4  Rubalcava shot Rodriguez as part of a gang dispute. *See* Nieves Police Report at 1-2, Matthias

5  Decl. Ex. 20. This evidence is sufficient to meet Defendants' initial burden to show that the

6  opinions in Nieves' report were not fabricated, but rather good faith expert opinions regarding

7  possible gang involvement in Rodriguez's shooting.

8         The burden thus shifts to Rubalcava to present evidence from which a reasonable trier of

9  fact could conclude that Nieves' report was fabricated. Rubalcava attempts to meet this burden by

10  arguing that Nieves' report was wholly unsupported; that anyone familiar with San Jose gang

11  culture would have understood Nieves' opinion to be wildly implausible; and that Nieves ignored

12  substantial evidence that the shooter was actually a Sureño, not a Norteño. As noted above,

13  Defendants have presented evidence from which a reasonable trier of fact could find that Nieves'

14  report was supported. Rubalcava bases his assertion regarding he implausibility of Nieves' report

15  in large part on the opinion of his own retained gang expert, Dr. Patrick Lopez-Aguado. *See*

16  Lopez-Aguado Expert Report, Matthias Decl. Ex. 27, ECF 216-1. That Nieves' expert opinion

17  clashes with the opinion of Rubalcava's retained gang expert does not suggest that Nieves' expert

18  opinion was fabricated. Finally, Rubalcava does not show that Nieves ignored substantial

19  evidence that the shooter was a Sureño. The only record evidence of Sureño involvement cited by

20  Rubalcava is the fact that some, but not all, witnesses described the occupants of the shooter's

21  SUV as wearing blue. *See* Police Report Compilation at 2-10, Matthias Decl. Ex. 69.

22         The Court finds that Rubalcava has failed to meet his burden to present evidence from

23  which a reasonable trier of fact could find that Nieves' report was fabricated. Thus, the motion for

24  summary judgment on Claim 1 is GRANTED as to Nieves.

25                                **iii.**       **Expert Opinion**

26         Defendants go beyond arguing that Nieves cannot be liable for fabrication based on his

27  police report in this case, and argue that an expert can never be held liable for deliberate

28  fabrication based on an opinion, even if the opinion later turns out to be wrong. The cases upon

United States District Court
Northern District of California

1    which Defendants rely do not stand for this broad proposition.  *See Gausvik*, 345 F.3d at 817;

2    *Richards v. Cnty. of San Bernardino*, No. 19-56205, 2022 WL 2292830, at *1 (9th Cir. June 24,

3    2022).  However, Nieves is entitled to summary judgment on the ground discussed above.

                        **b.      Second Element – Causation**

5           Having determined that Nieves is entitled to summary judgment because Defendants have

6    shown Rubalcava cannot establish the first element of the deliberate indifference claim, the Court

7    need not reach Defendants' argument on the second element.  The Court touches briefly on the

8    argument for the sake of completeness.  Defendants argue that Nieves' report was not introduced

9    at trial, and thus it could not have been the cause of Rubalcava's conviction and incarceration.

10   That argument is without merit, because as discussed above, under *Caldwell* Rubalcava may

11   satisfy the causation element by proving that the prosecutor relied on the allegedly fabricated

12   police report in making the decision to prosecute.  Defendants need not prevail on their causation

13   argument to obtain summary judgment for Nieves, however, in light of the Court's conclusions

14   regarding the first element.

                        **3.      Qualified Immunity**

16          Defendants argue that even if the officers deliberately fabricated evidence, they are entitled

17   to qualified immunity.  When evaluating an assertion of qualified immunity, "a court considers

18   whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly

19   established at the time of the alleged misconduct."  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 967-

20   68 (9th Cir. 2021). "Either question may be addressed first, and if the answer to either is 'no,' then

21   the state actor cannot be held liable for damages."  *Id*. at 968.

22          With respect to prong one, the Court has determined that there are factual disputes as to

23   whether Perez, Fonua, and Spillman deliberately fabricated their police reports by stating that

24   witnesses had made unequivocal identifications of Rubalcava as the shooter when they had not

25   done so, by misquoting witnesses, and by making false statements regarding the circumstances of

26   the reported witness identifications.  Defendants argue that they are entitled to qualified immunity

27   under the second prong of the analysis, under which the Court must determine whether the right

28   allegedly violated was clearly established at the time of the alleged misconduct.

