UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LIONEL RUBALCAVA,<br><br>    Plaintiff,<br><br>v.<br><br>JOSEPH PEREZ, STEVEN SPILLMAN, and TOPUI FONUA,<br><br>    Defendants. | Case No. 20-cv-04191-BLF<br><br>**ORDER RE *DAUBERT* MOTIONS**<br><br>[Re: ECF 200, 201, 202, 203] |

Before the Court are six *Daubert* motions, three brought by Plaintiff Lionel Rubalcava and three brought by Defendants Joseph Perez, Steven Spillman, and Topui Fonua.[1] Defendants move to limit the testimony of Plaintiff's eyewitness expert, Jennifer Dysart, Ph.D.; to exclude the testimony of Plaintiff's cellular technology expert, Gerald Grant, Jr.; and to exclude the testimony of Plaintiff's gang expert, Patrick Lopez-Aguado, Ph.D. Plaintiff moves to limit the testimony of Defendants' eyewitness expert, John Wixted, Ph.D.; to exclude the testimony of Defendants' cellular technology rebuttal expert, Joseph Kennedy; and to exclude the testimony of Defendants' gang rebuttal expert, Lawrence Day.

Plaintiff's motions are GRANTED IN PART AND DENIED IN PART as to Dr. Wixted, GRANTED as to Mr. Kennedy, and GRANTED IN PART AND DENIED IN PART as to Mr. Day. Defendants' motions are GRANTED IN PART AND DENIED IN PART as to Dr. Dysart, DENIED as to Mr. Grant, and GRANTED IN PART AND DENIED IN PART as to Dr. Lopez-Aguado.

---

[1] Defendants Rafael Nieves, Ramon Avalos, and City of San Jose originally were movants as well, but they subsequently obtained summary judgment against Plaintiff.

## I. BACKGROUND

The facts of this case are well-known to the parties and are set forth here only as relevant to the pending *Daubert* motions.[2] This suit arises from the drive-by shooting of 19-year old Raymond Rodriguez and the investigation that followed. Rodriguez was shot in front of his home on Mastic Street in San Jose, California, shortly before 5:30 p.m. on Friday, April 5, 2002. Rodriguez survived the shooting but was partially paralyzed. Other witnesses to the shooting included Rodriguez's younger brother, Eric Millan, and Rodriguez's neighbor, David Gonzalez. San Jose Police Department ("SJPD") officers Topui Fonua and Steven Spillman initially led the investigation, but a few days later Detective Joe Perez of the SJPD Gang Investigations Unit took over as the lead investigator.

Police reports authored by Perez, Fonua, and Spillman state that Rodriguez, Millan, and Gonzalez identified Plaintiff as the shooter from photo arrays. Plaintiff was arrested on April 8, 2002. Plaintiff denied any involvement in the shooting, claiming that he left San Jose at about 5:00 p.m. on April 5, 2002 and drove to Hollister for a date with a woman named Stephanie. Plaintiff's alibi caused the police some concern, as it was not clear whether Plaintiff could have shot Rodriguez in San Jose at 5:30 p.m. and made it to Hollister for his date. However, Perez filed a felony complaint against Plaintiff on April 12, 2002, charging him with attempted murder and a gang enhancement.

At trial, the prosecutor focused largely on the eyewitness testimony of Rodriguez, Millan, and Gonzalez. Rodriguez and Millan testified that Plaintiff was the shooter. Gonzalez testified that Plaintiff was not the shooter, but Gonzalez was impeached with his prior statements that Plaintiff was, or looked like, the shooter. A critical issue at trial was whether Plaintiff could have shot Rodriguez at 5:30 p.m. in San Jose and driven to Hollister in time for his date. Evidence was presented regarding Rodriguez's location throughout the evening based on data from cell phone towers. Also important to the prosecution's case was an explanation why Plaintiff would have

---

[2] The Court's prior order addressing Defendants' motion for summary judgment provides a comprehensive recitation of the facts, from which this abbreviated version is drawn. *See* Order, ECF 264.

shot Rodriguez when both men were associated with Norteño street gangs.  The prosecutor presented evidence that the shooting could have been motivated by a feud between two Norteño gangs, West Side Mob and Varrio Horseshoe.  The jury found Plaintiff guilty of attempted murder and the charged gang enhancement.