United States District Court
Northern District of California

25

1
2
3
4
5
6
7
8
9

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"In the Ninth Circuit, we begin [the clearly established] inquiry by looking to binding precedent.  If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end."  *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quotation marks and citation omitted, alteration in the original). "There need not be a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."  *Simmons v. G. Arnett*, 47 F.4th 927, 934 (9th Cir. 2022) (quotation marks and citation omitted, alteration in original).  "The plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the violation."  *Id*. at 934-35.

Rubalcava asserts that the right allegedly violated by Perez, Fonua, and Spillman's fabrication of evidence was clearly established in *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001).  In *Devereaux*, the Ninth Circuit held that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."  *Id*. at 1074-75.  In the present case, Rubalcava claims that Perez, Fonua, and Spillman deliberately fabricated their police reports to make it appear that three separate eyewitnesses provided reliable, unequivocal identifications of Rubalcava as the shooter, and that the prosecutor relied on those police reports when making the decision whether to prosecute Rubalcava for attempted murder.  This claim falls squarely within the holding of *Devereaux*.  Consequently, Defendants are not entitled to qualified immunity.

Defendants argue that *Devereaux* defines the right at too high a level of generality. According to Defendants, the Ninth Circuit did not recognize a fabrication claim based on misstatements in an investigative report until 2009, in *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010).  In *Costanich*, the Ninth Circuit clarified that a deliberate fabrication claim could be proved either by indirect methods discussed in *Devereaux – i.e.*, showing that the defendants continued their investigation even when they knew or should have known the plaintiff was innocent – *or* by direct evidence such as "direct misquotation of witnesses in investigative reports."  *Costanich*, 627 F.3d at 1111-14.  That *Costanich* expanded the methods available to prove violation of the constitutional right recognized in *Devereaux* does not change

26

1   the fact that the right itself was recognized in *Devereaux* in 2001.  *Devereaux*'s statement of the

2   right not to be subjected to criminal charges based on false evidence deliberately fabricated by the

3   government could not be more clear, and was sufficient to put Defendants on notice that they were

4   constitutionally prohibited from falsifying eyewitness identifications in their police reports.

5          The Court finds that Defendants are not entitled to qualified immunity with respect to the

6   deliberate fabrication claim.

7                          **4.       Conclusion**

8          In conclusion, Defendants' motion for summary judgment on Claim 1 is GRANTED as to

9   Nieves and DENIED as to Perez, Fonua, and Spillman.

10         **B.       Claim 2 – § 1983 Claim for Withholding Evidence**

11         Claim 2, for withholding evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963),

12  is asserted against Perez, Fonua, Spillman, and Nieves.  The *Brady* claim is based on the officers'

13  alleged failure to disclose the true circumstances of the eyewitness identifications of Rubalcava,

14  specifically, that the witnesses either said they could not make an identification or made an

15  equivocal identification.

16         Defendants argue that Rubalcava conflates his theories of liability for fabrication and

17  *Brady* violations and cannot establish the elements of a *Brady* claim, Rubalcava is estopped from

18  proceeding on the *Brady* claim, and Defendants are entitled to qualified immunity.  In opposition,

19  Rubalcava argues that there is sufficient evidence to proceed to trial on the *Brady* claim, estoppel

20  does not lie, and the officers are not entitled to qualified immunity.

21                          **1.       Elements of *Brady* Claim**

22         To prevail on a claim under *Brady*, the plaintiff must prove that "(1) the withheld evidence

23  was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was

24  suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff."  *Smith v.*

25  *Almada*, 640 F.3d 931, 939 (9th Cir. 2011).  Evidence is material "if there is a reasonable

26  probability that, had the evidence been disclosed to the defense, the result of the proceeding would

27  have been different."  *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003) (internal quotation

28  marks and citation omitted).  In order to show prejudice, the plaintiff need not show that it is more

1   likely than not that the withheld evidence would have resulted in his acquittal, but only that the

2   withheld evidence "could reasonably be taken to put the whole case in such a different light as to

3   undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

4           As the parties moving for summary judgment, Defendants have the initial burden to show

5   that Rubalcava cannot prove these elements.  Defendants seek to do so by arguing that the *Brady*