After Plaintiff served seventeen years in prison, the superior court vacated his conviction and made an express finding that he was factually innocent.  Plaintiff filed the present suit in 2020, alleging that law enforcement officers fabricated their police reports regarding eyewitness identifications of him and engaged in other misconduct that caused him to be wrongfully prosecuted for the shooting of Rodriguez.  After issuance of various court orders, including an order granting in part and denying in part a defense motion for summary judgment, four civil rights claims remain for trial against Defendants Perez, Fonua, and Spillman.

Each side has offered expert opinions regarding eyewitness identifications, cellular technology, and gangs, and each side has filed motions to limit or exclude the testimony of the other's experts.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

The Supreme Court's cases addressing the admissibility of expert testimony make clear that the district court must play a gatekeeping role, ensuring that any expert opinion admitted is both relevant and reliable.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  However, so long as an expert's methodology is sound and the expert's opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury.  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

### III. DISCUSSION

As it did at the hearing, the Court first addresses the motions to limit the testimony of the eyewitness experts, Dr. Wixted and Dr. Dysart. Next, the Court addresses the motions to exclude the testimony of the cellular forensics experts, Mr. Grant and Mr. Kennedy. Finally, the Court addresses the motions to exclude the testimony of the gang experts, Dr. Lopez-Aguado and Mr. Day. Before turning to the parties' specific arguments regarding those experts, however, the Court makes two general observations.

First, as noted above the Court must ensure that any expert opinion admitted is both relevant and reliable. During oral argument on the *Daubert* motions, a question arose whether expert testimony going to Plaintiff's actual innocence of the underlying crime is relevant to the civil rights claims in this case. Plaintiff argued that evidence of his innocence is highly relevant to both liability and damages. Defendants argued that Plaintiff's guilt or innocence is irrelevant to his civil rights claims, and urged the Court not to allow a *de facto* retrial of the criminal case.

The Court subsequently had occasion to address the relevance of evidence going to Plaintiff's innocence when it ruled on the parties' motions in *limine*. *See* Order Re Motions *in Limine*, ECF 309. The Court determined that evidence of Plaintiff's innocence, including after-acquired evidence that was not available to Defendants at the time of the investigation, is relevant to both liability and damages in this case. *See id.* at 5-6. The Court reasoned that evidence of Plaintiff's innocence has a tendency to make it more probable that Defendants falsified their police reports as claimed by Plaintiff, and less probable that Defendants accurately reported three independent eyewitness identifications of Plaintiff as the shooter. *See id.* at 3. Consequently, the Court is satisfied that expert testimony going to the issue of Plaintiff's innocence satisfies the relevance requirement for expert opinion.

Second, the Court observes that even though most of the experts are qualified to offer opinions in their fields, substantial portions of those opinions are inadmissible as currently phrased in the expert reports. The opinions may be admissible if rephrased and elicited by proper questioning during the trial. Unfortunately, the Court can neither speculate as to what questions may be asked at trial nor make final evidentiary rulings regarding responses that may be given.

The Court offers the clearest guidance it can under the circumstances.

### A. Motions to Limit Testimony of Eyewitness Experts

Plaintiff's criminal case turned largely on eyewitness testimony. Rodriguez and Millan testified at the criminal trial that Plaintiff was the shooter. Gonzalez testified that Plaintiff was not the shooter, but was impeached with his prior statements to the contrary. All three witnesses now recant their prior identifications of Plaintiff and offer testimony regarding Defendants' alleged misconduct relating to the reported witness identifications. Both Plaintiff and Defendants have retained experts to assist the jury in evaluating the testimony of these and other eyewitnesses in this case. Plaintiff moves to limit the testimony of Defendants' eyewitness expert, Dr. Wixted, and Defendants move to limit the testimony of Plaintiff's eyewitness expert, Dr. Dysart.

#### 1. Dr. Wixted

Dr. Wixted has been retained by Defendants to offer expert opinions regarding eyewitness identification and memory. *See* Wixted Report, ECF 200-2. Plaintiff does not dispute Dr. Wixted's qualifications to offer opinions in these fields. However, Plaintiff argues that Dr. Wixted's opinions fall into two categories – admissible opinions regarding the science of eyewitness identification, and inadmissible opinions that certain eyewitness testimony has no value and must be disregarded. Defendants argue that all of Dr. Wixted's opinions are admissible.