6   claim relies largely on the same evidence proffered in support of the deliberate fabrication claim,

7   which Defendants contend is baseless.  Defendants' argument is meritorious with respect to

8   Nieves, as Defendants have demonstrated an absence of record evidence of any wrongdoing

9   relating to his report.  Rubalcava does not offer any evidence or argument that would support a

10  *Brady* claim against Nieves.  Accordingly, the motion for summary judgment on Claim 2 is

11  GRANTED as to Nieves.

12          As discussed above, however, the Court finds that there are disputed facts as to whether

13  Perez, Fonua, and Spillman deliberately fabricated evidence regarding the identifications of

14  Rubalcava as the shooter by eyewitnesses Rodriguez, Gonzalez, and Millan.  Rubalcava cites

15  several cases holding that such conduct, if proved, is sufficient to support a *Brady* claim.  *See, e.g.,*

16  *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1226 (9th Cir. 2015) (holding that a *Brady* claim

17  may be based on officers' failure to disclose prior statements from testifying eyewitnesses

18  showing uncertainty regarding identifications); *Trulove v. D'Amico*, No. 16-CV-050-YGR, 2018

19  WL 1070899, at *6-7 (N.D. Cal. Feb. 27, 2018) (denying summary judgment on *Brady* claim

20  based on determination that a reasonable jury could determine that the defendants failed to

21  disclose evidence concerning the circumstances under which eyewitness identifications and

22  statements were obtained).  Information regarding eyewitnesses' uncertainty when identifying the

23  defendant is material because it may be used to impeach.  *See Carrillo*, 798 F.3d at 1225 ("Had

24  this evidence been disclosed, the defense could have used it to impeach the eyewitnesses'

25  identifications of [the defendant] as the killer.").  And here, where the government's entire case

26  turned on eyewitness testimony, and the prosecutor emphasized how unlikely it was that multiple

27  eyewitnesses would have identified Rubalcava by happenstance, the withheld evidence reasonably

28  could have "put the whole case in such a different light as to undermine confidence in the verdict."

United States District Court
Northern District of California

1   *See Kyles*, 514 U.S. at 435.

2          Defendants argue that a *Brady* claim cannot be based on the same facts as a deliberate

3   fabrication claim.  Defendants support this argument with citations to out of circuit authority.  *See*

4   *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (rejecting *Brady* claim based on officers'

5   "keeping quiet about their own wrongdoing"); *Harris v. Kuba*, 486 F.3d 1010, 1016-17 (7th Cir.

6   2007) (rejecting Brady claim based on officer's fabricated statements); *Lefever v. Ferguson*, 645

7   F. App'x 438, 444 (6th Cir. 2016) (same).  This Court declines to follow the cited authority given

8   the Ninth Circuit's holding in *Carrillo* that an officers' failure to disclose prior statements from an

9   eyewitness, showing uncertainty regarding identifications, can support a *Brady* claim.

10          The Court finds that Defendants have failed to meet their initial burden to show that

11   Rubalcava cannot prove the elements of his *Brady* claim against Perez, Fonua, and Spillman.

12                        **2.      Estoppel**

13          Defendants argue that Rubalcava is judicially estopped from asserting the present *Brady*

14   claim against Perez, Fonua, and Spillman.  Defendants argue that in his state court habeas petition,

15   Rubalcava argued that his trial counsel had all necessary materials to impeach Rodriguez,

16   Gonzalez, and Millan regarding their witness identifications, but failed to use those materials to do

17   so.  *See* Pet., Pritchard Ex. 12, ECF 199-3.  Rubalcava's habeas arguments were made in the

18   context of a claim for ineffective assistance of trial counsel.  *See id*.  Defendants also point to

19   Rubalcava's stipulation that no witness was "less than truthful" in his criminal proceedings.  *See*

20   Stip., Pritchard Ex. 15 n.1, ECF 199-4.  That stipulation was made in the context of Rubalcava's

21   attempt to obtain a judicial finding of actual innocence.  *See id.*  Relying on *Milton H. Greene*

22   *Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012), Defendants contend

23   that Rubalcava should not be permitted to take inconsistent positions in this Court.