The Court finds Dr. Wixted to be well-qualified to offer opinions in his fields of eyewitness identification and memory. Moreover, the Court finds that Dr. Wixted's opinions regarding the science of eyewitness identification, principles of memory, and memory contamination are admissible. Those opinions provide scientific knowledge that will help the jury understand the witness testimony and determine which witness testimony to credit. *See* Fed. R. Evid. 702. Numerous district courts have admitted expert testimony on eyewitness identification in civil rights cases arising out of a wrongful criminal conviction. *See, e.g., Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2021 WL 1930293, at *4-6 (S.D.N.Y. May 13, 2021); *Trulove v. D'Amico*, No. 16-CV-050 YGR, 2018 WL 1090248, at *4 (N.D. Cal. Feb. 27, 2018).

However, the Court agrees with Plaintiff that some of Dr. Wixted's opinions regarding specific eyewitness testimony in this case are problematic. Neither the Court nor Plaintiffs take

issue with Dr. Wixted's opinion that, if the good faith of both the eyewitnesses and the reporting officers is assumed, the eyewitnesses' initial identifications of Plaintiff constitute compelling evidence that he was the shooter. *See* Wixted Report at 16. Importantly, Dr. Wixted's report acknowledges that "whether or not the police record accurately reflects the initial identifications is in dispute." *Id*.

The difficulty is with other portions of Dr. Wixted's report in which he offers opinions as to which eyewitness testimony in this case is credible and which is not. For example, Dr. Wixted states that the police misconduct now reported by eyewitnesses "has little to no information value." *Id*. He also states that "delayed eyewitness accounts of police misconduct cannot reasonably be considered to provide any useful information." *Id*. at 17. Dr. Wixted's opinions that recent eyewitness accounts of 2002 events have no value, and cannot be considered, intrudes on the role of the jury. "[T]he Ninth Circuit has repeatedly emphasized that witness credibility is the sole province of the jury." *United States v. Chavez*, No. 15-CR-00285-LHK-1, 2021 WL 5810298, at *1 (N.D. Cal. Dec. 7, 2021) (collecting cases). The Court will exclude those opinions.

This ruling does not preclude Dr. Wixted from testifying regarding the science of memory and the effects of factors such as delay, so that the jury may apply those principles when making their own determinations whether to credit particular eyewitness testimony. The Court finds unpersuasive Plaintiff's argument that all testimony regarding memory is subject to exclusion because it is common knowledge that memories fade. While Plaintiff cites cases in which the testimony of memory experts was excluded, those cases are distinguishable from the present case. In *R.D. v. Shohola, Inc.*, No. 3:16-CV-01056, 2019 WL 6053223, at *11 (M.D. Pa. Nov. 15, 2019), the district court found that the memory expert's "report presents her opinions in a singularly equivocal and speculative fashion." In *United States v. Heine*, No. 3:15-CR-00238-SI-2, 2017 WL 5260784, at *3 (D. Or. Nov. 13, 2017), the proponent of the expert witness argued that "the proffered expert testimony will show the jury that memories are fallible and may deteriorate over time." The district court concluded that, "At this level of generality, this information is within the ken of the ordinary juror." *Id*. Dr. Wixted's testimony regarding the

science of memory is neither equivocal nor speculative, and it goes beyond the general premise that memories fade over time.

The cases cited by Plaintiff do not hold that expert testimony regarding the science of memory is always inadmissible. Other cases have held expressly that "there is no per se rule for or against the admissibility of expert testimony regarding memory. Instead, the court applies the *Daubert* analysis on a case-by-case basis." *United States v. Shiraishi*, No. CR 17-00582 JMS-RLP, 2019 WL 1386365, at *3 n.5 (D. Haw. Mar. 27, 2019). The Court finds that Dr. Wixted's testimony regarding the principles of memory and memory contamination will aid the jury in evaluating the conflicting witness testimony and satisfies the other requirements of Rule 702.

Accordingly, Plaintiff's motion to limit the testimony of Dr. Wixted is GRANTED IN PART as to his opinions that particular eyewitness testimony offered in this case has no value, and otherwise is DENIED.

### 2. Dr. Dysart

Dr. Dysart has been retained by Plaintiff to offer expert opinions regarding eyewitness identification. She authored an expert report as well as a rebuttal report directed to Dr. Wixted's opinions. *See* Dysart Report, ECF 226-4; Dysart Rebuttal Report, ECF 200-8. Defendants do not dispute Dr. Dysart's qualifications to offer testimony on the subject of eyewitness identification. However, Defendants contend that Dr. Dysart goes beyond the scope of her expertise by offering opinions that Defendants violated SJPD policies, and by offering rebuttal to Dr. Wixted's opinions on memory. Defendants also contend that Dr. Dysart usurps the jury's role to make credibility determinations by opining that is "extraordinarily unlikely" that three separate witnesses made immediate and positive identifications of Plaintiff from photo arrays as described by Defendants. Dysart Report at 6.