24          In *Milton H. Greene Archives*, the Ninth Circuit explained that judicial estoppel is "an

25   equitable doctrine invoked not only to prevent a party from gaining an advantage by taking

26   inconsistent positions, but also because of general considerations of the orderly administration of

27   justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing

28   fast and loose with the courts."  *Milton H.*, 692 F.3d at 993 (internal quotation marks and citation

United States District Court
Northern District of California

1   omitted).  "[C]ircumstances where the doctrine may apply are probably not reducible to any

2   general formulation."  *Id*. (internal quotation marks and citation omitted).  Courts may consider

3   three factors to decide whether to apply the doctrine:  (1) whether the party's later position is

4   "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a

5   court to accept that party's earlier position; and (3) "whether the party seeking to assert an

6   inconsistent position would derive an unfair advantage or impose an unfair detriment on the

7   opposing party if not estopped."  *Id*. at 994.

8        After consideration of these factors, the Court is not persuaded that application of judicial

9   estoppel is appropriate here.  In essence, Defendants seek to bar Rubalcava from proceeding on his

10  *Brady* claim based on positions he took while seeking habeas relief and an adjudication of actual

11  innocence.  Even assuming that the first two factors above are met, the Court is at a loss to discern

12  how allowing Rubalcava to proceed with his current *Brady* claim would give him an unfair

13  advantage, or impose an unfair detriment upon Defendants.  The Court therefore declines to apply

14  the judicial estoppel doctrine here.

15              **3.      Qualified Immunity**

16       Defendants argue that even if the officers violated *Brady*, they are entitled to qualified

17  immunity.  As noted above, Rubalcava has the burden to show that the right allegedly violated

18  was clearly established at the time of the violation.  The Court has no difficulty determining that

19  Rubalcava has satisfied that burden by directing the Court to the Ninth Circuit's statement in

20  *Carrillo* that "[b]ecause it was clearly established by 1984 that police officers were bound by

21  *Brady*, and that evidence undermining the credibility of government witnesses fell within *Brady*'s

22  ambit, it would have been clear to any reasonable officer that the nondisclosure of this evidence

23  was unlawful."  *Carrillo*, 798 F.3d at 1226.

24       The Court finds that Defendants are not entitled to qualified immunity with respect to the

25  *Brady* claim.

26              **4.      Conclusion**

27       In conclusion, Defendants' motion for summary judgment on Claim 2 is GRANTED as to

28  Nieves and DENIED as to Perez, Fonua, and Spillman.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### C.    Claim 3 – § 1983 Claim for Malicious Prosecution

Claim 3, for malicious prosecution, is asserted against Perez, Fonua, Spillman, and Nieves.

Defendants argue that Rubalcava cannot establish the elements of his malicious prosecution claim and that even if he could, the officers are entitled to qualified immunity.  In opposition, Rubalcava argues that there is sufficient evidence to proceed to trial on the malicious prosecution claim and that the officers are not entitled to qualified immunity.

#### 1.    Elements of Malicious Prosecution Claim

"In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009) (internal quotation marks and citation omitted, alterations in original).  Federal courts look to state law to define these elements of a § 1983 malicious prosecution claim.  *See Rezek v. City of Tustin*, 684 F. App'x 620, 621 (9th Cir. 2017) ("However, the elements of Rezek's malicious prosecution claims are controlled by California state law."); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) ("[W]e have incorporated the relevant elements of the common law tort of malicious prosecution into our analysis under § 1983."); *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987) (applying California state law to elements of § 1983 malicious prosecution claim).

In addition to the elements listed above, "[a]n individual seeking to bring a malicious prosecution claim must generally establish that the prior proceedings terminated in such a manner as to indicate his innocence." *Awabdy*, 368 F.3d at 1068.  A criminal defendant may sue not only the prosecutor for malicious prosecution, but also police officers and investigators who wrongfully caused his prosecution. *See Usher*, 828 F.3d at 562 (reversing dismissal of § 1983 malicious prosecution claim against arresting officers and city).

As the parties moving for summary judgment, Defendants have the initial burden to show that Rubalcava cannot prove these elements.  The requirement that the prior proceedings terminated in a manner indicating Rubalcava's innocence is undisputed in light of the Santa Clara County Superior Court's determination that he is actually innocent and the District Attorney's

31

dismissal of the charges.  *See* Order, Matthias Decl. Ex. 3; Tr., Matthias Decl. Ex. 2.  However, Defendants argue that Rubalcava cannot prove the remaining elements, asserting that  there is no evidence that the officers acted with malice; there was probable cause to prosecute Rubalcava; and there is no evidence that the officers acted with intent to deprive Rubalcava of equal protection or another constitutional right.