The Court finds that Dr. Dysart is well-qualified to offer testimony in the field of witness identification, including testimony regarding factors that may increase or decrease the reliability of witness identifications. As noted above, district courts frequently permit eyewitness experts to testify in civil rights cases involving an alleged wrongful conviction. *See, e.g., Rosario*, 2021 WL 1930293, at *4-6; *Trulove*, 2018 WL 1090248, at *4. Dr. Dysart's expertise provides an adequate

basis for her opinion regarding the likelihood of three separate eyewitnesses making an immediate, positive identification of Plaintiff as the shooter. Dr. Dysart describes the principles of the science of eyewitness identification and relevant empirical studies, and applies those principles and study results to form her opinion. *See* Dysart Report at 7-29. In one study referenced by Dr. Dysart, only 29% of witnesses were able to identify the perpetrator 40 minutes after viewing his face for 12 seconds – longer than any of the witnesses in this case had to view Rodriguez's shooter. *See id.* at 12.

The Court finds unpersuasive Defendants' argument that Dr. Dysart's opinion usurps the role of the jury to make credibility determinations. Unlike Defendants' expert, Dr. Wixted, who opines that certain eyewitness testimony should be disregarded as without value, Dr. Dysart opines that given the circumstances of the shooting, it is unlikely three witnesses would have made immediate and positive identifications of Plaintiff even if he had been the shooter. *See* Dysart Report at 6, 10-14. Dr. Dysart further opines that if Plaintiff's actual innocence is credited, the police account of three positive eyewitness identifications becomes even less likely. *See id.* at 6. Opinions regarding the likelihood of certain events do not usurp the role of the jury, and similar opinions offered by Dr. Dysart have been accepted by other district courts. *See, e.g., Rosario*, 2021 WL 1930293, at *5 (finding that Dr. Dysart's opinion that it was "highly unlikely" that three witnesses independently chose the plaintiff's photo was "an opinion based on Dysart's expertise in eyewitness identification and is precisely the kind of opinion that is not intuitive and may be helpful to the jury"); *Jones v. Cannizzaro*, 514 F. Supp. 3d 853, 864 (E.D. La. 2021) (finding admissible Dr. Dysart's opinion "there is a decreased likelihood of an accurate identification by the victims in this case, making it more probable that Plaintiff is innocent.").

The Court also finds that Dr. Dysart is qualified to offer rebuttal to Dr. Wixted's opinions that certain eyewitness testimony offered in this case cannot be credited, where such rebuttal consists of pointing to an absence of scientific support for Dr. Wixted's opinions. Based on the Court's ruling on Plaintiff's motion to limit Dr. Wixted's testimony, this issue may be moot. Plaintiff states that if the Court excludes Dr. Wixted's opinions that certain eyewitness testimony has no value, Plaintiff will not proffer Dr. Dysart's rebuttal opinions at trial.

8

The Court agrees with Defendants that Dr. Dysart is not qualified to testify that Defendants violated SJPD policies during witness identification procedures. Dr. Dysart does not have expertise in the field of law enforcement policies. Dr. Dysart argues that her "expertise in eyewitness identification procedures permits her to more easily understand and explain written policies." Pl.'s Opp. at 5, ECF 226. Dr. Dysart's ability to understand and explain police policies does not bring such policies within her "scientific, technical, or other specialized knowledge" as required to qualify as an expert under Rule 702.

Accordingly, Defendants' motion to limit the testimony of Dr. Dysart is GRANTED IN PART as to her opinions that SJPD policies were violated, and otherwise is DENIED.

### B. Motions to Exclude Testimony of Cellular Technology Experts

At Plaintiff's criminal trial, an important issue was whether Plaintiff could have shot Rodriguez at 5:30 p.m. in San Jose and driven to Hollister in time for his date with Stephanie. Cell phone records confirmed that Plaintiff was moving south toward Hollister that evening, but did not rule out the possibility that Plaintiff was still in San Jose at 5:30 p.m. in light of the testimony of Verizon employee Russell Bentson that the relevant cell phone towers had a range of 10 miles. Plaintiff has retained Mr. Grant, a cellular technology expert, who opines that the cell phone towers Plaintiff's phone connected to actually had a range of 2-5 miles. Plaintiff asserts that Mr. Grant's testimony would corroborate his alibi that he was on his way to Hollister at the time Rodriguez was shot. Defendants have retained Mr. Kennedy as a rebuttal expert in the field of cellular technology. Mr. Kennedy opines that the cell phone towers in question had a range of 21.75 miles. Defendants move to exclude the testimony of Mr. Grant, and Plaintiff moves to exclude the rebuttal testimony of Mr. Kennedy.