### a.    Malice

Under California law, "malice is not limited to hostility or ill will, but encompasses improper motive, which can be inferred from continued prosecution despite a lack of substantial grounds for believing in plaintiff's guilt." *Trulove*, 2018 WL 1070899, at *8 (citing *Greene v. Bank of Am.*, 216 Cal. App. 4th 454, 464-65 (2013)).  The Court observes that Defendants do not rely on California law for the relevant definition of malice, but instead cite The American Law Institute's Restatement 2d of Torts, § 668, for the proposition that malice requires "motives of anger, personal ill will or spite".  *See* Mot. at 28.  The cited section of the Restatement does not in fact limit malice to the definition proffered by Defendants and in any event, as discussed above, the applicable definition is that found in California law.

Defendants assert that there is no evidence that the officers bore Rubalcava any ill will, or that they pursued charges against Rubalcava for any reason other than their belief he was the shooter.  This assertion is insufficient to meet Defendants' initial burden on summary judgment with respect to Perez, Fonua, and Spillman, because Defendants simply ignore record evidence that those officers falsified witness identifications in their police reports.  A reasonable jury, viewing the evidence in the light most favorable to Rubalcava, could draw an inference that Perez, Fonua, and Spillman falsified their police reports for an improper purpose – to arrest Rubalcava without any substantial evidence of his guilt – and thus could find that the malice element is satisfied.  Accordingly, the Court concludes that Defendants have failed to establish that Perez, Fonua, and Spillman are entitled to summary judgment, especially since "[m]alice is usually a question of fact for the jury to determine." *Est. of Tucker ex rel. Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008).  This conclusion is consistent with other cases in this district addressing similar facts.  In *Trulove*, the district court found that disputed issues of material fact as

1   to malice precluded summary judgment on a § 1983 malicious prosecution claim where there was

2   evidence that the defendant officers knowingly pressured a witness to identify the plaintiff as the

3   shooter in a murder case, and knowingly knew or recklessly disregarded the falsity of another

4   witness's identification of the plaintiff as the shooter.  *See Trulove*, 2018 WL 1070899, at *8.

5        However, Defendants' assertion that there is no evidence of malice is meritorious with

6   respect to Nieves.  As discussed above, there is no evidence in this record suggesting that Nieves

7   fabricated his Gang Relatedness police report or withheld material evidence.  Defendants may

8   meet their initial burden on summary judgment with respect to Nieves by pointing to the absence

9   of record evidence on malice with respect to him.  *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at

10  387.  The burden thus shifts to Rubalcava to come forward with evidence from which a reasonable

11  trier of fact could conclude that Nieves acted with malice in helping to instigate the prosecution.

12  Rubalcava's opposition brief addresses only the police reports regarding witness identifications

13  prepared by other officers, not Nieves' Gang Relatedness police report.  Consequently, the motion

14  for summary judgment on the malicious prosecution claim is GRANTED as to Nieves.

15               **b.      Probable Cause**

16       Defendants next argue that Rubalcava cannot establish the second element the malicious

17  prosecution claim, that charges were brought against him with no probable cause.  "[P]robable

18  cause is an absolute defense to malicious prosecution."  *Lassiter*, 556 F.3d at 1054-55.

19  Defendants argue that the superior court's finding of probable cause after the preliminary hearing

20  is sufficient to defeat the malicious prosecution claim here.  "In California, as in virtually every

21  other jurisdiction, it is a long-standing principle of common law that a decision by a judge or

22  magistrate to hold a defendant to answer after a preliminary hearing constitutes *prima facie* – but

23  not *conclusive* – evidence of probable cause."  *Awabdy*, 368 F.3d at 1067 (9th Cir. 2004).  The

24  Court finds that Defendants' citation to the superior court's probable cause finding is sufficient to

25  meet their initial burden on the probable cause element.