#### 1. Mr. Grant

Plaintiff's cellular technology expert, Mr. Grant, has training and certifications in the field of cell phone forensics, has lectured on the topic, and has worked in the cellular forensic investigation field for more than 25 years. *See* Grant Report, ECF 201-4. He has been qualified as an expert and testified in more than 55 cases. *See id.* at 1. Defendants do not dispute Mr. Grant's qualifications and the Court finds that he is qualified as an expert in cellular technology.

Mr. Grant opines that Plaintiff's cell phone can be traced to the coverage ranges of the cell towers it connected to on April 5, 2002, each of which Mr. Grant estimates had a range of 2-5 miles. *See* Grant Report at 6-18. Mr. Grant's opinion contradicts Mr. Bentson's testimony at Plaintiff's criminal trial that the relevant cell phone towers had a range of 10 miles, and supports Plaintiff's alibi that he was traveling to Hollister at the time of the shooting.

Defendants contend that Mr. Grant's testimony should be excluded on two grounds. First, Defendants argue that the testimony would not assist the jury in the present case, because Mr. Grant merely concludes that Plaintiff's alibi is consistent with his cell phone records, and Defendants do not dispute that conclusion. This arguments is wholly unpersuasive. Based on Mr. Bentson's testimony at Plaintiff's criminal trial, the prosecution argued that Plaintiff could have been as much as 10 miles away from any cell phone tower he connected to, and thus that it was possible Plaintiff committed the crime in San Jose at 5:30 p.m. despite his connection to cell phone towers on the route to Hollister. Mr. Grant now opines that Plaintiff had to be within 4-5 miles of any cell phone tower he connected to, which means he would have been farther from San Jose than suggested by Mr. Bentson's testimony. *See* Grant Report at 11.

Mr. Grant's evidence, which supports Plaintiff's alibi, goes to the issue of Plaintiff's actual innocence. As discussed above, evidence of Plaintiff's innocence has a tendency to make it more probable that Defendants falsified their police reports as claimed by Plaintiff, and less probable that Defendants accurately reported three independent eyewitness identifications of Plaintiff as the shooter. Mr. Grant's testimony therefore would assist the jury in the present case. *See Restivo v. Hessemann*, 846 F.3d 547, 559 (2d Cir. 2017) ("Plaintiffs were not required to prove their innocence to win on their claims at trial. However, the evidence of their innocence provides an important backdrop for their claims at trial."); *Parish v. City of Elkhart, Ind.*, 702 F.3d 997, 1003 (7th Cir. 2012) ("Because the district court's rulings improperly limited the introduction of evidence relating to Parish's innocence, and that evidence was critical to the damages issue, the award of damages cannot stand.").

Second, Defendants argue that Mr. Grant did not employ reliable methodology in determining the cell phone towers' ranges. Mr. Grant explained that he plotted the locations of the

10

cell towers that connected to Plaintiff's phone, and the locations of neighboring towers, onto a map and then used several data sources to estimate the working coverage radius of each tower. *See* Grant Report at 2-6. The data sources utilized by Mr. Grant include the single propagation map provided by Verizon Wireless; trial testimony of a Verizon Wireless engineer; configuration data for some of the cell towers, including the antenna tilt, height, and power; topography; and the relative concentration of cell towers across the area. *See id.* at 5-18; Grant Rebuttal Report at 2, ECF 201-9. The Court is satisfied by Mr. Grant's explanation that he was able to use these data sources, along with his expertise in the field, to reach a plausible estimate of the coverage range of the cell towers at issue. "Experts working in specialized, scientific, and uncertain fields regularly 'extrapolate from existing data,'" and are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022) (quotation marks and citation omitted).

Defendants' motion to exclude the testimony of Mr. Grant is DENIED.