26       The burden thus shifts to Rubalcava to come forward with evidence establishing a factual

27  dispute as to probable cause.  "Among the ways that a plaintiff can rebut a *prima facie* finding of

28  probable cause is by showing that the criminal prosecution was induced by fraud, corruption,

33

United States District Court
Northern District of California

1   perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Awabdy*, 368

2   F.3d at 1067.  Rubalcava submits excerpts of the prosecutor's deposition testimony that he relied

3   on the allegedly falsified police reports when determining that there was probable cause to pursue

4   the charge of attempted murder against Rubalcava.  *See* Duffy Dep. 75:21-76:25, Matthias Decl.

5   Ex. 55.  Mr. Duffy also stated that he relied on the police reports in good faith, assuming that the

6   reports were accurate and written in good faith.  *See id.*  That evidence is sufficient to create a

7   triable issue of fact as to whether Mr. Duffy had probable cause to prosecute.

8       Defendants argue that the testimony presented at the preliminary hearing, which

9   Defendants characterize as "independent" of the allegedly fabricated police reports, was sufficient

10   to establish probable cause.  The victim, Rodriguez, made an in-court identification of Rubalcava

11   as the shooter, as did Rodriguez's brother Millan, and Gonzalez testified that Rubalcava looked

12   like the shooter.  *See* Prelim. Hrg. Tr. 21:20-22:3, 72:18-27, 133:23-135:2.  "Identifications

13   supplied by victims are generally sufficient to provide probable cause on their own[.]"  *Collins v.*

14   *County of Alameda*, 2024 WL 1192265, at *1 (9th Cir. Mar. 20, 2024).  However, that rule does

15   not apply where "the identification procedure was impermissibly suggestive and the witness did

16   not exhibit sufficient indicia of reliability."  *Id.*  "[P]laintiffs who can establish that an officer lied

17   or fabricated evidence [may] relitigate the issue of probable cause with the falsified evidence

18   removed from the equation or, in cases involving intentional concealment of exculpatory evidence,

19   with the undisclosed evidence added back into the equation."  *Trulove*, 2018 WL 1070899, at *8.

20   Under Rubalcava's version of events, Rodriguez and Millan initially told the police they could not

21   identify Rubalcava, and Gonzalez told Perez at the preliminary hearing that Rubalcava was not the

22   shooter.  Adding that evidence "back into the equation," thus calling in to question the witnesses'

23   in-court testimony, the Court finds that there is a material dispute of fact as to whether probable

24   cause existed to prosecute Rubalcava.

25       This case is distinguishable from *Collins*, cited by Defendants, in which the Ninth Circuit

26   concluded that even without the challenged witness identification, probable cause would have

27   been established by other evidence, including evidence the plaintiff matched the physical

28   description of the suspect and had rented a vehicle that matched the description of the vehicle used

1   in the shooting.  *See Collins*, 2024 WL 1192265, at *1.  Without the witness identifications in the

2   present case, there was no other evidence tying Rubalcava to the crime.

3                        **c.      Intent to Deprive of Constitutional Right**

4           Defendants argue that there is no evidence that Perez, Fonua, and Spillman caused the

5   prosecution with the intent to deprive Rubalcava or equal protection or another constitutional

6   right.  As discussed above, Rubalcava has submitted evidence that Perez, Fonua, and Spillman

7   fabricated witness identifications in their police reports, and failed to disclose that the witness

8   identifications they recorded as unequivocal actually were unreliable (if made at all).  Viewing the

9   evidence in the light most favorable to Rubalcava, a jury reasonably could infer that Perez, Fonua,

10  and Spillman falsified the police reports for the purpose of depriving Rubalcava of constitutional

11  rights guaranteed under the Fourteenth Amendment, including the due process right not to be

12  subjected to criminal charges on the basis of false evidence and the right to exculpatory evidence.

13                        **2.      Qualified Immunity**

14          Defendants argue that even if Rubalcava could establish that the officers' conduct

15  constituted malicious prosecution under § 1983, the officers are entitled to qualified immunity.

16  "Malicious prosecution, by itself, does not constitute a due process violation; to prevail [the

17  plaintiff] must show that the defendants prosecuted [him] with malice and without probable cause,

18  and that they did so for the purpose of denying [him] equal protection or another specific

19  constitutional right."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

20  Rubalcava has the burden to identify the constitutional right he claims the officers sought to

21  deprive him of, and to show that the right was clearly established at the time of the alleged

22  misconduct.