### 2. Mr. Kennedy

Defendants' rebuttal cellular technology expert, Mr. Kennedy, is a computer scientist with experience in local and wide area communication networking and management. *See* Kennedy Rebuttal Report, ECF 201-5. His report does not suggest any educational background or work experience in the field of cellular networks. *See id.* at 1. Mr. Kennedy has been employed as a Senior Manager at Cherry Biometrics since 2015, working on the development of trade secret, data center, and data transmission hacker blocking. *See id.* He is a member of Cherry Biometrics' "expert witness group," and in that capacity he has been authorized to testify as an expert witness in cell tower technologies in 17 cases. *See id.* at 1-2. Mr. Kennedy opines that the cell phone towers Plaintiff's phone connected to on April 5, 2002 had a range of 21.75 miles. *See id.* at 3.

Plaintiff moves to exclude Mr. Kennedy's testimony on the ground that he is not qualified as an expert in the field of cellular technology. Plaintiff submits Mr. Kennedy's deposition testimony regarding his lack of any education or work experience in the area of cellular technology prior to his employment with Cherry Biometrics. *See* Kennedy Dep. 28:17-31:11, 40:3-12, ECF 21-6. Mr. Kennedy did not receive any meaningful training in cellular technology

11

when he joined Cherry Biometrics – he was trained primarily on how to read call detail records and how to present himself in the courtroom. *See id*. 43:7-17. Mr. Kennedy does not appear to have an understanding regarding the design and configuration of cellular networks. When asked at his deposition whether it is common to configure cell towers to have a limited coverage range that is smaller than the maximum capacity, he stated that he did not know. *See id*. 117:12-118:23. Mr. Kennedy disclaimed any knowledge regarding industry practice of avoiding areas where four or more cell tower coverage areas overlap, stating that he does not know "what they do to set up cellular networks. *Id*. 171:10-173:18.

Defendants argue that Mr. Kennedy is qualified to testify as an expert in cellular technology, touting his education and experience in fields *other* than cellular technology. Those fields include electrical technology, communications, digital communications, digital logic, microprocessors, electronics, telephone related software, and digital radio frequency. Defendants do not provide any factual or legal basis to conclude that Mr. Kennedy's experience in those fields translates to knowledge of cellular technology. The Court concludes that any expertise Mr. Kennedy may have in other fields does not qualify him to testify as an expert on cellular technology and cellular networks in this case, and the Court will grant Plaintiff's motion to exclude Mr. Kennedy on that basis. *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (affirming district court's exclusion of expert with degrees in chemistry on the ground that those degrees did not qualify him to testify regarding chemical byproducts of metal working industry).

Plaintiff argues that even if Mr. Kennedy were qualified as an expert in the field of cellular technology, his opinions in this case would be subject to exclusion because they are not based on reliable methodology. It appears that Mr. Kennedy, and his employer Cherry Biometrics, virtually always take the position that cell towers have a coverage range of 21.75 miles, regardless of construction, engineering, topography, or any other factors. This approach does not appear to be accepted in the scientific community; Plaintiff submits an article in the peer-reviewed journal IEEE Access criticizing the approach as flawed and lacking any basis in the relevant scientific or engineering practices. Kennedy himself admitted during his deposition that he has never seen or

12

heard of a cell phone connecting to a cell tower 21 miles away. *See* Kennedy Dep. 99:10-14. The Court concludes that Kennedy's testimony is subject to exclusion on the additional ground that his opinions are not grounded in reliable methodology.

Plaintiff's motion to exclude the testimony of Mr. Kennedy is GRANTED.

### C. Motions to Exclude Testimony of Gang Experts

At Plaintiff's criminal trial, the prosecution presented evidence to explain why Plaintiff would have shot Rodriguez despite the fact that both men were associated with Norteño street gangs. The prosecutor theorized that the "red-on-red" shooting could have been motivated by a feud between two Norteño street gangs operating in San Jose, West Side Mob and Varrio Horseshoe. The jury apparently accepted that theory, as it found Plaintiff guilty of the charged gang enhancement.

Plaintiff has retained Dr. Lopez-Aguado to testify regarding gang culture generally as well as the prosecution's theory that the shooting was motivated by a feud between West Side Mob and Varrio Horseshoe. Defendants have retained Mr. Day as a rebuttal expert on gang-related issues. Defendants move to exclude the testimony of Dr. Lopez-Aguado and Plaintiff moves to exclude the testimony of Mr. Day.