23          As discussed above, Rubalcava claims that Perez, Fonua, and Spillman caused him to be

24  maliciously prosecuted for the purpose of depriving him of rights guaranteed under the Fourteenth

25  Amendment, including the due process right not to be subjected to criminal charges on the basis of

26  false evidence and the right to exculpatory evidence.  Rubalcava directs the Court's attention to

27  *Devereaux*, establishing in 2001 that "there is a clearly established constitutional due process right

28  not to be subjected to criminal charges on the basis of false evidence that was deliberately

United States District Court
Northern District of California

1   fabricated by the government," *see Devereaux*, 263 F.3d at 1074-75; and to *Carrillo*, establishing

2   that it was clearly established by 1984 that criminal defendants are constitutionally entitled to

3   disclosure of evidence undermining the credibility of government witnesses, *see Carrillo*, 798

4   F.3d at 1226.  There is no dispute that it was clearly established by 1987 that a criminal defendant

5   may bring a malicious prosecution claim against police officers who wrongfully caused his

6   prosecution for the purpose of depriving him of a constitutional right.  *See Usher*, 828 F.3d at 562.

7     Based on these authorities, the Court finds that Perez, Fonua, and Spillman are not entitled

8   to qualified immunity with respect to the § 1983 claim for malicious prosecution.

9        **3.**  **Conclusion**

10     In conclusion, Defendants' motion for summary judgment on Claim 3 is GRANTED as to

11   Nieves and DENIED as to Perez, Fonua, and Spillman.

12     **D.**  **Claim 4 – § 1983 Claim for Conspiracy**

13     Claim 4, for Conspiracy, is asserted against Perez, Fonua, Spillman, and Nieves.

14     The elements of a § 1983 claim for conspiracy are:  "(1) the existence of an express or

15   implied agreement among the defendant officers to deprive [the plaintiff] of his constitutional

16   rights, and (2) an actual deprivation of those rights resulting from that agreement."  *Avalos v.*

17   *Baca*, 596 F.3d 583, 592 (9th Cir. 2010).  "Whether defendants were involved in an unlawful

18   conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a

19   possibility that the jury can infer from the circumstances (that the alleged conspirators) had a

20   meeting of the minds and thus reached a understanding to achieve the conspiracy's objectives."

21   *Mendocino Env't Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999) (internal

22   quotation marks and citation omitted).  "To be liable, each participant in the conspiracy need not

23   know the exact details of the plan, but each participant must at least share the common objective

24   of the conspiracy."  *Id*. at 1302 (internal quotation marks and citation omitted).

25     Defendants argue that Rubalcava cannot establish the existence of a conspiracy.  In

26   opposition, Rubalcava argues that there is sufficient evidence to proceed to trial on the conspiracy

27   claim.

28     Given the evidence that Perez, Fonua, and Spillman worked closely and in tandem to

1   fabricate witness identifications, the Court finds that a jury reasonably could infer that those

2   officers conspired to deprive him of the constitutional due process right not to be subjected to

3   criminal charges on the basis of false evidence that was deliberately fabricated by the government,

4   and the constitutional right to exculpatory evidence.  Accordingly, the motion for summary

5   judgment on Claim 4 is DENIED as to Perez, Fonua, and Spillman.

6         However, there is no evidence from which a reasonable jury could infer that Nieves was

7   part of the alleged conspiracy.  He came into the case later, his alleged constitutional violations

8   related to a report regarding gang activity that was separate from and different in nature from the

9   reports of the other officers.  Accordingly, the motion for summary judgment on Claim 4 is

10  GRANTED as to Nieves.

11        **E.      Claim 5 – Bane Act Claim**

12        Claim 5, under the Bane Act, is asserted against Perez, Fonua, Spillman, and Nieves.

13        Under the Bane Act, a plaintiff can seek damages "if a person or persons, whether or not

14  acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by

15  threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals

16  of rights secured by the Constitution or laws of the United States, or of the rights secured by the

17  Constitution or laws of this state."  Cal. Civ. Code § 52.1(b)-(c).  "The essence of a Bane Act

18  claim is that the defendant, by the specified improper means (i.e., threats, intimidation or

19  coercion), tried to or did prevent the plaintiff from doing something he or she had the right to do

20  under the law or to force the plaintiff to do something that he or she was not required to do under

21  the law."  *Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1125 (2016) (internal quotation

22  marks and citation omitted).