#### 1. Dr. Lopez-Aguado

Plaintiff's gang expert, Dr. Lopez- Aguado, is a sociologist who has spent the bulk of his career studying Latino gangs in California, gang labeling, and criminalized street culture. *See* Lopez-Aguado Report, ECF 202-5. He has shadowed, interviewed, and surveyed hundreds of former and active gang members. *See id.* at 1. Dr. Lopez-Aguado's research encompasses both Norteño and Sureño gang culture. *See id.*

Defendants contend that Dr. Lopez-Aguado's expertise does not qualify him to offer any relevant opinions in this case, and they ask that his testimony be excluded entirely. Defendants also object to two specific opinions offered by Dr. Lopez-Aguado: his conclusion that "the Rodriguez shooting was most likely committed by a Sureño gang member," Lopez-Aguado Report at 2; and his conclusion that "the shooting of Mr. Rodriguez was not driven by a rivalry between Westside Mob and Varrio Horseshoe, *id*.

In opposition, Plaintiff argues that Dr. Lopez-Aguado's extensive knowledge of Latino gangs in California qualifies him to testify regarding Norteño gang culture generally and to offer his opinions regarding the likelihood that the shooter was a Sureño and that the shooting was not motivated by a rivalry between two Norteño gangs.

The Court finds that Dr. Lopez-Aguado has specialized expertise regarding Latino gangs in California, including the Norteño and Sureño gangs, and that Dr. Lopez-Aguado's expertise could "help the trier of fact to understand the evidence" relating to gang activity in this case. In *United States v. Skates*, No. 15-CR-00285-LHK, 2019 WL 634649, at *9 (N.D. Cal. Feb. 14, 2019), the district court qualified a former gang member as a gang expert based on his personal communications with thousands of gang-influenced people and his familiarity with the structure and practices of Norteño street and prison gangs. While Dr. Lopez-Aguado was not himself in a gang, he has shadowed, interviewed, and surveyed hundreds of former and active gang members, and made a study of the structure and practices of Norteño gangs. Accordingly, the Court will deny Defendants' motion to exclude Dr. Lopez-Aguado as unqualified.

However, the Court finds that the two specific opinions objected to by Defendants are inadmissible. With respect to the opinion that Rodriguez was most likely shot by a Sureño, Dr. Lopez-Aguado has not established expertise in the field of police investigative work and thus has not established a basis for his opinion as to who did or did not shoot Rodriguez. At the hearing, Plaintiff argued that Dr. Lopez-Aguado could testify at trial that it is very rare for a dispute between two Norteño gangs to result in fatal violence, and that it is more common for such violence to result from a dispute between Norteño and Sureño. Plaintiffs contended that such testimony would undermine Defendants' conclusion that the shooting was committed by a Norteño. The Court agrees that such testimony would fall squarely within Dr. Lopez-Aguado's expertise and may well be admissible to give the jury context for evaluating the reasonableness of Defendants' conduct. However, Dr. Lopez-Aguado's knowledge regarding general patterns with respect to violence between Norteño gangs does not provide a basis for his conclusion that a Sureño likely shot Rodriguez.

Dr. Lopez-Aguado's opinion that Rodriguez's shooting was not motivated by a rivalry

14

between Westside Mob and Varrio Horseshoe is subject to exclusion for similar reasons. Because Dr. Lopez-Aguado lacks expertise in police or investigative work, he is not qualified to testify who shot Rodriguez or why. Plaintiff argued at the hearing that Dr. Lopez-Aguado could opine that, in his view, the police reports concluding that Rodriguez was shot as a result of a dispute between West Side Mob and Varrio Horseshoe are not supported by the evidence attached to the reports. The Court agrees that such an opinion might be admissible if grounded in Dr. Lopez-Aguado's expertise regarding gang culture. "An expert opinion is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 816 (9th Cir. 2014) (quotation marks and citation omitted). However, Dr. Lopez-Aguado's expertise regarding gang culture in general does not qualify him to testify that on the particular occasion at issue in this case, Rodriguez's shooting was not the result of a red-on-red rivalry.

Accordingly, Defendants' motion to exclude the testimony of Dr. Lopez-Aguado is GRANTED IN PART as to his opinions that Rodriguez was most likely shot by a Sureño gang member and that the shooting was not motivated by a rivalry between Westside Mob and Varrio Horseshoe, and is DENIED IN PART as to Defendants' request that Dr. Lopez-Aguado be excluded entirely for lack of expert qualifications.