23        Bane Act claims are "limited to plaintiffs who themselves have been the subject of

24  violence or threats."  *Bay Area Rapid Transit Dist. v. Superior Ct.*, 38 Cal. App. 4th 141, 144

25  (1995).  Defendants point to an absence of evidence that any Defendant used violence or threats

26  against Rubalcava.  Because Rubalcava has the burden of proof at trial, Defendants may meet their

27  initial burden by pointing to an absence of evidence.  *See In re Oracle Corp. Sec. Litig.*, 627 F.3d

28  at 387.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The burden shifts to Rubalcava to come forward with evidence that he was subjected to

2  violence or threats.  He argues that his burden is satisfied with evidence that Defendants

3  deliberately fabricated evidence to cause a baseless seizure of his person, citing *Reese v. Cnty. of*

4  *Sacramento*, 888 F.3d 1030, 1043-45 (9th Cir. 2018).  In *Reese*, the plaintiff brought a Fourth

5  Amendment excessive force claim and a Bane Act claims arising from an incident in which he was

6  shot by a law enforcement officer.  *See id*. at 1035-36.  The issue before the Court was whether the

7  Bane Act claim required a showing of threats, intimidation or coercion in addition to the elements

8  required to prove the Fourth Amendment excessive force claim.  The Ninth Circuit held that on

9  the facts of *Reese*, the Bane Act did not require coercion independent from the Fourth Amendment

10  violation, and that a reasonable jury could find that the law enforcement officer had a specific

11  intent to violate the plaintiff's Fourth Amendment rights.  *Reese*, in which the plaintiff was shot,

12  does not hold or suggest that a plaintiff may proceed under the Bane Act where he himself has not

13  been the subject of violence or threats.  Accordingly, Rubalcava's reliance on *Reese* is misplaced.

14  The Court finds that Rubalcava has not presented evidence from which a reasonable trier of fact

15  could find in his favor on the Bane Act claim.

16    The motion for summary judgment on Claim 5 is GRANTED.

17    **F.      Claims 6 and 7 – Liability of the City**

18    Claim 6, brought under California Government Code § 815.2, and Claim 7, brought under

19  California Government Code § 825, seek to hold the City liable for its officers' alleged violation

20  of the Bane Act.  Because Defendants are entitled to summary judgment on the Bane Act claim, so

21  too are they entitled to summary judgment on the claims against the City.

22    The motion for summary judgment on Claims 6 and 7 is GRANTED.

23  //

24  //

25  //

26  //

27  //

28  //

**IV.   ORDER**

(1)   Defendants' motion for summary judgment is GRANTED IN PART

AND DENIED IN PART, as follows:

(a)   the motion is GRANTED on all claims against Defendants Avalos, Nieves, and the City of San Jose;

(b)   on Claim 1 (§ 1983 Claim for Fabrication of Evidence in violation of the Fourteenth Amendment), the motion is GRANTED as to Defendant Nieves and DENIED as to Defendants Perez, Fonua, and Spillman;

(c)   on Claim 2 (§ 1983 Claim for Withholding Evidence in violation of the Fourteenth Amendment), the motion is GRANTED as to Defendant Nieves and DENIED as to Defendants Perez, Fonua, and Spillman;

(d)   on Claim 3 (§ 1983 Claim for Malicious Prosecution in violation of the Fourth and Fourteenth Amendments), the motion is GRANTED as to Defendant Nieves and DENIED as to Defendants Perez, Fonua, and Spillman;

(e)   on Claim 4 (§ 1983 Claim for Conspiracy), the motion is GRANTED as to Defendant Nieves and DENIED as to as to Defendants Perez, Fonua, and Spillman;

(f)   on Claim 5 (Claim under the Bane Act, Cal. Civ. Code § 52.1), the motion is GRANTED in its entirety;

(g)   Claim 6 (Claim for Respondeat Superior and Vicarious Liability under Cal. Gov. Code § 815.2), the motion is GRANTED in its entirety; and

(h)   on Claim 7 (Claim for Employer Liability under Cal. Gov. Code § 825), the motion is GRANTED in its entirety.

(2)   This order terminates ECF 199.

Dated:  March 27, 2024

BETH LABSON FREEMAN
United States District Judge

39