### 2. Mr. Day

Defendants' gang rebuttal expert, Mr. Day, is a retired Sergeant with the SJPD. *See* Day Rebuttal Report, ECF 203-7. During his law enforcement career, Mr. Day became familiar with the Nuestra Familia Prison Gang. *See id.* at 1. He received more than 200 hours of formal training regarding criminal street gangs and prison gangs. Mr. Day has interviewed or interrogated more than 2,000 street gang and prison gang members or associates. *See id.* at 2. After entering the private sector, Mr. Day began teaching in the areas of criminal street gangs and prison gangs. *See id.* He offers general opinions regarding the conduct of Norteño and Sureño street gangs in the 1980s and 1990s, including turf wars between Norteño gangs. *See id.* at 3. He also offers opinions regarding more current Norteño on Norteño disputes, including a statement that "[t]here was in fact a dispute between Westside Mob and Varrio Horseshoe ('VHS') around

15

the time of the Rodriguez shooting in 2002." *See id.* at 4.  Mr. Day disputes Dr. Lopez-Aguado's opinion that such fear of Nuestra Familia's displeasure would deter such a conflict.  *See id.* at 7.  Finally, Mr. Day makes broad characterizations of gang members, stating for example that Norteño gang members "are naturally non-conformists who break the laws of society at will," and that a percentage of gang members "are simply sociopathic and psychopathic in actions and deeds."  *Id*. at 6-7.

Plaintiff contends that Mr. Day is unqualified to testify regarding any gang-related issues, and that his proffered opinions are inadmissible on other grounds as well.  For similar reasons that it has found Dr. Lopez-Aguado qualified as a gang expert, the Court also finds Mr. Day to be qualified.  He has extensive law enforcement experience working in the Gang Investigations Unit and other units where he interacted with street gang and prison gang members.  He has particular expertise regarding the Nuestra Familia prison gang, which Dr. Lopez-Aguado states has authority over Norteño street gangs.  "Law enforcement professionals are routinely qualified to offer expert testimony based on their training and experience." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022).  The Court is not persuaded that Mr. Day is unqualified simply because he was not selected to testify as a gang expert when he worked in the Gang Investigations Unit.  Accordingly, the Court will deny Plaintiff's motion to exclude Mr. Day's testimony in its entirety.

However, the Court agrees with Plaintiff that many of Mr. Day's opinions are inadmissible.  Most obviously, Mr. Day is not qualified to testify that a percentage of gang members suffer from mental health conditions, as he is not a mental health professional.  Mr. Day also may not testify that Plaintiff is guilty of shooting Rodriguez.  Perhaps the most relevant opinion offered by Mr. Day is that there was a territorial dispute between West Side Mob and Varrio Horseshoe at the time of the 2002 shooting.  However, Plaintiff presents Mr. Day's deposition testimony that that opinion and related opinions are based on five text messages he received from an unidentified informant.  *See* Day Dep. 111:3-118:3, 125:4-128:5, ECF 203-4.  Mr. Day deleted those text messages after being served with a subpoena seeking all documents upon which he based his opinions.  *See id.* 65:10-66:8, 128:21-130:4.

The Court will exclude all opinions based on the deleted text messages as a discovery

sanction under Federal Rule of Civil Procedure 37(c)(1), which provides that, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Defendants have not made a showing that Mr. Day's deletion of the text messages upon which he bases many of his opinions was substantially justified or harmless.  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[W]e give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1).").

In light of the forgoing, it is unclear what admissible testimony may be provided by Mr. Day at trial, beyond general background regarding Nuestra Familia and gang culture.  There may be other opinions that are within Mr. Day's expertise and that may be elicited by proper questioning.  What is clear is that Mr. Day may not testify as to any of his offensive characterizations of gang members in general, as to his opinion that Plaintiff is guilty, or as to any opinions grounded in the deleted text messages.

Plaintiff's motion to exclude the testimony of Mr. Day is GRANTED IN PART as to the type of opinions highlighted herein, but the motion is DENIED IN PART as to Plaintiff's request that Mr. Day be excluded for lack of expert qualifications.

//
//
//
//
//
//
//
//
//
//
//

**IV. ORDER**

    (1)    As set forth herein, Defendants' motions are:

        (a)    GRANTED IN PART AND DENIED IN PART as to Dr. Dysart;

        (b)    DENIED as to Mr. Grant; and

        (c)    GRANTED IN PART AND DENIED IN PART as to Dr. Lopez-Aguado.

    (2)    As set forth herein, Plaintiff's motions are:

        (a)    GRANTED IN PART AND DENIED IN PART as to Dr. Wixted;

        (b)    GRANTED as to Mr. Kennedy; and

        (c)    GRANTED IN PART AND DENIED IN PART as to Mr. Day.

    (3)    This order terminates ECF 200, 201, 202, and 203.

Dated: June 14, 2024

_____
BETH LABSON FREEMAN
United States District Judge